IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JILL DILLARD; JESSA SEEWALD;
JINGER VUOLO; and JOY DUGGAR                                        **PLAINTIFFS**

**V.**                              **CASE NO. 5:17-CV-5089**

CITY OF SPRINGDALE, ARKANSAS;
WASHINGTON COUNTY, ARKANSAS;
KATHY O'KELLEY, in her individual and
official capacities; ERNEST CATE, in his
individual and official capacities; RICK HOYT,
in his individual and official capacities;
STEVE ZEGA, in his official capacity;
BAUER PUBLISHING COMPANY, L.P.;
BAUER MAGAZINE, L.P.; BAUER MEDIA
GROUP, INC.; BAUER, INC.; HEINRICH BAUER
NORTH AMERICA, INC.; BAUER MEDIA GROUP
USA, LLC; and DOES 1–10, inclusive                                 **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are:

- The Motion to Dismiss (Doc. 21) and Brief in Support (Doc. 22) filed by Defendants
  City of Springdale ("the City"), Ernest Cate in his official and individual capacities,
  and Kathy O'Kelley in her official and individual capacities (collectively, "the
  Springdale Defendants"); the Response in Opposition (Doc. 32) filed by Plaintiffs
  Jill Dillard, Jessa Seewald, Jinger Vuolo, and Joy Duggar; and the Reply (Doc. 38)
  filed by the Springdale Defendants; and

- The Motion to Dismiss (Doc. 29) and Brief in Support (Doc. 30) filed by Defendants
  Washington County ("the County"), Rick Hoyt in his official and individual
  capacities, and Steve Zega in his official capacity (collectively, "the Washington

County Defendants"), and the Response in Opposition (Doc. 36) filed by the Plaintiffs.

For the reasons given below, both Motions are **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

The Plaintiffs, who are all sisters, filed this lawsuit on May 18, 2017. *See* Doc. 1, ¶ 2. In their Complaint, they allege that in December 2006, while they were all under the age of 16, they and their parents were interviewed during a police investigation ("the Investigation") involving allegations that they had been sexually assaulted by their brother, Josh Duggar. *See id.* The police investigators conducting the interviews promised all of them that their statements would remain confidential and not be publicized. *See id.* The contents of these interviews were documented in a Springdale Police Department official Offense Report, and in a Washington County Sheriff's Office official Incident Report. *See id.* Afterwards, the Washington County prosecutor's office filed a Family In Need of Services ("FINS") petition, pursuant to a request by the Springdale Police Department, but no charges were ever brought against Josh Duggar.

Nearly a decade later, while the Duggar family was starring in a national reality-television show, *see id.* at ¶¶ 51, 124, Defendants Bauer Publishing Company, L.P., Bauer Magazine, L.P., Bauer Media Group, Inc., Bauer, Inc., Heinrich Bauer North America, Inc., and Bauer Media Group USA, LLC (collectively, "the Bauer Defendants"), became aware of the aforementioned investigation, and on May 15, 2015, began submitting Freedom of Information Act ("FOIA") requests to the City and the County, seeking copies of the Offense Report and Incident Report (collectively, "the Reports")

2

along with any other documents relating to the Investigation, *see id.* at ¶ 4. The Bauer Defendants operate a web and print media tabloid publication called "In Touch Weekly," and on May 19, 2015, they caused an article to be published in it, naming Josh Duggar as the target of an "Underage Sex Probe," and promising more details to come in future articles. *See id.* at ¶ 51. The next day, the City released the Offense Report to In Touch Weekly, pursuant to the Bauer Defendants' FOIA request. *See id.* at ¶ 56. The day after that, the County did likewise with its Incident Report. *See id.* at ¶ 59. The individuals involved in the decision to release the Offense Report were Ms. O'Kelley (the Springdale Police Chief) and Mr. Cate (the City Attorney), *see id.* at ¶¶ 5, 56–57, and the individuals involved in the decision to release the Incident Report were Mr. Hoyt (an enforcement major at the Sheriff's office) and Mr. Zega (the County Attorney), *see id.* at ¶¶ 6, 59. In Touch Weekly published both Reports and many articles about them, *see id.* at ¶¶ 66, 72, 74, which were exposed to millions of people, *see id.* at ¶ 69. Both reports were redacted, but nevertheless contained enough unredacted information to permit readers to discover that the Plaintiffs were among Josh Duggar's victims. *See id.* at ¶¶ 58, 60.

