# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

June 15, 2020

Mr. Thomas N. Kieklak
HARRINGTON & MILLER
Suite 102
4710 S. Thompson
Springdale, AR  72764

Mr. Jason E Owens
JASON OWENS LAW FIRM
Suite 204
1023 Main Street
Conway, AR  72032

RE:  17-3284  Jill Dillard, et al v. Rick Hoyt
17-3287  Jill Dillard, et al v. Kathy O'Kelley, et al

Dear Counsel:

The court has issued an opinion in these cases. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc must be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

Michael E. Gans
Clerk of Court

AMT

Enclosure(s)

cc:   Mr. Steven E. Bledsoe
Mr. Shawn Bradley Daniels
Mr. Robert Justin Eichmann

Mr. Steven A Haskins
Ms. Sarah Coppola Jewell
Ms. Susan Keller Kendall
Mr. Stephen G. Larson
Mr. Michael R. Rainwater
Ms. Lauren S. Wulfe
Mr. Douglas F. Young

District Court/Agency Case Number(s):   5:17-cv-05089-TLB

# United States Court of Appeals
## *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
## St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

June 15, 2020

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

      RE:  17-3284  Jill Dillard, et al v. Rick Hoyt
           17-3287  Jill Dillard, et al v. Kathy O'Kelley, et al

Dear Sirs:

     A published opinion was filed today in the above cases which was argued before the En Banc Court on January 14, 2020.

     Counsel who presented argument on behalf of the appellant Rick Hoyt was  Jason E Owens, of Conway, AR. The following attorney also appeared on the brief;  Michael R. Rainwater, of Little Rock, AR.

     Counsel who presented argument on behalf of the appellants Kathy O'Kelley and Ernest Cate was Thomas N. Kieklak, of Springdale, AR. The following attorneys also appeared on the brief; Susan Kendall, of Rogers, AR., and Robert Justin Eichmann, of Springdale, AR.

     Counsel who presented argument on behalf of the appellees was Stephen G. Larson, of Los Angeles, CA. The following attorneys appeared on the appellee brief;  Steven A Haskins, of Ontario, CA.,  Robert Charles O'Brien, Jr., of Los Angeles, CA, Steven E. Bledsoe, of Los Angeles, CA.

     The judge who heard the case in the district court was Honorable Timothy L. Brooks. The judgment of the district court was entered on September 29, 2017.

     If you have any questions concerning this case, please call this office.

                        Michael E. Gans
                        Clerk of Court

AMT

Enclosure(s)

cc:  MO Lawyers Weekly

      District Court/Agency Case Number(s):   5:17-cv-05089-TLB

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-3284
No. 17-3287

_____

Jill Dillard; Jessa Seewald; Jinger Vuolo; Joy Duggar

*Plaintiffs - Appellees*

v.

Kathy O'Kelley; Ernest Cate;
Rick Hoyt, in their individual and official capacities

*Defendants - Appellants*

_____

Appeals from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: January 14, 2020
Filed: June 15, 2020

_____

Before SMITH, Chief Judge, LOKEN, COLLOTON, GRUENDER, BENTON, KELLY, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, *En Banc*.

_____

LOKEN, Circuit Judge, with whom COLLOTON, GRUENDER, BENTON, ERICKSON, STRAS, and KOBES, Circuit Judges, join.

Jill Dillard, Jessa Seewald, Jinger Vuolo, and Joy Duggar ("Plaintiffs") rose to prominence as members of the cast of "19 Kids and Counting," a television show about Jim Bob Duggar, his wife Michelle, and their nineteen children in Washington

County, Arkansas.  In 2015, the City of Springdale Police Department ("SPD") and the Washington County Sheriff's Office ("WCSO"), responding to a tabloid's request under the Arkansas Freedom of Information Act ("FOIA"), Ark. Code § 25-19-101 *et seq.*, released redacted copies of reports of a 2006 investigation into sexual misconduct by the Duggars' oldest child, Josh Duggar, which included interviews of Plaintiffs, who were minors at the time.  Despite redactions, social media users identified Plaintiffs as the victims of Josh's reported sexual abuse.  The resulting negative publicity brought about the show's demise, and then, this lawsuit.

Plaintiffs sued the City, the County, and several of their employees, asserting claims under 42 U.S.C. § 1983 and the Arkansas Civil Rights Act, along with state law tort claims for the tort of outrage and invasion of privacy.  As relevant here, Plaintiffs alleged that Springdale Police Chief Kathy O'Kelley, Springdale City Attorney Ernest Cate, and WCSO Enforcement Major Rick Hoyt ("individual defendants" or "Defendants") violated Plaintiffs' Fourteenth Amendment rights to informational privacy by disclosing the redacted reports to the media.  The district court denied the individual defendants' motions to dismiss the § 1983 claims based on qualified immunity and the state law claims based on official immunity under Ark. Code § 21-9-301.[1]  Defendants appealed; a panel of this court affirmed.  We granted Defendants' petition for rehearing *en banc* of the panel's qualified immunity ruling. Reviewing *de novo*, we conclude that the asserted due process right to informational privacy was not clearly established and therefore reverse the denial of qualified immunity.  Lyons v. Vaught, 781 F.3d 958, 960 (8th Cir. 2015) (jurisdiction and standard of review).  We otherwise reinstate the panel opinion.

