1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF ARKANSAS
2               FAYETTEVILLE DIVISION

3                                    )
     JILL DILLARD, JESSA SEEWALD,    )
4    JINGER VUOLO, and JOY DUGGAR,   )
                                     )
5              PLAINTIFFS,           )
                                     )
6    VS.                             )
                                     ) CASE NO.
7    CITY OF SPRINGDALE, ARKANSAS;   ) 5:17-5089-TLB
     WASHINGTON COUNTY, ARKANSAS;    )
8    KATHY O'KELLEY, in her individual )
     and official capacities;        )
9    ERNEST CATE, in his individual  )
     and official capacities; RICK   )
10   HOYT, in his individual and     )
     official capacities; STEVE ZEGA, )
11   in his official capacity;       )
     BAUER PUBLISHING COMPANY, L.P.; )
12   BAUER MAGAZINE, L.P.; BAUER MEDIA )
     GROUP, INC.; BAUER, INC.;       )
13   HEINRICH BAUER NORTH AMERICA,   )
     INC.; BAUER MEDIA GROUP USA, LLC; )
14   and DOES 1-10, inclusive        )
                                     )
15             DEFENDANTS.           )

16

17   ORAL AND VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE OF

18                  JILL DILLARD

19              SEPTEMBER 1, 2021

20

21

22

23

24

25



www.ArkansasRealtimeR



EXHIBIT

6

JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

14

1  outside the house is sort of an interesting question

2  these days with -- with all of the Internet and social

3  media and that sort of thing.  Do you do any work for

4  income?

5  A.    Yes, sir.

6  Q.    What -- what work is that?

7  A.    Mostly social media.  I would say just social

8  media right now, yeah.

9  Q.    And what -- what social media platforms do you

10  work on or do you derive income from?

11  A.    Instagram, YouTube, and our blog.

12          THE COURT REPORTER:  I'm sorry.  What

13      was the last one?

14          THE WITNESS:  Our blog.

15          THE COURT REPORTER:  Okay.

16  Q.    What's the title of your blog?

17  A.    Dillardfamily.com.

18  Q.    Okay.

19  A.    Oh, and --

20  Q.    And --

21  A.    -- Facebook.  I'm sorry.  Facebook, too.

22  Q.    Yeah.  How do you -- how do you make money on

23  these -- set the blog aside for just a second.  How do

24  you make money on these various social media

25  platforms?

JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

15

1   A.    Ads.

2   Q.    So, you are -- when you say ads, do you mean

3   that advertisers place ads in the midst of content

4   that you create?

5   A.    Kind of.

6   Q.    Okay.  Explain that for me, if you can.  I

7   just -- I'm not familiar with the way all that works.

8   A.    Yeah.  So, we have Google Ads, which is like a

9   simple, easy way to make revenue from like -- it's

10  basically like a standard setup.  You just -- I don't

11  know.  It's like a simple way to make revenue from

12  something that's just existing.  Basically there's

13  no -- there's not really a whole lot of interaction

14  there.

15             You just, like, check boxes and then,

16  like, there are advertisements that I may not even be

17  aware of exactly, you know, what's being on there.

18  It's not like I'm communicating with somebody

19  directly, so that's one way.

20             And then another way would be where

21  sometimes occasionally I will interact with people

22  directly and they -- and I'll do a product placement.

23  Q.    I see.  But these are ads that third parties are

24  placing kind of like a TV commercial is interspersed

25  during the TV show.  These would be ads placed by



1  third parties, interspersed in the midst of content

2  that you create on these platforms, right?

3  A.    The Google Ads are more -- it depends on the

4  platform, I guess.  The Google Ads are more like third

5  party -- it depends.  Like, if you're on YouTube, it

6  would pop up during the video.

7  Q.    I see.

8  A.    On the blog, it would just be a placement on the

9  blog.  And then the other ones that I would work out

10  would be something that I would post with -- with the

11  product or something.

12  Q.    And so how do you get advertisers to advertise

13  in -- in your content?  What I've -- what I've found,

14  I'm just telling you personally, nobody is much

15  concerned with my content on Facebook when I post

16  pictures bragging on my kids.  Nobody wants to

17  advertise.  How do you -- how do you do that?  Is that

18  based on page views or what?

19  A.    Not necessarily.

20  Q.    Are those contractual arrangements that you're

21  making with these advertisers?

22  A.    Sometimes.

23  Q.    Yeah.  You mentioned product placements.  Are

24  there any other times -- so, that would be where

25  you're actually going on one of these platforms and



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

17

1  saying this shampoo or whatever other product you

2  might be promoting is what I use or it's a really good

3  product, whatever you might say.  Are there any other

4  scenarios where you're contracting directly with an

5  advertiser?

6  A.     Other -- what do you mean?

7  Q.     So, you do product placements, and did I

8  describe it correctly, basically that you're going on

9  one of these platforms and actively promoting a

10 product.  Is that what you're talking about when you

11 said "product"?

12 A.     Correct.  That's a definition of a product

13 placement is I think probably --

14 Q.     Yeah --

15 A.     -- in layman terms.

16 Q.     Well, so I've heard product placement in a --

17 in a different form and since, like, in some big

18 feature film where they've -- you know, the lead

19 actor, just in the midst of the movie, drinks a Pepsi

20 just to -- you know, without saying anything about it,

21 just drinks a Pepsi.  So --

22 A.     Correct.

23 Q.     But when you're talking product placement,

24 you're talking about actively promoting some brand or

25 product, right?



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

18

1   A.      There is a little bit of both.  So, yeah.  I

2   mean, it depends on what they want you to do.

3   Sometimes it's outright and sometimes it's not.

4   Q.      So other than that, what you would define as

5   product placement, are there any other scenarios where

6   you're contracting or entering into agreements

7   directly with advertisers?