The Plaintiffs have brought a variety of tort and constitutional claims against the Springdale Defendants, the Washington County Defendants, and the Bauer Defendants. All of the Defendants have filed Motions to Dismiss under Fed. R. Civ. P. 12(b)(6). However, this Order is concerned only with the Motions to Dismiss filed by the Springdale Defendants and the Washington County Defendants. Both of those Motions have been fully briefed, and on September 25, 2017, the Court heard oral argument on them. Accordingly, both of those Motions are ripe for decision and will be taken up below.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must accept all of the Complaint's factual allegations as true, and construe them in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

However, the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* In other words, while "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

## III. DISCUSSION

Before diving into the weeds of the issues raised in these Motions to Dismiss, some general observations will streamline the analysis that follows. First, there is no effective difference between a suit for damages against an employee of a public entity in her *official*

capacity and a suit for damages against the public entity itself. *See Monell v. Dept. of Social Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55, 694 (1978). As a consequence, there is no effective difference between a suit for damages against one employee of a particular public entity in her official capacity and a suit for damages against a different employee of the same public entity in his official capacity; all are effectively suits for damages against the same public entity. Thus, while the Court will find it useful at times to refer to "the City official-capacity Defendants" or "the County official-capacity Defendants," the reader should understand that for all practical purposes in this Order, these phrases are simply legalese for "the City" or "the County," respectively. On the other hand, when the Court refers to a particular person as an "*individual*-capacity Defendant," then the reader should understand that the Court is referring to claims for damages that are being made against that particular person's own pocketbook—not her employer's.

Second, there are many Defendants in this case. Some of them are private-sector entities, and others are either public-sector entities or employees of public-sector entities. All of the Defendants have filed motions to dismiss. But this particular Order is *only* concerned with the motions to dismiss that have been filed by the *public*-sector entities and employees of *public*-sector entities. One consequence of that focus is that the doctrine of sovereign immunity looms large in this Opinion.

Sovereign immunity is a doctrine that is older than this country. Traditionally, it amounted to the principle that one could not sue an emperor or king in his own courts. *See, e.g., Alden v. Maine*, 527 U.S. 706, 767 n.6 (1999) (Souter, J., dissenting); *Seminole Tribe of Florida. v. Florida*, 517 U.S. 44, 102–03 (1996) (Souter, J., dissenting). But it is

also enshrined in the Eleventh Amendment to the United States Constitution, which "immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action." *Hadley v. N. Ark. Cmty. Technical Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996). And as it has been adapted to our federal system, the doctrine has acquired a lot of subtleties and exceptions over the years. Some of those turn, for example, on whether a particular public-sector defendant is an official-capacity defendant or an individual-capacity defendant. Others turn on whether the particular claim at issue is being brought under federal or state law. Still others turn on whether an official-capacity defendant is a true arm of the state or merely an independent political subdivision. These nuances will be explored more fully below, but the Court mentions them now simply to provide context for what follows.

Finally, the Plaintiffs' claims can be conceived generally as falling into two categories: claims that their constitutional rights were violated, and claims that torts were committed. For convenience, the Court will discuss the Plaintiffs' constitutional claims first. Then the Court will turn to the Plaintiffs' tort claims.

## A. Constitutional Claims

The Plaintiffs claim that the Springdale and Washington County Defendants violated their Due Process rights under the Arkansas Constitution and under the Fourteenth Amendment to the United States Constitution, by disclosing the Reports and details of the Investigation to the Bauer Defendants. The Plaintiffs bring their federal constitutional claims under the Civil Rights Act of 1871, which authorizes lawsuits against persons who, under color of law, have deprived someone of her "rights, privileges, or

immunities secured by the Constitution and laws." *See* 42 U.S.C. § 1983. The State of Arkansas has a similar statute called the Arkansas Civil Rights Act of 1993 ("ACRA"), which authorizes lawsuits against persons who, under color of law, have deprived someone of her "rights, privileges, or immunities secured by the Arkansas Constitution."[1] *See* Ark. Code Ann. § 16-123-105(a).

The reader has likely noticed the remarkable similarity of the language quoted from these two statutes. This is not an accident. Indeed, the ACRA explicitly states that "[w]hen construing this section, a court may look for guidance to state and federal decisions interpreting the Civil Rights Act of 1871, as amended and codified in 42 U.S.C. § 1983," though it goes on to emphasize that such federal civil rights law is only "persuasive authority" rather than binding authority. *See id.* at § 16-123-105(c).

The Plaintiffs have brought both individual-capacity and official-capacity constitutional claims. As was mentioned earlier in this Opinion, there are different types of immunity analysis that pertain to these different capacities. Furthermore, there is Arkansas law regarding immunity from claims under the Arkansas Constitution, and federal law regarding immunity from claims under the federal Constitution. However, as

---

[1] The Springdale Defendants argue in a footnote that the Plaintiffs' claims under the Arkansas Constitution should be dismissed because the Arkansas Constitution does not itself provide for a cause of action and the Complaint never makes any explicit reference to the ACRA. As the Court has already mentioned, the purpose of pleading is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555). All of the Springdale and Washington County Defendants (and the Plaintiffs too) have thoroughly briefed the ACRA issues in this case, such that it is plain that no one has been prejudiced by that oversight in the Complaint. The Court is not going to go through the wasteful formality of dismissing Count 5 on a technicality, allowing the Plaintiffs to amend Count 5 so as to add the words "Arkansas Civil Rights Act," and then taking up all of the arguments about the ACRA on the second round of motions to dismiss that would inevitably ensue, when those arguments can just as well be reached now.

will be explained below, it turns out that with respect to claims under the Arkansas Constitution, the Arkansas Supreme Court has interpreted the Arkansas statutes governing immunity in an identical manner to how federal law governs immunity from claims under the federal Constitution—with respect to both individual-capacity claims, as well as official-capacity claims. Thus, for analytical ease, in this Section, the Court will first address the Plaintiffs' *individual*-capacity claims under both the Arkansas and United States Constitutions, simultaneously. Then, the Court will address the Plaintiffs' *official*-capacity claims under both constitutions, again simultaneously.