---

[1]The district court dismissed official capacity claims against the individual defendants, claims against the City and County, and, in a separate Order, all claims against the tabloid's publishers.

# I.  Factual Allegations

Plaintiffs' Complaint alleges that on December 7, 2006, the Arkansas State Police ("ASP") Child Abuse Hotline received an anonymous tip that Josh Duggar had molested his younger sisters Jill, Jessa, Jinger, and Joy, along with another unnamed individual, at various times in 2002 and 2003.  SPD opened an investigation and requested an "agency assist" from WCSO.  An ASP investigator questioned Plaintiffs about the assaults; they were promised their answers would remain confidential.  A WCSO detective interviewed Jim Bob and Michelle Duggar, who acknowledged the allegations and identified the victims, location, and frequency of Josh's sexual misconduct.  WCSO documented the Duggar interview in an Incident Report; SPD summarized both the Duggar and sibling interviews in an Offense Report.  Based on the interviews, SPD submitted an affidavit to the Washington County Family in Need of Services Division and the Washington County Prosecutor's Office.  No criminal charges were filed, nor were the allegations made public.

The Complaint further alleges that on May 15, 2015, a tabloid called *In Touch Weekly* submitted FOIA requests to the SPD and the WCSO, seeking files related to Jim Bob Duggar, Michelle Duggar, Josh Duggar, and multiple addresses.  The request stated that *In Touch* had reason to believe the agencies had filed reports regarding the sexual assaults.  The Arkansas FOIA required a response by May 20.  On May 19, before SPD or WCSO responded, *In Touch Weekly* published an online article titled, "'19 Kids and Counting' Son Named in Underage Sex Probe."  The article stated that "multiple sources who have seen the police report and are familiar with the case" told the tabloid that police had investigated an alleged sexual assault.  "Josh was brought into the Arkansas State Police by his father," after Jim Bob "caught [Josh] leaving a young girl's bedroom and 'learned something inappropriate happened.'"  "Rumors about Josh have swirled for years," the article continued; "*In Touch's* investigation has uncovered the secret he has been hiding."

-3-

According to the Complaint, appellants O'Kelley and Cate "directed, oversaw, and approved" SPD's FOIA response. Officials suspected that employees were leaking details of the investigation to the media; O'Kelley worried that her department would "soon end up in the tabloids" and become the target of "worldwide media attention." Without seeking guidance from the Arkansas Municipal League or the City's child services department, O'Kelley and Cate decided to release a redacted Offense Report in response to the FOIA request and "rushed to prepare" the report. Appellant Hoyt "organized, oversaw, and approved" WSCO's redactions, while County Attorney Steve Zega "oversaw, counseled, and approved" the release of the report. On the evening of the May 20 deadline, O'Kelley received the redacted SPD Offense Report and sent it to *In Touch Weekly* and a local news organization. The next day, Hoyt and Zega directed WCSO employees to mail the redacted Incident Report to *In Touch Weekly*.

The redactions did not prevent identification of Plaintiffs as four of Josh's victims. Both reports included Jim Bob and Michelle Duggar's names, their current and former addresses, and "other personal details" about each individual victim. The Offense Report contained "full descriptions" of the victim interviews, and the Complaint alleges that Plaintiffs were "obviously identifiable." The Incident Report "expressly identified one of Josh's victims as his then 5-year-old sister." In response to a request from Cate, the Arkansas Municipal League advised that Arkansas law prohibited disclosing the identity of sex crime victims. O'Kelley then asked *In Touch Weekly* to refrain from using Jim Bob and Michelle Duggar's names and accept a different version of the SPD report. Instead, the tabloid published the original Offense Report with an article titled, "Bombshell Duggar Police Report: Jim Bob Duggar Didn't Report Son Josh's Alleged Sex Offenses For More Than A Year," and reporting that "explosive new information is contained in a Springdale, Ark. police report obtained by *In Touch* magazine." The article revealed details of the sexual assaults, including that some occurred while the victims were sleeping, one victim was fourteen at the time, and the victims forgave Josh after he apologized.

-4-

The Complaint alleges a "public backlash" against the disclosures.  Based on interview details, social media users identified Plaintiffs as the victims.  Some commentators expressed sympathy, others "chastised [Plaintiffs'] personal decision to forgive their brother," while others "reveled in the *ad hoc* disclosure of the lurid details" and subjected Plaintiffs to "spiteful and harsh comments and harassment." In response to Joy Duggar's motion, a state court judge ordered the Offense Report expunged from the public record, ordered all copies destroyed, and ruled that interviews and information about the sexual assaults were not subject to FOIA disclosure.  Undeterred, *In Touch Weekly* continued to post copies of the Offense Report and expanded its coverage of the scandal.  A June 3 article highlighted a "new report . . . from the Washington County Sheriff's Office," which had "fewer redactions" and "show[ed] the extent of Josh's abuse."  A June 15 article quoted an "insider" as saying, "The four Duggar girls 'forgave' Josh for his sins, but that's not how you get over sexual abuse."  The Complaint alleges that publicizing their trauma subjected Plaintiffs and their families "to extreme mental anguish and emotional distress."

## II.  The Federal Constitutional Claims

**A.**  The issue presented by this interlocutory appeal is whether individual Defendants O'Kelley, Cate, and Hoyt are entitled to qualified immunity from Plaintiffs' § 1983 damage claims.  Qualified immunity shields public officials from liability for civil damages if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  To defeat a motion to dismiss based on qualified immunity, Plaintiffs must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was

-5-

'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quotation omitted).