8   A.      I mean, generally, I think that's it.

9   Q.      Okay.

10  A.      It's advertising.

11  Q.      So, how do you get together with these product

12  placement advertisers on the front end?  In other

13  words, how do they get to you to say, hey, we would

14  like you to promote our makeup or shampoo or whatever

15  the product may be?

16  A.      Sure, yeah.  We have, like, "contact us" buttons

17  on most of our social media and blog.  So they can

18  reach out to us that way, or direct messaging, but

19  sometimes I don't always see it.

20  Q.      Yeah, I understand.  Do y'all have any third

21  party, an agent or anything like that that's helping

22  you coordinate these relationships?

23  A.      No, sir.

24  Q.      Have you ever had such a person to help you

25  with something like that?



1   A.      Yes, sir.

2   Q.      Who would that have been?

3   A.      Julia Mason and Chad Gallagher, I believe.

4   Q.      Okay.  Did they work together, or are they in

5   separate offices or companies?

6   A.      Separate.

7   Q.      Where is Julia Mason based?

8   A.      I believe in Nashville.

9   Q.      And Chad Gallagher is there in Northwest

10  Arkansas, right?

11  A.      No, sir.

12  Q.      He's in California?

13  A.      No, sir.

14  Q.      Where is located?

15  A.      In Fouke, Arkansas, I think.

16  Q.      Okay.  How did y'all get -- end up hiring

17  Julia Mason and Chad Gallagher as your agents?  How

18  did you come into contact with them?

19  A.      We didn't really hire them at first.

20  Q.      Okay.  Who -- who did?

21  A.      I'm confused.  So, the two separate things.

22  Q.      So I asked you how you came in contact with

23  them, and you said you didn't hire them.  How did you

24  come into contact with them?

25  A.      Yes, sir.  So Chad Gallagher was like a friend



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

20

 1  of my dad's, I guess, so my dad --

 2  Q.    Okay.

 3  A.    -- used him for stuff before we got married.

 4  and then he was handling stuff, like, for my dad, and

 5  I hadn't necessarily hired him for that.

 6            Once Derek and I got married in 2014,

 7  then is when he kind of transitioned into that role

 8  for us, I guess.  Like, and then at that point, I

 9  don't remember, yeah, if we, like, officially hired

10  him or what.  At what point that happened, I don't

11  know.  And then Julia Mason was last year and, yeah,

12  it was different setups, yeah.

13  Q.    Yeah.  How did that work with Julia?

14  A.    Derek was asking -- he asked somebody, a

15  friend, for a reference and got her contact

16  information that way.

17  Q.    Okay.  And what did y'all hire her to do?

18  A.    Well, we didn't, like, technically hire her.  It

19  was a contingent thing.  So, like, if we'd gotten a

20  deal, then she would have represented us, I guess, and

21  made a portion of that.  It was contingent.

22  Q.    Yeah.  Did she set up -- ultimately set up any

23  deals for you?

24  A.    No, sir.

25  Q.    Okay.  Why was that?  Why was -- from your



```
 1  perspective, why was she unable to set up any deals?
 2  A.    I believe she said she couldn't get anybody.
 3  Q.    Okay.  So, outside of product placements where
 4  you're making agreements directly with the advertisers
 5  to promote products in one way or another actively on
 6  social media, you get these -- these ads that either
 7  pop up or -- or play maybe before your video or
 8  whatever where you're not contracting directly with
 9  the advertiser.  How do you get those ads?
10  A.    What are you referring to exactly?
11  Q.    Yeah.  So my understanding from your earlier
12  testimony was that, for instance, Google Ads that you
13  mentioned --
14  A.    Oh, yeah.
15  Q.    -- and pop-up ads on YouTube that y'all derive
16  some revenue from those ads.  Are those just based
17  on -- on views and that sort of thing?
18  A.    So there's basically, when you set up your
19  social media, there's an option to apply for different
20  kinds of -- I think it's, like, different kinds of
21  accounts or something.
22             There's a process, and in that process
23  you have the option to select the box and, like, it's
24  different on different platforms.  So, like, Instagram
25  you don't make money directly but, like, on YouTube
```



```
 1  you can set up a Google account and get -- like, check
 2  the box, then they'll put ads in your YouTube
 3  video and then you're not, like, managing necessarily
 4  every single video ad.  It's just, like, they
 5  automatically come on there or whatever.  I don't
 6  know.
 7              Anyways, you have a Google account
 8  associated with your YouTube channel and then, yes,
 9  it's like you -- the ads -- I don't know.  I don't
10  know exactly how all of it works, but I know that,
11  like, yeah, it's associated with your Google account,
12  I guess.
13  Q.    So, how much income are you deriving on social
14  media efforts annually?
15  A.    It varies.
16  Q.    How about last year?
17  A.    I'm not sure exactly.
18  Q.    Do you know a ballpark?
19  A.    Possibly.
20  Q.    Yeah.  What would that ballpark amount be?
21  A.    It'd be, like, 10k.
22  Q.    Okay.  And would that be separate and apart
23  from your husband, or would that be all of your
24  income, whatever that number is?
25  A.    I mean, it's our joint account on there a lot
```



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021
23

1   of times, so I can't really --

2   Q.     I see.  Okay.

3   A.     Right.

4   Q.     So you said it varies.  Has that number, that

5   social media number, gone up or down over the last

6   five years, let's say?

7   A.     I guess it's hard to tell.

8   Q.     Sure.

9   A.     There's lots of --

10  Q.     Has that number ever exceeded, say, 15- or

11  20,000?

12  A.     I don't know.

13  Q.     Okay.  You mentioned you were married in 2014;

14  is that right?