## 1. Individual-Capacity Constitutional Claims

When a government official is sued in her individual capacity for violating someone's *federal* constitutional rights under color of law, then under the federal doctrine of qualified immunity, that official is immune from claims for damages arising from the alleged violation unless both of the following prongs are satisfied: (1) "the facts that a plaintiff has alleged . . . make out a violation of a constitutional right"; and (2) "the right at issue was clearly established at the time of the defendant's alleged misconduct." *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). When courts perform this qualified-immunity analysis, it is often preferable to consider the "violation" prong before considering the "clearly established" prong, but it is not mandatory for them to do so. *See id.* at 236.

On the other hand, when government officials are sued in their individual capacities for violating someone's *Arkansas* constitutional rights under color of law, an Arkansas statute provides that such officials "are immune from liability and from suit, except to the extent that they may be covered by liability insurance, for damages for acts or omissions,

other than malicious acts or omissions, occurring within the course and scope of their employment." *See* Ark. Code Ann. § 19-10-305(a). But as the Eighth Circuit has observed, "the Arkansas Supreme Court has held that legal principles that govern questions of qualified immunity in federal § 1983 claims apply to claims brought under the [ACRA]." *Hudson v. Norris*, 227 F.3d 1047, 1054 (8th Cir. 2000) (citing *Robinson v. Langdon*, 333 Ark. 662 (1998) (applying Ark. Code Ann. § 19-10-305(a) to individual-capacity claims brought under the Arkansas Constitution through the ACRA)). In other words, the same two-pronged qualified immunity analysis applies to Plaintiffs' individual-capacity claims under the Arkansas Constitution as applies to their individual-capacity claims under the United States Constitution. And for purposes of this qualified immunity analysis, the contours of the Arkansas Constitution's Due Process protections must be presumed to be coextensive with those under the Fourteenth Amendment, since "[n]either party argues that the Arkansas Constitution provides a different level of protection . . . from that provided by federal law." *See id.*

The Court will start, then, with the first prong: whether the Plaintiffs have alleged adequate facts to make out a violation of a constitutional right. The right to *privacy* is the particular constitutional right that the Plaintiffs are claiming the Springdale and Washington County Defendants violated. *See* Doc. 1, ¶¶ 131, 137. The Eighth Circuit has explained that the privacy interest of confidentiality, which is the one at issue here, "concerns an individual's interest in avoiding disclosure of personal matters," and has held that to violate this particular constitutional right, "the information disclosed must be either a shocking degradation or an egregious humiliation of her to further some specific state interest, or a flagrant bre[a]ch of a pledge of confidentiality which was instrumental

9

in obtaining the personal information." *Alexander v. Peffer*, 993 F.2d 1348, 1350 (8th Cir. 1993). The Eighth Circuit has further explained that "[t]o determine whether a particular disclosure satisfies this exacting standard, we must examine the nature of the material opened to public view to assess whether the person had a legitimate expectation that the information would remain confidential while in the state's possession." *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996). This constitutional confidentiality protection "is limited and extends only to highly personal matters representing 'the most intimate aspects of human affairs,'" *id.* (quoting *Wade v. Goodwin*, 843 F.2d 1150, 1153 (8th Cir. 1988)), but "[w]hen the information is inherently private, it is entitled to protection," *id.*

The Plaintiffs have brought individual-capacity claims against three Defendants: Mr. Hoyt, Mr. Cate, and Ms. O'Kelley. The Complaint alleges that the individual-capacity Defendants disclosed the Reports and details of the Investigation to the Bauer Defendants. *See* Doc. 1, ¶¶ 48, 50, 56–57, 59. The Complaint alleges that these disclosures, although redacted to some extent, nevertheless contained unredacted information that permitted readers to easily infer that the Plaintiffs were among Josh Duggar's victims, and that readers in the general public did in fact make this correct inference.[2] *See id.* at ¶¶ 58, 60, 67–68. The Complaint alleges that until these disclosures were made, the identities of Josh Duggar's victims were not publicly available. *See id.* at ¶¶ 51, 58, 60, 66–67. The Complaint alleges that members of the Duggar

[2] The Defendants contend that this allegation is merely a conclusory opinion that the Court need not accept as true for purposes of these Motions to Dismiss, but that simply is not correct. The Plaintiffs pleaded specific examples of instances where members of the general public inferred the identities of Josh Duggar's victims from the unredacted portions of the disclosed materials. *See* Doc. 1, ¶¶ 67–68. The Defendants may disagree with the veracity of those specific allegations, but that is a concrete factual dispute—not a difference of opinion.

family were already figures of national interest at the time of the disclosures, due to a reality-television series about them. *See id.* at ¶¶ 51, 69, 124. And the Complaint alleges that the embarrassing disclosures were made to a media company going by the name of "In Touch Weekly," after that company had already published an article identifying Josh Duggar as the target in an "Underage Sex Probe" and promising to publish additional articles with more details on the topic. *See id.* at ¶¶ 10, 34, 46–52.