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quotation omitted). Thus, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Id. (quotation omitted). The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (quotation omitted). Rather, we look for a controlling case or "a robust consensus of cases of persuasive authority." Al-Kidd, 563 U.S. at 741-42 (quotation omitted). There need not be a prior case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 741.

**B.** This case presents these recurring qualified immunity issues in an unusual context. Often, controlling precedent establishes that an alleged constitutional right exists, but its parameters are "inapplicable or too remote," or their application to the facts is unclear. See, e.g., Kisela, 138 S. Ct. at 1153. In other cases, the right's parameters are unclear because there is no controlling case, and courts in other jurisdictions may be "sharply divided" on the issue. See, e.g., Stanton v. Sims, 571 U.S. 3, 6 (2013). Here, by contrast, a Supreme Court decision raises the threshold question whether the right Defendants are alleged to have violated even exists.

In Whalen v. Roe, the Supreme Court stated that its prior cases "sometimes characterized as protecting 'privacy' have in fact involved . . . the individual interest in avoiding disclosure of personal matters." 429 U.S. 589, 598-99 (1977) (footnote omitted). The Court then upheld a New York statute requiring the State Department of Health to collect records identifying persons who acquired certain prescription

drugs, concluding that "this record does not establish an invasion of any right or liberty protected by the Fourteenth Amendment." Id. at 606. The Court cautioned:

> We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data -- whether intentional or unintentional -- or by a system that did not contain comparable security provisions.

Id. at 605-06. That same year, the Court decided Nixon v. Administrator of General Services, which noted its decision in Whalen, weighed "any intrusion [on privacy] . . . against the public interest," and held that the Presidential Recordings and Materials Preservation Act "does not unconstitutionally invade [former President Nixon's] right of privacy." 433 U.S. 425, 457-58 (1977).

Despite the Court's inconclusive acknowledgment of a constitutional right it held not violated, a majority of the courts of appeals interpreted Whalen and Nixon as recognizing a constitutional right to the privacy of medical, sexual, financial, and other categories of highly personal information, grounded in the Fourteenth Amendment right to substantive due process. See Wolfe v. Schaefer, 619 F.3d 782, 785 (7th Cir. 2010) (collecting cases). Panels of this court followed suit. As we said in affirming the *denial* of relief in Alexander v. Peffer, "In Whalen . . . the Supreme Court determined that one component of the protection of the right to privacy embodied in the fourteenth amendment is an individual's interest in avoiding disclosures of personal matters." 993 F.2d 1348, 1349 (8th Cir. 1993).

More than thirty years after Whalen and Nixon, the Supreme Court returned to the issue in NASA v. Nelson, 562 U.S. 134 (2011). It again rejected a constitutional privacy challenge, this time to mandatory background checks for contractors at NASA's Jet Propulsion Laboratory. See id. at 159. The Court declined to provide a "definitive answer" to whether there is a constitutional right to informational

privacy, because the government as petitioner had not presented the issue for decision and it was not briefed and argued.  See id. at 147 n.10.  Rather, the majority concluded, "*[a]s was our approach in Whalen,* we will assume for present purposes that the Government's challenged inquiries implicate a privacy interest of constitutional significance." Id. at 147 (emphasis added).  Two Justices took issue with this approach, arguing that "[a] federal constitutional right to 'informational privacy' does not exist," and it was "unfathomable" why Whalen and Nixon's "passing, barely explained reference to . . . an unenumerated right that they held to be not applicable . . . should be afforded *stare decisis* weight." Id. at 160, 164 (Scalia, J., concurring in the judgment).

Although Nelson left the issue unresolved, it confirmed that our court and other circuits erred in reading inconclusive statements in Whalen and Nixon as Supreme Court recognition of a substantive due process right to informational privacy.  In this case, at oral argument before our *en banc* court, Defendants urged us to hold that the alleged right does not exist.  But they did not raise this issue in the district court, before the panel, or in their petition for rehearing *en banc*.  Nor did Plaintiffs address the issue prior to responding at oral argument.  In similar circumstances, seven Supreme Court Justices declined to decide this constitutional issue in Nelson, observing that,  "Particularly in cases like this one, where we have only the scarce and open-ended guideposts of substantive due process to show us the way, the Court has repeatedly recognized the benefits of proceeding with caution." Id. at 147 n.10 (cleaned up).  The Court in Nelson opted to "assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in Whalen and Nixon." Id. at 138.  However, even if the right is assumed to exist, in reviewing the denial of qualified immunity, Nelson raises an essential question: whether a right the Supreme Court has only assumed may exist, and this court has never held to be violated, can be a clearly established constitutional right.