15  A.     Yes, sir.

16  Q.     How old are you today?

17  A.     Today I'm 30.

18  Q.     Okay.  Okay.  How many children do you have?

19  A.     Two.

20  Q.     And what are their ages?

21  A.     Six and four.

22  Q.     Okay.  We -- as I recall, we took your husband's

23  deposition earlier, Derick.  He is in law school or

24  just graduated.  Is he still in law school?

25  A.     No, sir.



1  A.    I think it was In Touch was the one that
2  published it.
3  Q.    Okay.  And to your understanding, how close in
4  time was that to the actual disclosure of the report?
5  A.    Pretty quick.
6  Q.    Same date?
7  A.    I don't know.
8  Q.    To your knowledge, was it the same day that the
9  article had been published by In Touch?
10  A.    I don't know.
11  Q.    Do you remember seeing your name when you read
12  the In Touch article?
13  A.    I don't know.
14  Q.    Okay.
15  A.    I'm pretty sure it was, like, in the article,
16  but I can't remember.  There were so many articles.
17  It was, like, everywhere.
18  Q.    Do you remember seeing the copy of the report?
19  A.    Yes.
20  Q.    Do you remember seeing your name appearing in
21  the copy of the report?
22  A.    No.
23  Q.    Okay.  But you seem to recall, though, your name
24  was in the article itself?
25  A.    Like, I don't know.



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

101



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

102



18   Q.   Okay.   What does -- if you would, tell me about

19   what a day in the life of Jill Dillard looks like.

20   What do you do on a day-to-day basis?

21   A.   Well, like, not today -- unfortunately -- then

22   I -- nothing against you but --

23   Q.   I understand.

24   A.   But I usually wake up, take our oldest child to

25   school.   Well, I do other things before then:   Get

1  ready, all of that, breakfast, coffee, go out the
2  door, get him to school, come back, do preschool work
3  with our younger son, who is still at home with me
4  right now.
5            And depending on the day, we may be out,
6  we may go to the library or something; or if we're
7  well and our friends are well in our small circle of
8  friends with stuff right now with -- we may try and
9  get together for a play date outside or something.
10           And then I do some -- I might do some
11  media work or something like that and then dinner and
12  time with the kids in the evening and then put them to
13  bed, a little bit of time with my husband, and then we
14  go to bed.
15  Q.    Okay.  You mentioned you go to Cross Church.
16  Do they do what I always called Sunday school on
17  Sunday mornings or do they have, like, the community
18  group model where you do it during the week?
19  A.    They have both options.
20  Q.    Okay.  Do y'all participate in some Sunday
21  school or a -- or a community group during the week?
22  A.    Not currently.
23  Q.    Okay.  Are y'all involved in any nonprofits or
24  civic organizations?
25  A.    What do you mean?



1  this was -- yeah, at, like -- we -- the year '15 or

2  so.  I don't remember exactly.  I wouldn't say it's

3  continued to affect me necessarily.

4  Q.    That happened -- how long ago did that happen?

5  A.    I think it was like -- I'm trying to think of

6  the year.  I don't remember exactly but it was when we

7  were there on the field, like 2016 or 2017, somewhere

8  in there.

9  Q.    Okay.

10  A.    I mean, obviously, when we lose a friend, it's

11  devastating, you know, at the time.

12  Q.    Sure.  Sure.  Any other events in your life

13  that you would consider traumatic?

14  A.    I don't know.

15  Q.    Okay.  As part of your social media presence we

16  talked about earlier, how often do you post on social

17  media?

18  A.    About every day on one form of social media or

19  another.

20  Q.    Okay.  Do you do that with other members of

21  your family, or is that always just you?

22  A.    I don't know.  What do you mean?

23  Q.    Well, I mean, I assume -- maybe I'm just wrong

24  about this, but I assume that most of your social

25  media posts are videos of you; is that correct?



1  A.    No.

2  Q.    What are most of your social media posts?

3  A.    Pictures probably.

4  Q.    Okay.  Okay.  I recall Derick telling us in his

5  deposition that y'all essentially opted out of the

6  reality TV show at some point; do you recall that?

7  A.    Yes.

8  Q.    When did that happen?

9  A.    May of 2017.

10 Q.    What was the reason for that?

11 A.    Multiple reasons.

12 Q.    What -- what are those reasons?

13 A.    It wasn't, like, a good fit for our family.  We

14 were settling into our own family routine and it

15 basically didn't align with that anymore.  It didn't

16 work out.

17 Q.    In terms of scheduling or something else?

18 A.    No.  Just, like, the overall dynamic

19 essentially -- yeah, like more about, like, the

20 structure and all of that.

21 Q.    What about the structure made it a bad fit for

22 you?

23 A.    Just like, I mean, scheduling.  You said that.

24 It's not the only thing.  Scheduling, the demand for a

25 lot of hours here and there, flexible schedule, that

1  Q.    Okay.  So which of the two were you specifically

2  referring to?

3  A.    I don't know.  I think I was lumping it

4  together is what I was saying.

5  Q.    Okay.  And so it would be an issue of the

6  control or the management of your -- your and your

7  family's participation in shows, in television shows?

8  A.    Are you -- can you rephrase that?

9  Q.    Yeah.  But I think I -- basically I think I

10  understand.  The mediation didn't occur and, yet, you

11  continued to see this therapist?

12  A.    Uh-huh.

13  Q.    So, what was the reason to continue to see a

14  therapist?

15  A.    We felt like it wouldn't hurt anything.  It was

16  beneficial.

17  Q.    It was beneficial.  I mean, it's not free,

18  right?  It does cost money?

19  A.    Well, our insurance covers it right now.

20  Q.    Oh, excellent.  Has it been beneficial?

21  A.    I would say it's -- I believe it's good for

22  anyone, yeah.