Accepting these allegations as true, and drawing all reasonable inferences from them in the Plaintiffs' favor (as the Court must do at this stage of this case), the Court finds that the Plaintiffs have alleged facts that make out a violation of their constitutional right to privacy. It is difficult to imagine a more "shocking degradation" or "egregious humiliation" than: (1) to endure the public disclosure of the fact that one was sexually molested by one's own brother as a child; (2) for that disclosure to immediately erupt into a nationwide scandal; and (3) for that disclosure to have been made under circumstances in which the national media feeding frenzy that ensued would have been entirely predictable to any reasonable person in the position to make the disclosure in the first place. And the facts alleged in the Complaint show that the Plaintiffs had "a legitimate expectation that the information would remain confidential while in the state's possession," given that: (1) at the time they shared the facts of their victimization with police investigators, they were assured that those facts would remain confidential,[3] *see*

---

[3] The Defendants argue that these assurances could not have been the basis for any "flagrant breach of a pledge of confidentiality which was instrumental in obtaining the personal information," because the City and the County are not who gave the assurances in the first place. Whatever the merits of that argument may be, the Court sees no need to reach it here. One method of violating someone's constitutional right to privacy is the "flagrant breach" method; another is the "shocking degradation or egregious humiliation" method. *See Alexander*, 993 F.2d at 1350. At a minimum, the Plaintiffs have pleaded

11

*id.* at ¶ 2; (2) at the time the individual-capacity Defendants made the FOIA disclosures to In Touch Weekly, an Arkansas statute explicitly stated that "[a]ny data, records, reports, or documents that are created, collected, or compiled by or on behalf of the Department of Human Services, the Department of Arkansas State Police, or other entity authorized under this chapter to perform investigations or provide services to children, individuals, or families shall not be subject to disclosure under the [FOIA],"[4] Ark. Code Ann. § 12-18-104(a); and (3) the individual-capacity Defendants did, in fact, redact at least some material pertaining to the Plaintiffs' identities, giving rise to the plausible inference that the individual-capacity Defendants *believed* the Plaintiffs had a legitimate expectation of confidentiality.

The Defendants cite *McNally v. Pulitzer Publishing Company* for the proposition that "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public" or "for giving publicity to facts about the

_____

sufficient facts to show that the latter occurred. And regardless of whether the assurances in question were ever "breached" by the party who gave them, when those assurances are viewed within the context of the language quoted above from Ark. Code Ann. § 12-18-104(a), they suffice to show that the Plaintiffs had a "legitimate expectation" of confidentiality.

[4] The Court is not implying here that there is some equivalence between a statutory violation and a constitutional violation. Nor is the Court even necessarily saying that this statute was or was not violated. Although these parties all seem eager for the Court to make a definitive ruling at this time on whether this statute was violated, the Court believes such a ruling would be unduly hasty at the pleading stage, given that none of these parties has presented the Court with any "before" or "after" versions of the disclosed materials. Right now, the Court can only go on what is pleaded in the Complaint. Taking those allegations as true, and drawing all reasonable inferences in the Plaintiffs' favor, the Court can only observe that the Plaintiffs have pleaded sufficient facts to support an inference that the existence of this statute, perhaps in combination with the assurances of confidentiality the Plaintiffs received, provided a basis for the Plaintiffs to have a "legitimate expectation" of confidentiality regarding the facts of their victimization by Josh Duggar, and for the Defendants to believe that the Plaintiffs had such an expectation.

12

plaintiff's life which are matters of public record." *See* 532 F.2d 69, 78 (8th Cir. 1976) (quoting Restatement (Second) of Torts § 652D, comment c (Tent. Draft No. 13, 1967)). They then point the finger at each other as having disclosed the worst information first, and at the Bauer Defendants as having beaten all of them to the punch. The Court would make several observations on this point.

First, regardless of whatever the Springdale and Washington County Defendants may contend the facts actually are, the Court must accept the facts pleaded in the Complaint as true, and view them in the light most favorable to the Plaintiffs. And under that standard, the Complaint alleges that the identities of Josh Duggar's victims were not in the public record before the FOIA disclosures were made. *See* Doc. 1, ¶¶ 51, 58, 60, 66–67. Thus, regardless of whether the victim-identifying information came first from a City employee or County employee, it was not merely "further publicity" about *Josh Duggar*, but rather it also contained facts about all of *these Plaintiffs*' lives which were *not* matters of public record.

Second, the federal rules permit alternative pleading, which is to say that plaintiffs are allowed to plead inconsistent claims. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). In other words, if a Complaint alleges facts that would support an inference that several Defendants committed a constitutional violation, it is no defense for each of them to point the finger at the other and say that liability of one precludes liability of the other.