-8-

**C.** Although <u>Whalen</u> and <u>Nixon</u> did not involve alleged wrongful disclosures of private information, a number of our pre-<u>Nelson</u> decisions extended their interpretation of those decisions to disclosures of "inherently private" information that is "either a shocking degradation or an egregious humiliation . . . or a flagrant breach of a pledge of confidentiality which was instrumental in obtaining the personal information." <u>Eagle v. Morgan</u>, 88 F.3d 620, 625 (8th Cir. 1996), quoting <u>Peffer</u>, 993 F.2d at 1350 (alteration omitted). However, although we considered a wide variety of disclosures, in each case we concluded that the alleged right had not been violated. <u>See</u> <u>Cooksey v. Boyer</u>, 289 F.3d 513, 517 (8th Cir. 2002) (disclosure of police chief's treatment for stress); <u>Riley v. St. Louis Cty. of Mo.</u>, 153 F.3d 627, 631 (8th Cir. 1998) (release of photo of son's body following suicide), <u>cert. denied</u>, 525 U.S. 1178 (1999); <u>Eagle</u>, 88 F.3d at 624-27 (disclosure of guilty plea already in public domain); <u>Wade v. Goodwin</u>, 843 F.2d 1150, 1151 n.2, 1153 (8th Cir.) (disclosure of list of "survivalists" denoting membership in organizations like the Ku Klux Klan), <u>cert. denied</u>, 488 U.S. 854 (1988). Indeed, in <u>Eagle</u>, we reversed the denial of qualified immunity, noting "that the exact boundaries of this right are, to say the least, unclear." 88 F.3d at 625. To the extent these cases read <u>Whalen</u> and <u>Nixon</u> as recognizing the right to informational privacy, <u>Nelson</u> makes clear they were wrong to do so. The disclosures in this case occurred years after the decision in <u>Nelson</u>, and we have not revisited the issue. The resulting legal uncertainty surely means the alleged constitutional right to informational privacy is not "beyond debate" in the Eighth Circuit. <u>Al-Kidd</u>, 563 U.S. at 741.

The Supreme Court applied this principle in <u>Reichle v. Howards</u>, where plaintiffs asserted an alleged First Amendment right to be free of retaliatory arrest, despite probable cause to arrest, arguing two Tenth Circuit cases clearly established a right the Supreme Court had never recognized. 566 U.S. 658, 664-66 (2012). The Court reversed the denial of qualified immunity, concluding the Tenth Circuit cases did not clearly establish the right at issue because an intervening Supreme Court decision had abrogated one and cast significant doubt on the other. <u>See</u> <u>id.</u> at 666-70.

-9-

"As we have previously observed," the Court explained, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." Id. at 669-70 (quotation omitted).  Under Reichle, therefore, the uncertain status of the right to informational privacy means that Defendants are entitled to qualified immunity.  If a right does not clearly exist, it cannot be clearly established.

### III.  The State Law Claims

Defendants' interlocutory appeal also challenged the district court's denial of qualified and statutory immunity from Plaintiffs' state law tort claims.  The panel agreed that we review state law claims on interlocutory appeal to determine if the district court "properly denied a state entity or its agent immunity from suit."  The panel concluded, based on its analysis of the Arkansas official immunity statute, Ark. Code § 21-9-301(a), that Defendants "are not entitled to statutory or qualified immunity on [Plaintiffs'] state law claims at this stage of the proceedings."

As they conceded at oral argument, Defendants petitioned for rehearing en banc only of the panel's denial of qualified immunity from Plaintiffs' § 1983 federal constitutional claims.  Accordingly, Section II.B. of the panel opinion is reinstated. See Szabla v. City of Brooklyn Park, MN, 437 F.3d 1289 (8th Cir. 2006) (order reinstating panel opinion as to issues not raised in the petition for rehearing en banc). The district court of course remains free to revisit its initial ruling on the immunity issue, or any other aspect of the state law claims, at a later stage of the proceedings.

### IV.  Conclusion

For the foregoing reasons, the order of the district court dated September 29, 2017, is affirmed in part and reversed in part, and the case is remanded for proceedings not inconsistent with this opinion.

-10-

COLLOTON, Circuit Judge, concurring.

I join the opinion of the court and submit these observations in response to the separate opinions that follow.  Both opinions take the view that court decisions *rejecting* a plaintiff's claim of constitutional right can clearly establish a constitutional right for the benefit of a future plaintiff.  The court properly declines to adopt that reasoning.

The judicial power under Article III of the Constitution is limited to resolving cases and controversies.  When a court holds that a plaintiff's allegations do not establish a violation of a constitutional right, the case is resolved.  The judges have no authority to bind other judges in the future to rule that some other plaintiff presenting some other set of facts would demonstrate a violation of the Constitution.  "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."  *Cohens v. Virginia*, 19 U.S. 264, 399-400 (1821).  So when panels of this court in *Alexander v. Peffer*, 993 F.2d 1348 (8th Cir. 1993), *Eagle v. Morgan*, 88 F.3d 620 (8th Cir. 1996), and *Cooksey v. Boyer*, 289 F.3d 513 (8th Cir. 2002), determined that there was no violation of a constitutional right, they could not in dicta create or recognize a clearly established right for purposes of applying the doctrine of qualified immunity in a future case.  Judges do not increase their power by uttering dictum with an air of certitude.

"A judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word 'hold.'"  *United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring).  If there is no decision that a constitutional right exists, then the right is not clearly established, and officials do not have fair notice about it.  In the context of qualified

-11-

immunity, therefore, "clearly established law comes from holdings, not dicta," *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019), with the likely exception of decisions that declare a constitutional violation in a concrete case before granting qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (discussing "development of constitutional precedent" through the discretionary first step of qualified immunity analysis).