23  Q.    And you -- you get to go, yes?

24  A.    Yes.

25  Q.    You said this last week.  You have mentioned



```
 1  you to know?

 2  A.    I don't know.

 3  Q.    Is it true that you cannot say right now if you

 4  have ever read anything that indicated that Kathy

 5  O'Kelley was trying to harm you personally?

 6  A.    I'm sorry.  What?

 7  Q.    Is it true that you don't know if you have ever

 8  read anything that said that Ms. O'Kelley was trying

 9  to harm you personally?

10  A.    Yeah, I don't know.

11  Q.    And the same for Mr. Cate.  Is it true you

12  don't know if you've ever read anything that Mr. Cate

13  was trying to harm you personally?

14  A.    I don't know.

15  Q.    And so you cannot tell me today of any document

16  that would contain the information that Ms. O'Kelley

17  was trying to harm you personally?

18          MR. DANIELS:  Object to form.

19  A.    What is the question again?

20  Q.    Sure.  It is -- is it true that you cannot

21  identify any document that you have read that

22  contained the information that Ms. O'Kelley was trying

23  to harm you personally?

24          MR. DANIELS:  Object to form.

25  A.    I don't know.
```



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021                                    173

1   Q.    So you don't know if that's true or not true?

2   A.    I don't know.

3   Q.    What is the part of that that is confusing to

4   you?

5   A.    I don't know.

6   Q.    You don't know why it's confusing?

7   A.    I don't know.  Like, you're asking a bunch of

8   similar questions to try and get a different result,

9   and I don't know.

10  Q.    Ms. Dillard, did someone tell you to say "I

11  don't know" to all my questions during the break?

12            MR. DANIELS:  Object to form.

13  A.    No.

14  Q.    No, of course not.

15            Did you -- can you identify a document

16  that Mr. Cate wrote himself that is evidence that he

17  was trying to harm you personally?

18  A.    I don't know.

19  Q.    Can you identify a document that Ms. O'Kelley

20  wrote herself that indicates she was trying to harm

21  you or your sisters personally?

22  A.    I don't know.

23  Q.    Do you know of any evidence at all in existence

24  that would establish that Ms. O'Kelley had anything

25  personal against you or your sisters where she would



1  wish you harm?

2  A.     I don't know.

3  Q.     Do you know of any evidence in existence that

4  would indicate that Mr. Cate wanted to do you or your

5  sisters harm when he released the redacted report?

6  A.     I don't know.

7  Q.     What do you know about Mr. Cate, anything at

8  all?

9  A.     I don't know specifically right now off the top

10  of my head.

11  Q.     What do you know about Ms. O'Kelley?  Anything?

12  A.     I mean, I know generally, like, she's the police

13  chief and, like, stuff like that.  But I'm just

14  saying, like, you're asking me very specific

15  questions, and I'm afraid to give specific answers.

16  Q.     What's the specific part of my question?

17  A.     I'm -- I feel like all of these are trying to

18  get to something and I just want to be very careful in

19  how I say things and phrase things.

20            And so I believe if you're talking about

21  the reports that were released if they had any hand in

22  releasing those, I feel like that was wrong; as to the

23  intent and if I have proof or whatever, I'm not trying

24  the case right now, so I don't know.

25  Q.     Is it your testimony that you will only answer



```
 1  few specific questions about that.  In -- in there, if
 2  you look down a little bit, it is discussed kind of
 3  what the logistics are going to be.  And when
 4  Mr. Gallagher, who is writing these, he talks about a
 5  list of questions that you'll be sent.  And I don't
 6  want to go too fast, so you tell me if you can -- when
 7  you catch up to that part, you'll see a paragraph
 8  about "I'll send you some questions."
 9  A.    Yes, I see, uh-huh.
10  Q.    Okay.  Is that, to your recollection, what
11  occurred?  Were you sent some questions to get ready
12  for that appearance?
13  A.    I don't know.  I honestly can't remember.
14  Q.    If you can't remember, is it fair for us to
15  trust what is said here in these e-mails?
16              MR. DANIELS:  Object to form.
17  A.    I don't know.
18  Q.    Do you have any reason why the e-mails would --
19  you can tell us why the e-mails you provided would be
20  inaccurate?
21              MR. DANIELS:  Object to form.
22  A.    I don't know.
23  Q.    So, you don't know if they're accurate or not?
24              MR. DANIELS:  Object to form.
25  A.    I mean, I can see the words there that say "I
```



1  will send you some questions to think on."

2  Q.    Okay.

3  A.    He said that in a e-mail, but I don't know.

4  Like, I can't -- I'm not going to put my life on

5  whether or not what happened after that -- like, I

6  can't remember, so I don't know.

7  Q.    Sure, sure.  You see below that where

8  Mr. Gallagher writes that she's agreed -- I'm assuming

9  she is Megyn Kelly -- that they will not name the

10  victims; only the victims can name themselves.  Do you

11  see that?

12  A.    Yes.

13  Q.    Do you recall that Megyn Kelly did, in fact,

14  break that agreement and name the victims without the

15  victims naming themselves?

16        MR. DANIELS:  Object to form.

17  A.    I don't know.

18        (Exhibit 6 previously marked for

19        identification.)