The Complaint alleges that the City employees disclosed the Offense Report to In Touch Weekly and a local news organization late in the evening of May 20, 2015, *see* Doc. 1 at ¶¶ 56–57, and that the County employees disclosed the Incident Report on the very next day, May 21, *see id.* at ¶ 59. It also alleges that In Touch Weekly published the City's disclosures on May 21, *see id.* at ¶ 66—the same day on which the County made its disclosures—and that it published the County's disclosures on June 3, *see id.* at ¶ 74. It also alleges that on May 21, before In Touch Weekly published the City's disclosures, the following events occurred: City employees sent the Offense Report to the Arkansas Department of Human Services ("DHS") pursuant to DHS's request to review it, *see id.* at ¶ 64, and Ms. O'Kelley called In Touch Weekly's attorney and asked him to refrain from publishing the materials he had already received and to accept a different redacted version of the Offense Report, *see id.* at ¶ 65. Finally, the Complaint also alleges that the Offense Report and the Incident Report contained different identifying information about the Plaintiffs. *See id.* at ¶¶ 58, 60. From these facts, it is a plausible inference that the County's disclosures were made earlier in the day on May 21 than when In Touch Weekly published the Offense Report, and that in any event, the County's disclosures contained more identifying information about the Plaintiffs than would have otherwise been publicly available.

In sum, the Complaint alleges sufficient facts to state a claim against each individual-capacity Defendant, when those facts are viewed in the light most favorable to the Plaintiffs with respect to each such Defendant. The first prong of the qualified-immunity analysis being satisfied, then, the Court turns to the second prong: whether the constitutional right at issue here was clearly established at the time it was violated, such

that a reasonable official would have known she was violating that right. To that point, the Court would observe that in its discussion of whether the Plaintiffs alleged a constitutional violation, every single one of the cases and statutes that the Court cited predates the alleged violation. And although the Court would at least agree with the Defendants that there are no controlling cases with facts that are strongly analogous to the facts of this case, that is not what the "clearly established" prong of qualified immunity requires. The Eighth Circuit "has taken a broad view of what constitutes clearly established law for the purposes of a qualified immunity inquiry," explaining that in the case of *Hope v. Pelzer*, 536 U.S. 730 (2002), "the Supreme Court changed the clearly established law inquiry from a hunt for prior cases with precisely the same facts to asking whether the official had fair notice her conduct was unconstitutional." *Lindsey v. City of Orrick, Mo.*, 491 F.3d 892, 902 (8th Cir. 2007) (internal quotation marks omitted). As the Court has already observed above, taking the facts alleged in the Complaint as true, any reasonable person in the position to make these disclosures would have understood that these disclosures would be published, would cause a national scandal, would be a "shocking degradation" or "egregious humiliation" for the Plaintiffs, that the Plaintiffs had a "legitimate expectation" of confidentiality in these materials, and that disclosing these materials would therefore violate the Plaintiffs' constitutional right to privacy.

Therefore, the second prong of the qualified-immunity analysis is also satisfied here. Accordingly, the Court will deny the individual-capacity Defendants' Motions to Dismiss the Plaintiffs' constitutional claims against them.

This does not necessarily mean these Defendants will be unable to successfully assert the defense of qualified immunity at some later stage of this case, when a different

legal standard is at play. It is often the case that, through discovery, the parties to a case learn that the actual facts are different in some material respect from the facts that are alleged in a complaint. If these Defendants move for summary judgment at the close of discovery on the grounds of qualified immunity, on the basis of evidence that the Court has not been permitted to consider at this early stage of proceedings, then the Court will have an obligation to perform the qualified-immunity analysis again, but taking into account the newly-offered evidence. The Court cannot prejudge at this time what the result of that analysis would be. It can only say for now that the Plaintiffs have pleaded sufficient facts in their Complaint to set out a violation of their constitutional rights by the individual-capacity Defendants that was clearly established at the time the violation occurred. Now, having disposed of the issues surrounding the Plaintiffs' individual-capacity constitutional claims, the Court will turn to the Plaintiffs' official-capacity constitutional claims.

### 2. Official-Capacity Constitutional Claims

The United States Supreme Court has held that although the Eleventh Amendment protects unconsenting states from liability for damages in federal courts, it does not provide such protection to counties or cities. *See Lincoln Cnty. v. Luning*, 133 U.S. 529, 530–31 (1890). The United States Supreme Court has further held 42 U.S.C. § 1983 authorizes suits for damages against official-capacity county or city defendants for deprivations of federal constitutional rights—but only when that deprivation was inflicted by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 & nn.54–55, 694 (1978).

Additionally, it has held that "'inadequate training' . . . could be the basis for § 1983 liability in 'limited circumstances.'" *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989)).

There is an Arkansas statute that declares generally "that all counties, [and] municipal corporations, . . . shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance," and that "[n]o tort action shall lie against any such political subdivision because of the acts of its agents and employees." *See* Ark. Code Ann. § 21-9-301. However, when applying this immunity statute to claims brought under the Arkansas Constitution through the ACRA, the Arkansas Supreme Court has simply imported from federal law the same "policy or custom" and "failure to train" standards articulated in cases like *Monell* and *Bryan County*, pursuant to the ACRA's invitation for it to do so. *See Gentry v. Robinson*, 2009 Ark. 634, at *6–*8, *12–*13, *21. Thus, and just as was the case with respect to the Plaintiffs' individual-capacity constitutional claims, the Court's immunity analysis for the Plaintiffs' official-capacity constitutional claims will be the same regardless of whether the claims are brought under the United States Constitution or the Arkansas Constitution.