This case leaves undisturbed our precedent that a prior *holding* of the Eighth Circuit is sufficient to recognize a clearly established right. *E.g.*, *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020); *cf. City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (assuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity). But in discerning a clearly established substantive due process right to informational privacy, the panel decision in this case mistakenly attributed the force of binding law to dicta in *Peffer*, *Eagle*, and *Cooksey*. *See Dillard v. City of Springdale*, 930 F.3d 935, 943-44 (8th Cir. 2019). Whether some other disclosure of information that amounted to a "shocking degradation" or "egregious humiliation" would have implicated the concept of substantive due process was unnecessary to the decision or result in those cases. It was sufficient for this court in *Peffer*, *Eagle*, and *Cooksey* to assume without deciding that a disclosure of matters more personal would violate the Constitution, just as it was sufficient for the Supreme Court to do so in *Whalen v. Roe*, 429 U.S. 589, 599, 605 (1977), and *NASA v. Nelson*, 562 U.S. 134, 147 (2011). Such an assumption does not clearly establish a constitutional right. *See Nelson*, 562 U.S. at 147 n.10.

Decisions of four other circuits denying qualified immunity in this context relied on precedent of that circuit deciding in an actual case that a constitutional right to informational privacy existed and was sufficiently pleaded or proved. *See Sealed Plaintiff No. 1 v. Farber*, 212 F. App'x 42, 43 (2d Cir. 2007) (citing *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994)); *Anderson v. Blake*, 469 F.3d 910, 914

-12-

(10th Cir. 2006) (citing *Sheets v. Salt Lake County*, 45 F.3d 1383, 1387-88 (10th Cir. 1995)); *Sterling v. Borough of Minersville,* 232 F.3d 190, 192 (3d Cir. 2000) (citing *Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir. 2000), and *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 118 (3d Cir. 1987)); *James v. City of Douglas*, 941 F.2d 1539, 1540-41 (11th Cir. 1991) (citing *Fadjo v. Coon*, 633 F.2d 1172, 1175 (5th Cir. 1981)).   Whatever the merit of those underlying constitutional rulings, *cf. Nelson*, 562 U.S. at 147 & n.10; *id.* at 159-68 (Scalia, J., concurring in the judgment), the qualified immunity decisions do not support the view that a prior decision *rejecting* a plaintiff's claim of right can create a clearly established right.   *Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000), did rely on dicta from prior decisions of that court, so it was likely incorrect on this view, as there should be no exception even for Posnerian dicta.  *See id.* at 956-57 (citing *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995)).[2]

The larger point about the misuse and misunderstanding of judicial dicta was well stated by Judge Leval in his Madison Lecture from October 2005.  The thesis can be recounted succinctly:

> We judges regularly undertake to promulgate law through utterance of dictum made to look like a holding—in disguise, so to speak.  When we do so, we seek to exercise a lawmaking power that we do not rightfully possess.  Also, we accept dictum uttered in a previous opinion as if it were binding law, which governs our subsequent adjudication.  When we do so, we fail to discharge our responsibility to deliberate on and decide the question which needs to be decided.

---

[2]In a different context, this court in *Putnam v. Keller*, 332 F.3d 541, 547 (8th Cir. 2003), misdescribed an aspect of *Coleman v. Reed*, 147 F.3d 751 (8th Cir. 1998), as a "holding," but the denial of qualified immunity in *Putnam* was grounded in an actual holding of this court in *Winegar v. Des Moines Independent Community School District*, 20 F.3d 895, 899-902 (8th Cir. 1994).

-13-

Pierre N. Leval, *Judging Under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1250 (2006). Given the conflicting views exhibited in this case about how binding law is decreed, and how clearly established rights are recognized, the Leval thesis and Chief Justice Marshall's teaching in *Cohens* warrant the renewed attention of the court.

GRASZ, Circuit Judge, with whom SMITH, Chief Judge, joins, concurring in part and concurring in the result.

The constitutional right to informational privacy in the Eighth Circuit is dead.[3] Some believe it never lived. In any event, in this age of digital information, where the government may possess massive amounts of personal data, the protection of twenty-two million people from wrongful disclosure of intimately private information by government officials now lies squarely in the hands of the state legislatures in Arkansas, Iowa, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota.[4] Perhaps that is where it belonged from the start, given that the federal constitution is silent on the matter and the United States Supreme Court has yet to conclude that a constitutional right to informational privacy exits. See NASA v. Nelson, 562 U.S. 134, 138 (2011) ("We assume, *without deciding*, that the Constitution protects a right to [informational] privacy . . . .") (emphasis added).

While the demise of informational privacy as a constitutional right in this circuit may be appropriate, we should at least recognize this was not an academic

---

[3]Although a litigant might, in theory, still attempt a facial challenge to a statute or regulation, or seek to enjoin the prospective release of information, the retroactive enforcement of any right to informational privacy under 42 U.S.C. § 1983 is now effectively precluded.

[4]The protection of informational privacy is now left to the state legislatures in the absence of any relevant state constitutional provisions.

-14-

exercise to the plaintiffs.  The court has concluded that the Arkansas public officials here, who are alleged to have callously revealed intimate and humiliating personal information of young sexual assault victims to a tabloid under highly suspicious circumstances, are exempt from liability because of qualified immunity.[5]  Ante at 10.  The court does so, in part, based on the proposition that a constitutional right not definitively recognized by the Supreme Court cannot be "clearly established" for purposes of qualified immunity analysis.  Ante at 9–10.  While this reasoning may have facial appeal, it is simply not true that a right established in circuit precedent cannot be "clearly established" for purposes of qualified immunity even in the absence of definitive Supreme Court precedent.  Indeed, many other circuit courts would likely be quite surprised by this holding.[6]  Regardless, today's decision means future litigants have no recourse in this circuit under 42 U.S.C. § 1983 for informational privacy violations.