20  Q.    All right.  The next one we'll look at is

21  Exhibit 6.  "Precarious" is the best word in this

22  process, so, we'll try to move with dispatch.  E-mail

23  strings are funny, you know, because this one kind of

24  goes a little bit bottom to top.  But there is, I

25  believe, what appears to be a e-mail that you wrote to



```
 1   Chad.
 2             You can't see it.  Never mind.  Hold on
 3   a second.  I'm going to hold on.  I'm going to slow
 4   down.
 5             So, this one -- you see the top where it
 6   says from Duggar Jill there?
 7   A.    Yes, uh-huh.
 8   Q.    Okay.  So, going down, you can see where you
 9   wrote "Makes sense," I think, with a happy face?
10   A.    Uh-huh.
11   Q.    And -- but if we skip the answer to go to the
12   question first, it says, "Thanks, Chad.  This helps a
13   lot"?
14   A.    Yes.
15   Q.    And you're talking about "Us couples are going
16   over things."  Who does that refer to?
17   A.    I don't remember.
18   Q.    It says, "What's the reasoning for not bringing
19   up the police chief?  Just wondering legal," question
20   mark.  What does that refer to?
21   A.    I don't know.
22   Q.    Did you write that?
23   A.    It looks -- it appears like I did.
24   Q.    All right.  And then Mr. Gallagher says, "Yes,
25   legally Megyn can mention it, the police department,
```



JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

198

```
 1   but we don't have proof of all these suspicions in her
 2   motives, et cetera."
 3              What is Mr. Gallagher discussing when we
 4   talks about "suspicion of her motives"?
 5              MR. DANIELS:  Object to form.  Calls for
 6         speculation.
 7   A.    I don't know.
 8   Q.    Do you have any understanding about or any
 9   memory about anyone's motives, her motives?
10   A.    I don't know.
11   Q.    Is her name Kathy O'Kelley?
12              MR. DANIELS:  Object to form.
13   A.    I don't know.
14   Q.    Did you ever have a suspicion about Kathy
15   O'Kelley's motives?
16   A.    I don't know.
17   Q.    In fact, I asked you earlier if any evidence
18   that Kathy O'Kelley had anything personal about --
19   against you or want to hurt you or your sisters, I
20   think your answer was you don't know?
21   A.    Yeah, I think I don't -- I think that's what I
22   said, I don't know.
23   Q.    Okay.  Let me go to the next page.  The next
24   page contains a list of items.  Do they appear to be
25   instructions on how to act and how to answer
```



1  questions?  Will you take a look at those?

2              MR. DANIELS:  Object to form.

3  A.    You want me to read all of it here?

4  Q.    Sure.  If you have the paper ones, you can read

5  those; but if you don't, we'll go up.  And I don't

6  want to go up too fast and I don't want to spend any

7  more time than you need on it to read it.

8  A.    Okay.

9  Q.    I just want -- in fact, if you can look at what

10 you've looked at so far and can you agree that is sort

11 of the list of instructions that you and your parents

12 were given about the show itself, the Megyn Kelly

13 Show, your appearance?

14             MR. DANIELS:  Object to form.

15 A.    I don't really know.  What's the context here?

16 Q.    You don't have any idea what the context of

17 the --

18 A.    So, I -- I think maybe if -- was it -- was this

19 from Chad?  I can't --

20 Q.    Yes.  You see where --

21 A.    Okay.  So, Chad, yeah, yeah, yeah, okay.

22 Q.    He says, "Here's a few notes I want to get in

23 your minds."

24 A.    Yeah, it looks like a list of something.

25 Q.    Can you tell me why, when you're going to appear



1   on the show, you'd be given a list of things to

2   remember to talk about or not talk about?

3                MR. DANIELS:  Object to form.

4   A.    I don't know.

5   Q.    Do you believe that you followed the advice or

6   the instructions given to you by Mr. Gallagher when

7   you appeared on the Megyn Kelly Show?

8                MR. DANIELS:  Object to form.

9   A.    I don't know.

10  Q.    Do you believe you ignored that advice

11  completely?

12               MR. DANIELS:  Object to form.

13  A.    Completely?

14  Q.    Yes, ma'am?

15  A.    I don't know.

16  Q.    Could you go to the bottom of that, please?  A

17  little further.  Would you look at number 11 for me?

18  "Focus on a few things, be very careful when talking

19  about it, not to get worked up about how it came up.

20  You don't want people to say they cared more about how

21  this came up than what actually happened to their

22  children."

23               Do you recall receiving that advice?

24  A.    No.

25  Q.    Do you recall following that advice?



**From:** Chad Gallagher <chad.gallagher@legacymail.org>
**Date:** May 30, 2015 at 11:38:42 PM CDT
**To:** Jim Bob Duggar <duggardad@gmail.com>
**Cc:** Michelle Duggar <duggarmom@gmail.com>, Jessa Duggar
<jessaduggar@gmail.com>, Duggar Jill <ipreferaphonecall@gmail.com>
**Subject: Re: Megyn Kelly**


Yes
They are also open to our suggestions for questions to get our story out

Sent from my iPhone

On May 31, 2015, at 12:24 AM, Jim Bob Duggar <duggardad@gmail.com>
wrote:

> Will she send a list of questions?

> Sent from my iPhone

> On May 30, 2015, at 9:42 PM, Chadwick Gallagher
> <chad.gallagher@legacymail.org> wrote:

>> just wanted to give you guys a brief update on the
>> upcoming interview. There will be more to come:

>> - they will tape the interview on Wednesday
>>   morning from 10am-12pm.
>> - they will tape two interviews: one with Jim Bob
>>   and Michelle and a separate one with Jessa and Jill
>> - we are not advertising the interview with Jessa and
>>   Jill until it airs on Friday.

CONFIDENTIAL                    **EXHIBIT 5**                    JD009638

Wednesday night her show will air a portion of the jim bob and michelle interview and create a framework bringing her viewers up to speed on who the family is.

- the full one hour special will air friday night.

I will send you some questions to think on and i'd like you to be thinking about answers. I will also provide some suggested answers.

She's agreed:

- that they will not name victims—only victims can name themselves.
- they will not ask any timeline questions
- they will not ask about the specific incidents

Send me any thoughts you have about the interview so we can begin that dialogue now.

thanks!