The Eighth Circuit has summarized the *Monell* line of cases as follows: "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). The Complaint does not allege that these isolated disclosures by the City and County were part of "a pattern of unconstitutional acts committed by [their employees]," so it has failed to state an official-capacity failure-to-train claim. *See id.*

(quoting *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010)). Similarly, it has failed to state an official-capacity unofficial-custom claim, because, again, there is nothing in the Complaint to indicate that these disclosures were anything other than isolated incidents for the City and County, rather than part of "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Thelma D. By and Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 932–33 (8th Cir. 1991).

As for whether the constitutional violations resulted from an official municipal policy, the Complaint does not specifically identify any such policy. It certainly makes no mention of a *written* official policy. But in their briefing in opposition to the Motions to Dismiss, the Plaintiffs point out that a constitutional violation can result from an unwritten official policy if the violation was committed or ratified by a person who has "final policymaking authority" for the municipality in question. *See Atkinson*, 709 F.3d at 1214–15.

This Court must "consult two key sources to determine whether" a particular individual was "a final policymaker: (1) state and local positive law[;] and (2) state and local custom or usage having the force of law." *See id.* at 1215 (internal quotation marks omitted). Here, the Plaintiffs contend that Mr. Cate and Mr. Zega, in their capacities as City Attorney and County Attorney, respectively, held such final policymaking authority. But the only positive law Plaintiffs cite in support of this contention simply states that Mr. Cate must "advise" on "legal questions," *see* Springdale Code § 2-86, and "confer" with department heads on FOIA requests, *see* Springdale Personnel & Procedures Manual, § 3.7, and that Mr. Zega, similarly, must "furnish written opinions upon subjects of a legal

nature" and provide "legal advice" to "authorities of the County," *see* Washington County
Ordinances § 2-174(2), (3). Plainly, these are not the duties of individuals with "final
policymaking authority"; they are the duties of individuals who *advise* other individuals
that *do* have policymaking authority. And just as the Complaint fails to plead any facts
showing a pattern of unconstitutional activity, it likewise fails to plead any facts showing
a pattern of Messrs. Cate and Zega exercising *de facto* final policymaking authority in the
absence of positive legal authority for them to do so.

In other words, the Plaintiffs have failed to plead facts showing a viable claim
against the official-capacity Defendants for a constitutional violation. Therefore, the
Plaintiffs' constitutional claims for damages against the official-capacity Defendants will
be dismissed without prejudice. Having disposed of all issues pertaining to the Plaintiffs'
constitutional claims, the Court will now turn to the Plaintiffs' common-law tort claims.

### B. Tort Claims

The Plaintiffs have brought three tort claims against various of these public-entity
and public-employee Defendants. Specifically, the Plaintiffs have alleged the tort of
Invasion of Privacy—Public Disclosure of Private Fact against the Springdale Defendants
and the Washington County Defendants, the tort of Invasion of Privacy—Intrusion upon
Seclusion against the Springdale Defendants and Mr. Hoyt in his individual and official
capacities, and the tort of Outrage against the Springdale Defendants and Mr. Hoyt in his
individual and official capacities.

The reader might recall from Section III.A.2 of this Opinion that Ark. Code Ann.
§ 21-9-301 states "that all counties, [and] municipal corporations, . . . shall be immune
from liability and from suit for damages except to the extent that they may be covered by

liability insurance," and that "[n]o tort action shall lie against any such political subdivision because of the acts of its agents and employees." The Defendants argue that the plain text of this statute immunizes them from the Plaintiffs' tort claims. In a vacuum, the Defendants might have a good argument. But interpretations of Arkansas law by the Arkansas Supreme Court are binding on this Court, see *Curtis Lumber Co., Inc. v. La. Pac. Corp.*, 618 F.3d 762, 771 (8th Cir. 2010), and the Arkansas Supreme Court has expressly foreclosed this argument. Specifically, in the case of *Deitsch v. Tillery*, 309 Ark. 401 (1992), the Arkansas Supreme Court observed that the appellants in that case "argue that immunity from tort liability under Ark. Code Ann. § 21-9-301 (1987 and Supp. 1991), which provides that '[no] tort action shall lie against [school districts] because of the acts of their agents and employees,' would not extend to intentional acts," *id.* at 405 (alterations in original), and then it went on to state, in terms that could not have been more clear: "Appellants are correct that Section 21-9-301 does not provide immunity for the intentional acts of school districts and their employees, only their negligent acts," *id.* at 407. And the Arkansas Supreme Court has explicitly affirmed as recently as 2016 that it "has consistently held that section 21-9-301 provides city employees with immunity from civil liability for negligent acts, but not for intentional acts," and explicitly declined to revisit that rule. See *Trammell v. Wright*, 2016 Ark. 147, at *5.