I remain of the view that the panel below was bound to follow this court's opinions in Cooksey v. Boyer, 289 F.3d 513, 515–16 (8th Cir. 2002), Eagle v. Morgan, 88 F.3d 620, 625 (8th Cir. 1996), and Alexander v. Peffer, 993 F.2d 1348, 1350 (8th Cir. 1993), in which we recognized and narrowly defined the right to

---

[5]Like informational privacy, qualified immunity is a textually invisible right.

[6]Several of our sister circuits have denied qualified immunity while finding the right to informational privacy was clearly established.  See Anderson v. Blake, 469 F.3d 910, 912, 917 (10th Cir. 2006) (video of rape victim's assault disclosed by police officer); Sterling v. Borough of Minersville, 232 F.3d 190, 192 (3d Cir. 2000) (threat to disclose arrestee's sexual orientation); Denius v. Dunlap, 209 F.3d 944, 956–57 (7th Cir. 2000) (medical information of a teacher); James v. City of Douglas, Georgia, 941 F.2d 1539, 1540–41 (11th Cir. 1991) (police officer viewed and allowed other people to view video of informant and suspect engaging in sexual activity).  Other circuits have recognized the right and found violations.  See Tucson Woman's Clinic v. Eden, 379 F.3d 531, 551 (9th Cir. 2004) (medical records); Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994) (recognizing the constitutional right to confidentiality of a HIV diagnosis).

-15-

informational privacy.[7]  However, I agree with the en banc court that the foundation

---

[7]The initial concurring opinion does not alter this view by calling the recognition of informational privacy in these cases "dicta."  To be sure, the general propositions and maxims about judicial power and dicta presented in the initial concurring opinion are not subject to question.  But their asserted application in the present context is.  First of all, whether a case or controversy exists to support the exercise of judicial power under Article III is a threshold issue.  I fail to see how this is affected by whether a constitutional right is clearly established for purposes of granting qualified immunity.  Qualified immunity does not dissolve the claim or deprive the court of judicial power.  It is an affirmative defense.  Second, there is no dispute that obiter dictum is not binding law.  "Obiter dictum" is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential . . . ." *Obiter Dictum*, Black's Law Dictionary (11th ed. 2019); accord Sanzone v. Mercy Health, 954 F.3d 1031, 1039 (8th Cir. 2020) (using the same definition to define dicta).  However, the notion that recognition of a constitutional right, analytical framework, or legal test is per se dicta in a case where a violation of a constitutional right is not found to have been successfully alleged sweeps too broadly.  See Seminole Tribe of Florida v. Florida, 517 U.S. 43 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").  In my view, a court must apply some legal standard to determine whether a purported constitutional right was violated.  The legal standard applied is not "beyond the case."  It is essential to its determination.  In this regard, I am aware of no precedent standing for the proposition that the legal standard employed by an appellate court is not part of its holding unless it *also* finds that a violation of that standard has occurred.  Consider, for example, Terry v. Ohio, 392 U.S. 1, 27–30 (1968), in which the Court concluded the Fourth Amendment protected against police frisks absent reasonable suspicion, while simultaneously finding the officer did not violate the Fourth Amendment.  Or consider Strickland v. Washington, 466 U.S. 668, 687–701 (1984), in which the Court set forth the legal standard for ineffective assistance of counsel, yet found the legal representation in question did not violate the defendant's Sixth Amendment rights.  See also Putnam v. Keller, 332 F.3d 541, 547 (8th Cir. 2003) (affirming denial of qualified immunity based on the standard articulated in Coleman v. Reed, 147 F.3d 751, 755 (8th Cir. 1998), in which we found no violation of a constitutional right).  In the present case, the first four federal judges to review the plaintiffs' claims all read our circuit's precedent as recognizing the right

of those cases is gone.  And today's decision has effectively negated them.  <u>Ante</u> at 9 ("To the extent these cases read <u>Whalen</u> and <u>Nixon</u> as recognizing the right to informational privacy . . . they were wrong to do so.").  With no right to informational privacy recognized in this circuit, the appellants cannot, as a matter of law, prevail against the assertion of qualified immunity.  They must instead look to state law for relief.

KELLY, Circuit Judge, concurring in part and dissenting in part.

In 2006, Plaintiffs provided private and intimate details regarding their childhood sexual abuse to government officials under a promise of confidentiality. More than eight years later, government officials broke that promise and disclosed this sensitive information to a tabloid without Plaintiffs' consent.  Because I believe this violated Plaintiffs' clearly established right to privacy, I respectfully dissent.

The issue in this appeal is whether a reasonable government official in the Eighth Circuit would have understood that disclosing to a tabloid private information regarding childhood sexual abuse would violate the constitutional right to privacy. <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  This raises two basic questions: (1) whether this court's caselaw, prior to <u>NASA v. Nelson</u>, 562 U.S. 134 (2011), provided fair notice that publicly disclosing this information would violate the constitutional right to privacy; and (2) if so, whether a government official could have reasonably believed that <u>Nelson</u> had undermined that caselaw.