C. Chadwick Gallagher
Legacy Consulting
chad.gallagher@legacymail.org
www.legacyincorporated.com
501.246.8842

CONFIDENTIAL

| | |
|---|---|
| **From:** | Duggar Jill |
| **To:** | Chadwick Gallagher |
| **Cc:** | Jim Bob Duggar; Michelle Duggar; Jessa Duggar |
| **Subject:** | Re: interview thoughts |
| **Date:** | Sunday, May 31, 2015 2:57:24 PM |

Makes sense. :)


Sent from my iPhone



On May 31, 2015, at 16:48, Chadwick Gallagher <chad.gallagher@legacymail.org> wr=te:

> yes legally.
> Megyn can mention it and mention the polic= department but we don't yet have
> proof of all we suspicion in her m=tives etc so we don't need to speculate or even
> make it seem like w= are targeting her.
>
>
> C. Chadwick G=llagher
> Legacy Consulting
> chad.gallagher@legacyma=l.org
> www.legacyincorporated.com
> 501.246.884=
>
>> On M=y 31, 2015, at 5:46 PM, Duggar Jill
>> <ipreferaphonecall@gmail.com> wrote:
>>
>> Thanks chad. This helps a lot! Us couples are go=ng over things
>> together here at our place. What's the reasoning for not bri=ging up
>> the police chief? Just wondering...legal?
>> -Jil=
>>
>>
>> Sent from my iPhone
>>
>>
>>
>> On May 31, 2015, at 15:49, Chadwick Gallag=er
>> <chad.gal=agher@legacymail.org> wrote:
>>
>> here=are a few notes I want to get in your minds:

CONFIDENTIAL                    **EXHIBIT 6**                    JD009683

1. she will not ask time line questions so don't s=eak in timelines. For example, don't say "first we did this= then we did this." instead you just talk about the various things b=t not in an order.
2. we=can set the length of each interview and we can be done whenever we want an= if all else fails you can always instead of answering just say, "I=E2��m sorry can we take a break for a moment?" then we you are o=t of the interview and can get help, redirect the question or get your thou=hts together.
3. remembe= you can say that daughters were victims but not who and how many. Jessa an= Jill will share for themselves that there were victims.
4. For JB & M: I know you will but =I think the=key is to be yourselves—humble, broken people.  Make clear tha= from the beginning, you were heartbroken and shocked because you�=99ve always worked so hard to train your children in the right way but kids=can still choose wrong even when taught right.
5. It was very impo=tant to you to correct Josh's behavior and make sure the girls had t=e support and affirmation they needed.
6. Communicate that you w=re devastated by what Josh did; you didn't ignore it at all, but so=ght to handle it so as not to create more trauma for the girls.  It�=80�s why you went to elders in the church & the state police because y=u wanted there to be accountability. It's why you arranged professi=nal counseling for Josh and the girls.  At the time you did everything=you could think to do to help Josh without creating embarrassment for the g=rls or long term harm.
7. There is no indication that Josh has h=d behavior like this since he came to you, admitted what he did and receive= help.
8. Don't be defensive or argumentative (not=that you would anyway), but to display the humility and brokenness that I k=ow you have in all this.
9. Josh was a=minor and while you were incredibly upset with him, you also wanted to real=ze that he was a child himself.  You were concerned that his life get o= track.
10. The girls were high priority in the sit=ation, the family worked through it (painfully, but dutifully) and came thr=ugh it, eventually after many tears allowing everyone to find true resoluti=n.
11. On the issue of it coming up now I think you=focus on a few things:
    1. be very careful when talking abo=t it not to get to worked up on how it came up. You don't want peop=e to say, "They cared more about how this came up than what ac=ually happened to their children."

CONFIDENTIAL

JD009684

2. we want Megyn to be the on= to talk about how wrong it was for this to come up. But you should fo= sure say —"we were shocked because we were always told=that these records were juvenile records and would never be made public.�=80�

3. we were so concerned for the victims and Josh both when t=is came up. We were at a lose of even how to explain to our children that t=is happened because we all trusted that it was a private matter. (we will l=t Jill and Jessa be the ones to really talk about this piece of it bec=use they are the ones victimized by the police department and the tabloids)=/font>

4. As it has all unfolded you are praying and hoping that it becom=s a way that you can show people how even in the toughest days faith c=n get you through.

---

JBD & M potent=al questions:

1. tell us what happened. take us back 12 years.
2. how did y=u feel?
3. were you shocked?
4. do you think Josh really changed�=94is he a changed person?
5. what did you do to address this—how=did you respond?
6. what did you do to ensure it didn't happen a=ain and the girls felt safe in your home?
7. Some people say your perfe=t family has really been make-believe. What do you say to that?=li class="">how d=d you feel when this first came out last week?
8. how is your family do=ng now?

---

Jessa/Jill:<=div>

- tell how yo= felt 12 years ago when this all happened.
- tell how your parents hand=ed this (watch their interview first and take note of what they say)=/li>
- 
  - how do you think your parent= handled this? what could they have done differently?
  - do you forgive j=sh? how?
  - do you think he's changed?
  - =font face="Calibri, sans-serif" size="3" class="">how did

CONFIDENTIAL

JD009685

you feel wh=n this news came out?
  ○ how do you think your family gets through this=whole thing now?

I think f=r the two of you it is important to focus on how you really were able to mo=e past this and if as a mom you had to deal with this kind of thing yo=rself you hope you would do so as well as your parents did.

also good to focus on how you know your parents and f=mily aren't perfect but how in every situation they really do try t= do the right thing and that hopefully other families that have diffic=lt things like this happen in their lives will see from your family that&nb=p;there is hope for living through crisis.

lastly you two can make a stronger point than anyone about how disapp=inted and sad you are that juvenile records were released.

you should not talk about the police chief speci=ically but that doing this brought great pain to the two of you and puts th= whole juvenile system at jeopardy.

just a f=w thoughts as you start to focus on this.