All three of the torts that the Plaintiffs allege are intentional torts, which is to say that each of those three torts requires intentional acts as a necessary element. So for each of these torts, if the Plaintiffs have pleaded sufficient facts to show the commission of the tort by a particular Defendant, then Ark. Code Ann. § 21-9-301 does not apply. And if, for any of these torts, the Plaintiffs have failed to allege sufficient facts to show the

commission of that tort, then the claim must be dismissed under Fed. R. Civ. P. 12(b)(6) regardless of what Ark. Code Ann. § 21-9-301 has to say about anything. In other words, the immunity statute at § 21-9-301 simply has no relevance to this Court's analysis of the tort claims in this case, and the Court will not discuss it any further in this Opinion. However, since the Defendants have also argued that even in the absence of immunity the Plaintiffs have failed to state a claim for any of these torts, the Court will proceed to examine the sufficiency of the Plaintiffs' pleadings as to each such tort, beginning with Invasion of Privacy—Public Disclosure of Private Fact, then turning to Invasion of Privacy—Intrusion upon Seclusion, and then finally taking up Outrage.

### 1. Invasion of Privacy—Public Disclosure of Private Fact

None of the parties have cited this Court to any Arkansas cases that clearly set out the elements of the tort of Invasion of Privacy—Public Disclosure of Private Fact, and this Court has so far been unable to find any such cases from its own independent research. However, the Court is confident that this tort is actionable in Arkansas courts. For one thing, in 1979 the Arkansas Supreme Court adopted the Restatement (Second) of Torts's characterization of the general tort for invasion of privacy as being actionable under four different circumstances, of which "unreasonable publicity given to the other's private life" is one. See *Dodrill v. Ark. Democrat Co.*, 265 Ark. 628, 637 (1979). For another thing, the Arkansas Model Jury Instructions ("AMI Civil") contains a set of model instructions for this same tort. See AMI Civil § 422. Unfortunately, the elements set out in AMI Civil § 422[5] are not identical to the elements set out in Restatement (Second) of Torts

---

[5] (1) the plaintiff sustained damages; (2) the defendant made a public disclosure of a fact about the plaintiff; (3) before this disclosure, the fact was not known to the public; (4) a reasonable person would find disclosure of the fact highly offensive; (5) the defendant

21

§ 652D—Publicity Given to Private Life,[6] though in substance they are quite similar.  The

Court sees no need to formally adopt either (or some other construction) as the law of the

case at this time, since we are still only at the pleading stage and the question here is

whether the Plaintiffs have pleaded sufficient facts to permit a reasonable inference that

this tort occurred.  The Court finds that they have, for the same reasons that those same

facts permit a reasonable inference that their constitutional right to privacy was violated.

The Court will not rehash that discussion here, but would simply reference the reader

back to that portion of Section III.A.1 in this Opinion which contains it.

### 2. Invasion of Privacy—Intrusion upon Seclusion

Turning to Invasion of Privacy—Intrusion upon Seclusion: the Court is much less

in the dark here.  The Arkansas Court of Appeals has definitively stated that "[t]o prove

intrusion upon seclusion, a plaintiff must establish the following elements:"

> First, that he sustained damages;
>
> Second, that the defendant intentionally intruded physically or otherwise
> upon plaintiff's solitude or seclusion and believed or was substantially
> certain that he lacked the necessary legal authority or personal permission,
> invitation, or valid consent to commit the intrusive act;
>
> Third, that the intrusion was of a kind that would be highly offensive to a
> reasonable person, as the result of conduct to which a reasonable person
> would strongly object;
>
> Fourth, that the plaintiff conducted himself in a manner consistent with an
> actual expectation of privacy; and

---

knew or should have known that the disclosed fact was private; (6) the fact was not of
legitimate public concern; and (7) the public disclosure of the fact proximately caused the
plaintiff's damages.

[6] "One who gives publicity to a matter concerning the private life of another is subject to
liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a)
would be highly offensive to a reasonable person, and (b) is not of legitimate concern to
the public."

Fifth, that the defendant's intrusion was the proximate cause of the plaintiff's damages.

*Coombs v. J.B. Hunt Transport, Inc.*, 2012 Ark. App. 24, at \*4–\*5 (citing AMI Civil § 420).

The Washington County Defendants contend that the Plaintiffs have failed to allege either "seclusion" (since it is clear from the Complaint that the Plaintiffs were already nationally famous for other reasons) or an "intrusion" thereupon by the Washington County Defendants (since, the argument goes, the Washington County Defendants did not themselves invade the Plaintiffs' privacy but rather simply mailed documents to third parties). Both of these arguments are unpersuasive.

*Coombs* is instructive. In that case, the plaintiff (Coombs) passed out drunk in a hotel room that he shared with a co-occupant, who then invited other coworkers of theirs in to mock, deface, and photograph the plaintiff. *See id.* at \*2–\*3. Coombs had no memory of these events, but learned of them later. *Id.* at \*3. The Court of Appeals, in holding that Coombs had presented sufficient evidence to avoid summary judgment, stated: "Coombs clearly shared a room with a co-occupant, who had the right to enter the room and invite guests, but this does not end the inquiry. . . . [P]rotection is afforded not just for the physical realm but for a person's emotional sanctum and to safeguard the notions of civility and personal dignity." *Id.* at \*5. The Court then went on to approvingly quote the California Supreme Court for the propositions that "privacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic," that "[t]here are degrees and nuances to societal recognition of our expectations of privacy," and that "the seclusion referred to need not be absolute." *Id.* at \*5–\*6 (quoting *Sanders v. Am. Broad. Cos., Inc.*, 978 P.2d 67, 72 (Cal. 1999)). Or to put it differently, sharing highly embarrassing

information about someone with others who already knew (or knew of) the person but who did not know those embarrassing facts about the person can indeed constitute "intrusion" upon "seclusion."