I agree with the district court and the panel that our pre-<u>Nelson</u> caselaw clearly established that the government's disclosure of this sensitive information would violate the constitutional right to privacy.  This court has repeatedly stated, in no uncertain terms, that "the right to privacy embodied in the fourteenth amendment"

---

to informational privacy.  They were not wrong.

-17-

protects "an individual's interest in avoiding disclosures of personal matters." Alexander v. Peffer, 993 F.2d 1348, 1349 (8th Cir. 1993); see also Cooksey v. Boyer, 289 F.3d 513, 515 (8th Cir. 2002); Riley v. St. Louis Cty. of Mo., 153 F.3d 627, 631 (8th Cir. 1998); Eagle v. Morgan, 88 F.3d 620, 625 (8th Cir. 1996); Wade v. Goodwin, 843 F.2d 1150, 1153 (8th Cir. 1988). Following other circuits, we have held that to violate an individual's constitutional right of privacy "the information disclosed must be either a shocking degradation or an egregious humiliation of her to further some specific state interest, or a flagrant bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal information." Peffer, 993 F.2d at 1350 (citing Davis v. Bucher, 853 F.2d 718, 721 (9th Cir. 1988)).

Until this case, we had not been presented with a factual scenario that satisfied this exacting standard.[8] But in my view, we had provided fair notice to government officials in the Eighth Circuit that the public disclosure of "highly personal matters representing the most intimate aspects of human affairs," that is "either a shocking degradation or an egregious humiliation . . . , or a flagrant breach of a pledge of confidentiality," violates the constitutional right to privacy. See Eagle, 88 F.3d at 625 (cleaned up). As a result, government officials in the Eighth Circuit are not entitled to qualified immunity for such disclosures. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (explaining that the clearly established test focuses on whether officials have "fair warning" that their conduct is unconstitutional).

---

[8]However, we had endorsed other circuits' decisions that certain disclosures violated the right to privacy. For example, in Eagle, 88 F.3d at 625, we cited with approval Sheets v. Salt Lake Cty., 45 F.3d 1383, 1387–88 (10th Cir. 1995) (concluding that the husband of a murder victim stated a cognizable right-to-privacy claim based on the disclosure of excerpts from his wife's diary), and York v. Story, 324 F.2d 450, 455–56 (9th Cir. 1963) (deciding, 14 years before Whalen and Nixon, that photographing appellant's nude body, over her objection and for no legitimate law-enforcement purpose, and distributing the photos after telling appellant they had been destroyed, "constituted an arbitrary intrusion upon the security of her privacy, as guaranteed to her by the Due Process Clause of the Fourteenth Amendment").

-18-

Four judges have decided that Plaintiffs' constitutional right against the disclosure of this information was clearly established. The district court reasoned that

> taking the facts alleged in the Complaint as true, any reasonable person in the position to make these disclosures would have understood that these disclosures would be published, would cause a national scandal, would be a "shocking degradation" or "egregious humiliation" for the Plaintiffs, that the Plaintiffs had a "legitimate expectation" of confidentiality in these materials, and that disclosing these materials would therefore violate the Plaintiffs' constitutional right to privacy.

Dillard v. City of Springdale, 5:17-CV-5089, 2017 WL 4392049, at *7 (W.D. Ark. Sept. 29, 2017). A unanimous panel of this court agreed, concluding that:

> The particular facts alleged here are not near the periphery of the right to privacy but at its center. Certainly, allegations of incestuous sexual abuse implicate "the most intimate aspects of human affairs" and are "inherently private." The content and circumstances of these disclosures do not just meet the standard of "shockingly degrading or egregiously humiliating," they illustrate them. And releasing insufficiently redacted reports detailing minors' sexual abuse to a tabloid, notwithstanding promises that these reports would remain private, is "a flagrant breach of a pledge of confidentiality."

Dillard v. City of Springdale, 930 F.3d 935, 949 (8th Cir. 2019) (cleaned up).

These decisions are well-supported. Other courts have similarly concluded that a reasonable government official would have notice that the constitutional right to privacy protects against the government's disclosure of the details of sexual abuse. See Sealed Plaintiff No. 1 v. Farber, 212 F. App'x 42, 43 (2d Cir. 2007) (affirming the denial of qualified immunity and noting that "a person's status as a juvenile sex abuse victim is clearly the type of 'highly personal' information that we have long recognized as protected by the Constitution from governmental dissemination");

-19-

Anderson v. Blake, 469 F.3d 910, 914–18 (10th Cir. 2006) (affirming the denial of qualified immunity because plaintiff had a constitutionally protected privacy interest in a rape video and was not required, at the motion-to-dismiss stage, to disprove every possible compelling interest the government might assert); Bloch v. Ribar, 156 F.3d 673, 685–87 (6th Cir. 1998) (concluding that "a rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no pen[o]logical purpose is being served" and stating that, as of September 1998, public officials in the Sixth Circuit were "on notice that such a privacy right exists"); Stafford-Pelt v. California, No. C-04-00496, 2005 WL 1457782, *8–11 (N.D. Cal. June 20, 2005) (denying qualified immunity because plaintiff had plausibly alleged that disclosing partially redacted reports detailing her allegations of sexual abuse against her half-brother violated her clearly established right to privacy). I believe our pre-Nelson precedent dictates this same result.