C. Chadwick Gallagher
Legacy Consulting
chad.gallagher@legacymail.org
www.le=acyincorporated.com
501.246.8842




=




CONFIDENTIAL                                                    JD009686

| From: | Chadwick Gallagher |
|---|---|
| To: | Duggar Jill |
| Cc: | Jessa Duggar; Jim Bob Duggar; Michelle Duggar |
| Subject: | Questions |
| Date: | Tuesday, June 2, 2015 6:15:57 PM |

**Potential Questions/Issues to ask parents =bout:**

1. Take us back to twelve =ears ago. What happened, how did you find this out?
2. what was going on with you? How did you feel? were you =urprised.
3. What did you do?
4. Why =id you take him to the authorities? Was this hard?
5. Impact on daughters. how did you handle this with =hem?
6. Are they ok now? long term impact?
7. What about Josh? Is he the same, has he =hanged?
8. what about those who say that this =ituation shows your lives are fake or you're hypocrites who =ere really hiding things?
9. What about the future of =he show?
10. Police records. How did you feel =hen this came out?
11. What good can come from this =errible situation?

_____

**Girls =uestions:**

1. why did you come =orward and speak out now?
2. Take us back—how =id you feel?
3. what happened after you learned this. =hat changed in your house?
4. did you feel safe after =his? were you scared it would happen again?
5. how are =ou as a result of this? what kind of impact has this had on your life =ong term?
6. how are you with Josh now? Do you =hink he's changed? What do you think about him? Has this =mpacted your relationship? do you think he would do this again?
7. Present time: discussion on this coming public now, how you =eel about that?
8. This is such a big story, what =o you think happens now—to the show? to the =uggars?

=

CONFIDENTIAL                    **EXHIBIT 8**                    JD009670

| | |
|---|---|
| **From:** | Duggar Jill |
| **To:** | Gallagher Chad |
| **Subject:** | Jill/Jessa Interview notes |
| **Date:** | Tuesday, June 2, 2015 9:15:23 AM |
| **Attachments:** | Jessa FoxInterview.docx |
| | Untitled attachment 00017.htm |

</html

**EXHIBIT 9**

**"Tell us how you felt when all of this happened":**

1st

When all of this happened, Josh went to my parents and told them what he had done. Let me just say right now that he was the one to fess up. It wasn't dragged out of him or discovered by another. He knew his curiosities had crossed a line and he didn't want to continue down that path. My parents acted, and Josh spent a period of time away from home getting help, Dad took him to the police station where he gave a thorough report of all his wrong doings. Contrary to the lies that former-Officer Mr. Hutchens has recently spread—this was not a partial-confession. Josh told everything—in detail. Nothing was "covered up" or "swept under the rug." We worked through what had happened, and all was dealt with and forgiven. Forgiveness, that is, but with boundaries. Safety-guards were set in place. By God's Grace, Josh was truly repentant and changed, and never again went down that path.

Josh made some seriously wrong choices in his youth, but here, I will stand up in his defense against those who absurdly title him as a "child molester," a "pedophile" or a "rapist." That is way overboard and so blown out of proportion. And before you people get upset at me and try to tell me I'm wrong, let me inform you—I was one of the "victims." I am quite familiar with the goings on. And I think I can speak for myself. I know the situation well. In Josh's case, he was a boy in puberty and a little too curious about girls. There was no violence or force. We're talking about very mild "inappropriate touching" of fully clothed individuals. A quick feel with the hand— and in most instances while a person was sleeping. Matter of fact, all of the girls involved found out after Josh went to my parents, because they weren't aware that anything had happened. My parents talked through everything with us and we even received individual counseling from licensed professionals. But as much as people would try to sensationalize it, we weren't victims of a "horror story" and knowing each of the victims well, I can say that no one feels "scarred for life." That doesn't make Joshua's actions anymore "ok" or permissible, and I will not justify his wrongdoing, but I *will* stand up and speak out against those who look into this and try to use this for their own agenda.

2nd

It was years later when the state came along and decided to run their own investigation. As kids who had worked through this situation previously, we knew that we were in no way "at fault," and that Josh was very wrong in what he did; however, we had no desire to dig up old bones. We had worked through this already, and didn't care to bring up and relive a sad time in our past. Still, we were honest with them about everything, and didn't hide anything. We shared our stories, and were promised **confidentiality**.

When their investigation was complete, they came to the conclusion that we had dealt with things. Nothing was still ongoing all these years later. Josh was a changed person. Case was closed and we moved on with life.

**"Do you think he (Josh) has changed?"**

3rd

CONFIDENTIAL                                                                                          JD009667

Shortly after was when we started filming our weekly reality show! People got to know our family, and enjoyed watching us grow over the years. We never claimed to be a perfect family. Like every other family, we've walked through some challenging times, but God had brought us through—and we were all the stronger for it. The sensational headlines concerning our family right now are "Duggar Scandal" and "Secret Past Uncovered."

People got to know us post-Josh's-childhood-struggles, and we have been real and genuine. There is nothing "fake" about my family or the way we have chosen to live out our lives and our faith. Some are trying to paint us like hypocrites, saying that these 10 years of television have been a total fake. This is outlandish. Our family message has always been grounded in our faith—and central to the Christian faith is the message that Jesus Christ changes lives. Joshua is one of those "changed lives."

"But has he really changed?" people wonder. Yes, he has. I've seen firsthand the transformation in his life. He would never dream of doing anything so foolish again. Yes, for sure there was a time period of rebuilding trust with family and friends, but we all witnessed this change in his life. No one continues to harbors bitterness or hurt feelings about the past. He is an awesome big brother, and has gone on to become a dedicated husband and a loving father to his three beautiful children. Do you say to the guy who messed around with drugs at 14 years of age, that "Hey man, You're ruined. Once you dabble in that stuff you're a druggie for life"? How can we celebrate one man's sobriety for over a decade, and yet turn and condemn another man to a lifetime of failure? Do we really believe that no on can ever change or turn from their past failures? I don't think so.