The Springdale Defendants, on the other hand, contend that the Complaint does not allege that they "believed or [were] substantially certain that [they] lacked the necessary legal authority or personal permission" to release the Offense Report. The Court disagrees. There is no plausible reading of the Complaint that would permit an inference that any of the Defendants believed they had the Plaintiffs' "personal permission" to make these FOIA disclosures. As for their beliefs as to their legal authority, the Springdale Defendants argue that the facts in the Complaint permit an inference that they believed they were required to make these FOIA disclosures. The Court agrees that this is one plausible inference from the facts in the Complaint. But the Complaint also permits the reasonable inference that they believed they lacked the legal authority to make these FOIA disclosures, given that—as previously noted—Arkansas law already plainly stated at the time that "[a]ny data, records, reports, or documents that are created, collected, or compiled by or on behalf of the Department of Human Services, the Department of Arkansas State Police, or other entity authorized under this chapter to perform investigations or provide services to children, individuals, or families shall not be subject to disclosure under the [FOIA]."[7] Ark. Code Ann. § 12-18-104(a). And the facts in the Complaint must be viewed in the light most favorable to the Plaintiffs. *Cf. Fletcher*

---

[7] Once again, the Court would emphasize that it is not ruling here that the disclosures did or did not violate Ark. Code Ann. § 12-18-104(a). Rather, it is simply saying that it is reasonable to infer from the facts in the Complaint that the Springdale Defendants were aware of this statute and that they believed it applied to the materials they disclosed.

v. *Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 876 & n.3 (2000) (holding that a jury could reasonably discredit the testimony of an employee who claimed that she believed that she had legal authority or permission to obtain confidential medical information about a former employee by using a medical release form that the other employee had filled out for a different purpose, and noting the absence of "any Arkansas authority to support this remarkably broad proposition").

### 3. Outrage

The Court turns finally to the tort of outrage which has the following four elements:

(1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Rees v. Smith*, 2009 Ark. 169, at *5. The Springdale Defendants argue that the Plaintiffs failed to allege that the Springdale Defendants "should have known that emotional distress was the likely result of [Josh Duggar's] conduct." The Court disagrees; as it has previously stated, when reading the Complaint in the light most favorable to the Plaintiffs, the disclosures were "made under circumstances in which the national media feeding frenzy that ensued would have been entirely predictable to any reasonable person in the position to make the disclosure in the first place." *Supra*, p. 11.

All Defendants also argue that their conduct here was not so "extreme and outrageous" as to be "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." The Court is certainly aware of and sensitive to the fact that "[t]he test for outrage is an extremely narrow test that is committed by the most heinous

25

conduct." *Forrest City Mach. Works, Inc. v. Mosbacher*, 312 Ark. 578, 585 (1993). But "extremely narrow" does not mean "impossible." When evaluating the egregiousness of the conduct at issue, the Court must be "[m]indful of the importance in which our society and the . . . law has held" the interest of which that conduct has run afoul. *See Travelers Ins. Co. v. Smith*, 338 Ark. 81, 92 (1999). Our society places the utmost importance on the protection of minor victims of sexual assault. Individuals who are convicted in this Court of committing sex crimes against minors consistently receive sentences that are among the harshest that this Court imposes on individuals who appear before it—and that is often the case even after varying downward from the sentencing range that is recommended by the United States Sentencing Guidelines for the offense of conviction. Furthermore, it seems likely to the Court that protecting the identities of such minor victims is one of the primary purposes of the FOIA exemption at Ark. Code Ann. § 12-18-104(a) that has already been mentioned several times in this Opinion.

The Court will remain mindful, as this case proceeds, of the high bar that must be cleared to prevail on a claim of outrage. But the Court believes that the Plaintiffs have pleaded sufficient facts to get past the pleading stage on this claim. Going forward, the devil will be in the details revealed by the discovery process.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that the Springdale Defendants' Motion to Dismiss (Doc. 21) and the Washington County Defendants' Motion to Dismiss (Doc. 29) are both **GRANTED IN PART AND DENIED IN PART** as follows:

- Count 7 of the Complaint (Doc. 7) is **DISMISSED WITHOUT PREJUDICE**.

- With respect to any claims for damages that Counts 5 and 6 of the Complaint may attempt to bring against Defendants City of Springdale, Washington County, or any of their employees in their *official* capacity, those particular claims for damages in Counts 5 and 6 are also **DISMISSED WITHOUT PREJUDICE**.

- In all other respects, the Motions are **DENIED**.

   **IT IS SO ORDERED** on this ___29th___ day of September, 2017.

   _____
   TIMOTHY L. BROOKS
   UNITED STATES DISTRICT JUDGE