The question then becomes whether our precedent was undermined, such that the rule in this circuit would not have been clear to a reasonable official, by the Supreme Court's decision in Nelson. In that case, the Court "assume[d], without deciding, that the Constitution protects a privacy right of the sort mentioned in Whalen and Nixon." Nelson, 562 U.S. at 138. And it explained that, contrary to the interpretation adopted by most circuits, this was "the same approach . . . the Court took more than three decades ago in Whalen and Nixon." Id. at 147 n.10.

In the court's view, "Nelson raises an essential question: whether a right the Supreme Court has only assumed may exist, and this court has never held to be violated, can be a clearly established constitutional right." Ante at 8. Relying on Reichle v. Howards, the court answers this question in the negative, reasoning that "the uncertain status of the right to informational privacy means that Defendants are entitled to qualified immunity." See id. at 9–10 (citing Reichle, 566 U.S. 658, 664–66 (2012)). I disagree.

-20-

In <u>Reichle</u>, the Supreme Court decided that it was not clearly established in the Tenth Circuit that a retaliatory arrest could violate the First Amendment even if the arrest was supported by probable case. <u>See</u> 566 U.S. at 663. The Court reasoned that, although there was Tenth Circuit caselaw to this effect, a reasonable officer could have believed that caselaw had been abrogated by the Court's subsequent decision in <u>Hartman v. Moore</u>, 547 U.S. 250 (2006), which reached the opposite conclusion regarding retaliatory prosecutions. <u>See</u> <u>Reichle</u>, 566 U.S. at 663. The Court explained that most circuits had treated retaliatory arrest and prosecution claims similarly before <u>Hartman</u>, that it had granted certiorari in <u>Hartman</u> to resolve a circuit split pertaining to both retaliatory arrests and prosecutions, that much of the rationale in <u>Hartman</u> applied to both retaliatory arrests and prosecutions, and that several circuits had decided that <u>Hartman</u>'s no-probable-cause requirement extended to retaliatory arrests. <u>Id.</u> at 667–68.

I do not agree that <u>Nelson</u>'s effect on our right-to-privacy caselaw is similar to <u>Hartman</u>'s effect on the Tenth Circuit's retaliatory-arrest caselaw. Unlike <u>Hartman</u>, which was intended to resolve a circuit split and abrogate contrary circuit authority, <u>Nelson</u> purported to leave the state of the law intact. <u>See id.</u> at 147 & n.10. The Court expressly acknowledged that, after <u>Whalen</u> and <u>Nixon</u>, different circuits had adopted different interpretations of when the disclosure of private information by government officials would violate the right to privacy, and the Court declined to decide which circuit's caselaw was correct. <u>See</u> <u>Nelson</u>, 562 U.S. at 146–47 & n.9.[9]

---

[9]Moreover, I do not believe our prior caselaw rested entirely on our interpretation of <u>Whalen</u> and <u>Nixon</u>. It is true that we followed most other circuits in interpreting those decisions as "recognizing a constitutional right to the privacy . . . of highly personal information, grounded in the Fourteenth Amendment." <u>Ante</u> at 7. But in defining the contours of the right and deciding what a plaintiff would have to show to establish a violation, we relied not on <u>Whalen</u> and <u>Nixon</u>, but on general constitutional principles and opinions from other circuits, some of which traced their roots to before <u>Whalen</u> and <u>Nixon</u> were decided. <u>See, e.g.</u>, <u>Eagle</u>, 88 F.3d at 625 ("canvassing the relevant cases").

-21-

At least one other circuit has stated that <u>Nelson</u> does not provide courts with "any reason to take the opportunity to revisit [their] past precedents on this matter." <u>See</u> <u>Lee v. City of Columbus</u>, 636 F.3d 245, 260 n.8 (6th Cir. 2011).  And other circuits have not abandoned their pre-<u>Nelson</u> right-to-privacy caselaw after <u>Nelson</u>. <u>See</u> <u>Hancock v. Cty. of Rensselaer</u>, 882 F.3d 58, 65–70 (2d Cir. 2018) (continuing to apply pre-<u>Nelson</u> caselaw recognizing "the right to privacy in one's personal information, including information about one's body" in the Second Circuit); <u>Wyatt v. Fletcher</u>, 718 F.3d 496, 506 n.14 (5th Cir. 2013) (noting that, even after <u>Nelson</u>, a "general right to nondisclosure of private information" was established in the Fifth Circuit); <u>see also</u> <u>Leiser v. Moore</u>, 903 F.3d 1137, 1144 (10th Cir. 2018) (assuming, without deciding, that the Tenth Circuit's pre-<u>Nelson</u> precedents had not been overruled).  I agree with these courts that <u>Nelson</u> did not abrogate or overrule pre-existing circuit caselaw.  And unlike in <u>Reichle</u>, I do not think a reasonable government official could have concluded otherwise.

<u>Nelson</u> did clarify that our prior caselaw was not required by <u>Whalen</u> and <u>Nixon</u>.  A reasonable government official could have wondered whether, in light of that clarification, we would revisit our past decisions and change our right-to-privacy jurisprudence.  But because we had not done so when the government officials made the disclosures at issue here, they could not have reasonably concluded that the law in the Eighth Circuit had been changed.  And we have not been presented with an opportunity to revisit our pre-<u>Nelson</u> caselaw in this appeal.  <u>See</u> <u>ante</u> at 8.

For these reasons, I believe the panel's opinion was correct, and I would reinstate it.  To the extent the court does otherwise, I respectfully dissent.

_____