**"How do you feel now that everything has come out recently?"**

I guess the real question is, did the entire world have a right to know about Josh's early-teen-year problems way back when the show started? I say "no." He had some stupid failures in his past, but he was—and is—and changed man. Here's how I see it: People feel like they know us very well. They've watched us grow up. They've invited us into their living room every Tuesday night for the past 10 years—and yet, on the other hand, we do not know them personally. My question for the public is: Do you publicize failures from your childhood days? Do you feel the need as an adult, to inform complete strangers of the stupidest things you did when you were a kid?
Close friends and officials involved know about Josh's past. They walked alongside our family and encouraged us through some of our hardest days. There is no reason in the world that we should be forced to share private information with those who are not part of the problem or the solution.

4th
What is really infuriating to me is that this juvenile case was not sealed, but released to the public. I speak for the "victims" when I say that we are very angry about this. The police department that handed over our report to the tabloids under the

CONFIDENTIAL                                                                    JD009668

"Freedom of Information Act" did so illegally. Documents containing juvenile records are to be sealed from public FOYAs. The system here is majorly flawed. The very system that is set up to protect children who make dumb choices and the children affected by them has failed greatly. Everyone involved in this case—victims and even the judge-- are infuriated by this. The judge ordered an expungement of all documents containing the report, and yet InTouch wouldn't listen. They ignored the court order and went on to print portions of the document in their next magazine. They, and every other group who has used our story—do not care **about** anything but making headlines and making money—and what they've done is wicked. When you look below the surface, InTouch's parent company "Bauer" is a major porn-provider for Germany, so it's in keeping with their ideals that they make objects out of women and do whatever they can to make money off of them. Only in our situation, what they have done is illegal. They don't care in the least for the victims in this situation or our wish for things to remain private. All they want is to parade us around and make money off of us. We have been re-victimized, and this is a thousand times more painful than what we walked through 12 years ago.

**"How do you think your family gets thru this whole thing now?"**
5th
We are closer as a family today than ever before. Every time we face a challenge like this together, it strengthens our relationships. When people started stirring all this up, we were talking as a family and I said "Hey guys, people may be stirred up against us right now, but at least we have harmony as a family. We're not the ones feuding!" I cannot say that it's been easy, the road we've walked these past few weeks. My parents have taken so much flak that they do not deserve. But when it comes down to it, we are glad to be tight as a family. No matter what anyone else says, Josh is an amazing man and I'm blessed to have him as my big brother.

CONFIDENTIAL

JD009669

From: **Chadwick Gallagher** <chad.gallagher@legacymail.org>
Date: Fri, Jun 19, 2015 at 1:00 PM
Subject: Touching Base
To: Duggar Jill <ipreferaphonecall@gmail.com>, Anna Duggar <anna@championnwa.com>,
Joshua Duggar <josh@ez14us.com>, Jim Bob Duggar <duggardad@gmail.com>, Michelle
Duggar <duggarmom@gmail.com>, Jana Duggar <jana@championnwa.com>, Jinger Duggar
<coffeecanon@gmail.com>, John Duggar <john@championnwa.com>, Josiah Duggar
<josiahduggar@icloud.com>, Ben Seewald <mswld9@gmail.com>, Jessa Seewald
<jessaseewald@gmail.com>, Derick And Jill <djdillard2014@gmail.com>,
<joyduggar@icloud.com>

All, I just want to give you a couple of quick updates, reminders and requests.

As you know we are working diligently in navigating this forward step by step. I want to
commend each of you for the approach you've taken on walking through this difficulty.
Above all, let God find your response pleasing. Our chief priority must be to honor Him—give
Him praise. We must re-think our approach anytime it is driven by self-defense, hurt,
frustration, annoyance, vengeance or anything other than obeying God, honoring Him and
following Him step by step in this.

LEGAL:

Redacted

Redacted

Redacted

TLC:

Jim Bob and Michelle and I will meet with TLC on Monday to discuss ideas on moving the

**EXHIBIT 12**

series forward. They want to explore it and have signed an extension with us giving them more time to make a determination about entering into another season. We will have a better feel for what they will do after the meeting on Monday.

PR:

on the public side of things we are slowly easing into posting again but we are thoughtful about it because we don't want to stir the pot. At any given time we have various things going on that everyone may not realize (on a legal front, a media inquiry issue, the TLC side, etc). I would ask that for the month of July at least you continue to coordinate with me about posting so we keep one unified message/front and I can be sure you are aware of things going on that would impact what you say or do.

This week we posted a nice little blog post from Ben and Jessa and have started posting a few pics again. We also posted a verse again for the first time.

We will next announce Jill and Derick's new adventure.

After that we are looking to do the first letter to fans from Jim Bob and Michelle on this whole matter. Likely we will keep it short and simple and mostly thank them for love and prayers, glorify God for HIs help and try to point people toward Him. More and more over time this will become part of the story told of God's faithfulness—just as he was to David and Paul who God brought through tough pasts!

We will also likely do our own announcing of Josh and Anna's sweet new baby. I'm talking through that with them but at this time please do not share any details about their baby plans—not even with TLC.

We are also thinking about additional sit down interviews at some point—especially for Josh but are looking to see if we can get a read on TLC's plans to factor that in.

Overall, things are going well and I want to encourage everyone to keep your eyes on pleasing the only ONE who ultimately matters!

Chad

C. Chadwick Gallagher
Legacy Consulting
chad.gallagher@legacymail.org
www.legacyincorporated.com
501.246.8842

CONFIDENTIAL