IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| JILL DILLARD, JESSA SEEWALD, JINGER VUOLO, and JOY DUGGAR, <br><br> Plaintiff, <br><br><br> CITY OF SPRINGDALE; WASHINGTON COUNTY; KATHY O'KELLEY; ERNEST CATE; RICK HOYT; STEVE ZEGA; BAUER PUBLISHING COMPANY, L.P.; BAUER MAGAZINE, L.P.; BAUER MEDIA GROUP, INC.; BAUER, INC.; HEINRICH BAUER NORTH AMERICA, INC.; BAUER MEDIA GROUP USA, LLC; and DOES 1-10, inclusive, <br><br> Defendant. | Case No.: 5:17-CV-05089-TLB |

**PLAINTIFFS' RESPONSE TO SPRINGDALE DEFENDANTS' SEPARATE STATEMENT OF UNCONTESTED MATERIAL FACTS**

Plaintiffs Jill Dillard, Jessa Seewald, Jinger Vuolo and Joy Forsyth ("Plaintiffs") hereby respond to the Statement of Uncontested Material Facts submitted by the Springdale Defendants in support of their Motion for Summary Judgment.

1.     Ernest Cate ("Cate") is a licensed Arkansas attorney and the current City Attorney of the City of Springdale ("Springdale"). Cate served as Deputy City Attorney for Springdale from 1998 until 2010, and then as the elected City Attorney from 2013 until present. *Ex. 1, Declaration of Ernest Cate*

**PLAINTIFFS' RESPONSE**: Undisputed

2.      Kathy O'Kelley ("O'Kelley") is the former Police Chief of the City of Springdale Police Department ("SPD"). Prior to the events of May 2015 at issue in this litigation, O'Kelley had announced her retirement from a 34-year career in law enforcement effective on June 30, 2015. O'Kelley was the Chief of Police for the SPD from 2005 until 2015. *Ex. 2, Declaration of Kathy O'Kelley*

**PLAINTIFFS' RESPONSE**: Undisputed.

3.      Prior to May 20, 2015, neither Cate nor O'Kelley knew of, or had ever met, the Plaintiffs Jill Dillard ("Dillard"), Jessa Seewald ("Seewald"), Jinger Vuolo ("Vuolo") or Joy Duggar ("Joy Duggar"). With the exception of a brief and inconsequential encounter each that occurred years prior to the events at issue in this litigation, neither Cate nor O'Kelley has ever met any member of the Duggar family. *Ex. 1, ¶ 3; Ex. 2, ¶ 4.*

**PLAINTIFFS' RESPONSE**:  Undisputed that prior to May 20, 2015, neither Cate nor O'Kelley had ever met the Plaintiffs and that except for a brief encounter with Jim Bob and Josh, neither Cate nor O'Kelley have met any other member of the Duggar family in person.  Disputed that neither Cate nor O'Kelley knew of Plaintiffs prior to May 20, 2015.  Cate testified that he knew of the Duggar family since about the late "90s or early 2000s", *See* Bledsoe Decl., Ex. 3 [Cate Dep. Tr.] 7:21-8:3, and O'Kelley testified that she was aware of the Duggar family, that they lived in Springdale, and that they had a television show.  *See* Bledsoe Decl., Ex. 2 [O'Kelley Dep. Tr.] 27:19-28:10.

4.      The Duggar family, including the Plaintiffs and Josh Duggar, has regularly appeared in the past on reality television shows called *17 Kids and Counting*, *18 Kids and*

*Counting* and *19 Kids and Counting* which aired on a television network called TLC. The Plaintiffs have regularly appeared in reality television shows while they were adults called *Jill & Jessa Counting On* and *Counting On* which also aired on TLC. *Ex. 3, Deposition of Jessa Seewald*, 75:17-76:4; *Ex. 5, Deposition of Jinger Vuolo* 45:19-47:13.

**PLAINTIFFS' RESPONSE**: Undisputed that Plaintiffs have appeared in the past on reality television shows called *19 Kids and Counting* and *Counting On*.  Disputed as to the remainder.  The cited evidence does not support the alleged fact.  Seewald testified that the Duggar family was filmed and she was recognized in public while the show was running.  City Defs' Ex. 3, 75:17-76:4.  Vuolo testified that after Defendants' disclosures, the show Counting On aired about Dillard and Seewald, and Vuolo appeared in that show until the show stopped running.  City Defs' Ex. 5, 45:19-47:13.


5.      On May 20, 2015, Josh Duggar was a lobbyist for the Family Research Council and lived and worked in Washington D.C. Ex. 7, Declaration of Elizabeth A. McNamara (Doc. 45), Ex. B.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged statement.  Exhibit B to City Defs' Exhibit 7 discusses the official police report without mentioning that Josh Duggar was a lobbyist in 2015.


6.      Jim Bob Duggar served as an Arkansas State Representative and made an unsuccessful run to be a United States Senator from Arkansas. Ex. 4, Deposition of Joy Duggar Forsyth, 21:15-17.

**PLAINTIFFS' RESPONSE**: Undisputed that Jim Bob Duggar was elected as an

Arkansas State Representative.  Disputed as to the remainder.  The cited evidence does not support the alleged statement.  Forsyth testified that her father "ran for office and was elected at one point."  City Defs' Ex. 4, 21:15-17.

7.      The Duggar Family regularly engaged in politics, including Michelle Duggar participating in a robo-call campaign to defeat an anti-discrimination ordinance in the neighboring city of Fayetteville Arkansas. Ex. 3, 107:11-18.

**PLAINTIFFS' RESPONSE**: Undisputed that Michelle Duggar recorded a robo call about a civil rights ordinance in Fayetteville.  Disputed as to the remainder.  The cited evidence does not support the alleged statement.  Seewald testified that her mother recorded the robo calls about an ordinance in Fayetteville.  City Defs' Ex. 3, 107:11-18.

8.      The Plaintiffs are celebrities who have been in the in the in the public eye and social media influencers who regularly market or advertise products on various social media platforms. Ex. 5, 15:5-17:20, 109:5-111:02; Ex. 4, 63:20-65:4, 149:12-150:2, 24:5-7; Ex. 3, Deposition of Jessa Seewald 28:9-19, 93:8-97:4; Ex. 6, Deposition of Jill Dillard 14:7-18:19, 21:3-22:21. Before May 20, 2015, the Plaintiffs author a book titled "Growing up Duggar" and recently Vuolo and her husband have helped author a book titled "The Hope We Hold." Ex. 5, 15:5-17:20 14:13-21; Ex. 3, 48:22-49:13. The Plaintiffs all have, or have had in the past, been represented by talent agents or agencies. Ex. 6, 18:24-21:2; Ex. 5, 109:2-7; Ex. 4, 27:16-20.

**PLAINTIFFS' RESPONSE**: Undisputed that Plaintiffs authored a book titled "Growing up Duggar" and "The Hope We Hold," Plaintiffs market products on their social media accounts, and Plaintiffs have been represented by talent agents or agencies.  Disputed that Plaintiffs are

celebrities or social media influencers as the cited evidence does not support the statement.
Dillard testified that Chad Gallagher was handling things for her father and she does not recall if
she hired him.  Dillard testified that she also did not hire Julia Mason as her agent.  City Defs'
Ex. 5, 15:5-17:20.  Vuolo testified that she has a business called The Gift Shop manage her
Facebook account.  City Defs' Ex. 5, 109:2-7.  Dillard testified that she did not have an agent
but her family as a whole did.  City Defs' Ex. 4, 27:16-20.

9.     In December of 2006, the Duggar family were scheduled to make an appearance
on the Oprah Winfrey Show. On December 7, 2015, an email was sent to Harpo Studios in
Chicago, Illinois (the producer of the Oprah Winfrey Show) that stated as follows:

```
BEFORE YOU AIR THE DUGGAR FAMILY FROM ARKASAS WITH ▮▮▮▮▮▮▮▮
YOU NEED TO KNOW THE TRUTH. THEY ARE NOT WHAT THEY SEEM TO BE.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮     HAS MOLESTED ▮▮▮▮▮▮▮▮▮ WHILE ▮▮▮▮ WERE
SLEEPING AND THE PARENTS HAVE BEEN HIDING THIS SECRET FOR A LONG
TIME. JIM BOB LIES TO HIS CHURCH AND HIS FRIENDS TO MAKE HIM LOOK
GOOD. AT THIS MOMENT HE IS IN TROUBLE WITH THE CHURCH FOR LYING
ABOUT ▮▮▮▮▮▮▮ AND THINGS THAT CONCERN THE WAY THE CHURCH
MEMBERS REACTED. I THINK THAT YOU SHOULD KNOW THE TRUTH BEFORE
THEY MAKE A COMPLETE FOOL OF YOU AND YOUR SHOW. THEY HAVE BEEN ON
TV BEFORE AND COME ACROSS AS A PERFECT FAMILY, WHICH COULDN'T BE
FURTHER FROM THE TRUTH. THEY JUMP FROM SHOW TO SHOW TO RECEIVE
GIFTS FOR THEIR FAMILY AND TO MAKE THEM LOOK REALLY GOOD TO. PLEASE
CONSIDER THIS AND CONFRONT THEM ABOU THEIR SECRET.
```

*Ex. 9, Declaration of Ron Hritz, Ex. B*, 13

**PLAINTIFFS' RESPONSE**: Undisputed that the email stated as above.  Disputed as to
the remainder as the cited evidence does not support that the Duggar family was scheduled to
make an appearance on the Oprah Winfrey Show or the email was sent to the Harpo Studio on
December 7, 2015.  Ex. B to City Defs' Ex. 9 states that Detective Hignite "was given a copy of
an e-mail that was sent to Harpo Studios . . . in reference to the Duggar family."

10.     Upon receipt of the December 7, 2006 email, the Oprah Winfrey Show did not air the show with the Duggars. *Ex. 11, Declaration of Captain Lester Coger, Ex. A,* 25; *Ex. 3*, 90:20.

**PLAINTIFFS' RESPONSE**: Undisputed that page 25 of Exhibit A to City Defs' Exhibit 11 states the above.  Plaintiffs also object to the statement on the grounds that the declarant lacks personal knowledge and foundation as to why the Oprah Winfrey show did not air the interview with the Duggars.  Fed. R. Evid. 602.

11.     Also on December 7, 2006, a phone call was made to the Arkansas Department of Human Services Hotline in which the caller disclosed information that Josh Duggar had molested four of his sisters and a non-family member babysitter. *Ex. 9, Ex. B, 11*.

**PLAINTIFFS' RESPONSE**: Undisputed.

12.     SPD Sgt. Darrell Hignite opened an investigation (the "Investigation") of Josh Duggar following a December 7, 2006 phone call from an Arkansas State Police Investigator. The Investigation is detailed in the "SPD Offense Report." *Ex. 9, Ex. B, 1-33*.

**PLAINTIFFS' RESPONSE**: Undisputed.

13.     Josh Duggar was a minor at the time of the molestations, but at the time of the Investigation, Josh was an adult. *Ex. 2, ¶6*.

**PLAINTIFFS' RESPONSE**: Undisputed.  Josh Duggar was 18 years old at the time of the Investigation.

14.     The molestation incidents at issue in the Investigation were alleged to have been perpetuated by Josh Duggar in 2002 and 2003. At the time of these incidents, Josh Duggar was a minor. The Plaintiffs were minors at the time of these incidents, as was the non-family member babysitter. *Ex. 9, Ex. B,* 1-15.

**PLAINTIFFS' RESPONSE**: Undisputed.


15.     Jim Bob Duggar disclosed in the Investigation that "he met with the elders of his church and had told them what was going on." Jim Bob and Michelle Duggar disclosed in the Investigation that "several members of their church were aware of the situation and had been supportive." *Ex. 9, Ex. B,* 15.

**PLAINTIFFS' RESPONSE**: Undisputed apart from the portion of the statement alleging that Michelle Duggar made a disclosure as the cited evidence only mentions that Jim said that "several members of their church were aware of the situation and had been supportive."


16.     The SPD Offense Report indicates that report of the molestations was disclosed by an individual who wrote a letter about the 2002 and 2003 incidents and placed it in a book. The book with the letter inside it was loaned out to a member of the Duggar's church. *Ex. 9, Ex. B,* 12.

**PLAINTIFFS' RESPONSE**: Undisputed that the Offense Report stated as above.


17.     The SPD Offense Report indicates "that it all came out because of a letter" and that the Investigation had determined "who had written the letter that started this investigation." *Ex. 9, Ex. B,* 31-32.

**PLAINTIFFS' RESPONSE**: Undisputed that the Offense Report stated as above.

18.     Kaeleigh Holt Tull ("Tull") is the individual who wrote the letter referenced in the SPD Offense Report. Tull is the daughter of Jim Holt. The Holt family were close friends with the Duggars. The Holts and Duggars were in the group of people who attended regular worship or church gatherings at various homes. *Ex. 8, (Draft) Deposition of Tull* 35:20-36:11, 38:8-13.

**PLAINTIFFS' RESPONSE**: Undisputed.

19.     On March 30, 2003, Tull was informed by her parents that Josh Duggar has molested 4 of his younger sisters and another person. Tull was 15 years old at the time and was betrothed to Josh Duggar in an arrangement that was approved by the parents of both children. *Ex. 8,* 14:24- 15:25, 16:16-17:4, 20:23.

**PLAINTIFFS' RESPONSE**: Undisputed that on March 30, 2003, when she was 15 years old and betrothed to Josh Duggar, Tull was informed by her parents that Josh had molested his sisters and possibly others.  Disputed as to being told Josh had molested "4 of his younger sisters" as the cited evidence does not support this alleged statement.  Tull said "yes" to a question asking whether she learned "there had been an incident in the Duggar family where Josh, the oldest, had molested his sisters and possibly others."  City Defs' Ex. 8, 14:24- 15:6. Plaintiffs object to the statement as it was obtained by a leading question.  *See* Fed. R. Evid. 611.

20.     The betrothal was placed on hold and there was a lot of distrust between the Duggar and Holt families. The relationship between the became strained. *Ex. 8,* 22:5-16.

**PLAINTIFFS' RESPONSE**: Undisputed.

21.     Josh Duggar was sent by his father to a facility in Little Rock for a couple of months and returned home on before July 18, the birthday of Jim Bob Duggar. During this time, the molestation incidents were not well known by people in their gathering. Ex. 8, 23:15-24:12, 25:17-25.

**PLAINTIFFS' RESPONSE**: Undisputed that Tull testified to the above at her deposition.  Plaintiffs object to the statement that Josh Duggar's father sent him to a facility for a couple of months and returned before July 18 on the ground that the deponent lacks personal knowledge and foundation.  Fed. R. Evid. 602.


22.     Tull recalls that the betrothal with Josh Duggar later ended when Josh Duggar was lied about viewing pornography. Ex. 8, 29:22-32:6.

**PLAINTIFFS' RESPONSE**: Undisputed.


23.     The incidents of molestation were not well known until the Duggars were reported to DHS by the Oprah Winfrey Show. Ex. 8, 27:8-11, 35:10-14.

**PLAINTIFFS' RESPONSE**: Undisputed that Tull testified that the allegations of Josh's molestation "became more well-known" around the time Harpo Production reported the allegations to DHS.  Plaintiffs object to the rest of the statement as argumentative, lacking foundation, and improper opinion testimony.  Fed. R. Evid. 602, 701.

24.     In 2003, Tull had written a letter to an author of a book that she was reading providing the details of the molestation incident. The letter was never sent, but instead was placed inside of a book on her bookshelf. The letter detailed that Josh Duggar had molested his sisters. Ex. 8, 35:19-36:23, 38:8-13.

**PLAINTIFFS' RESPONSE**: Undisputed.


25.     In 2006, the book containing the letter about molestations incident was loaned out by Tull to a friend, Gabrielle Reno, who discovered the letter and showed it to her parents. The Reno family then told other parents who attended the gatherings about the letter and then there was a whole group of people who knew about the molestations at that time. Ex. 8, 36:4-39:7.

**PLAINTIFFS' RESPONSE**: Undisputed that Tull testified that in 2006, the book containing the letter that she wrote was lent out to a friend, Gabi Reno, who discovered the letter and told her parents who told other parents.  Plaintiffs object to the remainder of the statement as it lacks foundation, is improper opinion testimony, and is hearsay.  Fed. R. Evid. 602, 701, 801.


26.     The information in the letter changed the nature of the gatherings and split the group into multiple factions and caused a permanent split between the families that attended the gatherings. The molestation incidents and the contact with the Oprah Winfrey Show caused the families to split into three factions – people that felt like the Duggar family should not have been turned in, people who felt like the Duggar family should have been turned in and people who wanted to stay out of it entirely. Ex. 8, 39:3-40.

**PLAINTIFFS' RESPONSE**: Undisputed that Tull testified that the letter changed the nature of the gatherings, causing three groups of people to emerge—"people that felt like they

should not have been turned in, people that felt like they should have been, and then the group of people who wanted to stay out of it entirely."

Plaintiffs object to the statement as it is argumentative, lacks foundation, and is improper opinion testimony.  Fed. R. Evid. 602, 701.


27.     Over a hundred people were a part of the gathering and basically everybody in the church was aware of the molestation allegations. Some of the families who learned about the molestations left the gatherings. Ex. 8, 59:7-60, 60:10-17.

**PLAINTIFFS' RESPONSE**: Undisputed that Tull made the alleged statement. Plaintiffs object to the statement as it lacks foundation and is improper opinion testimony, and was obtained by a leading question.  Fed. R. Evid. 602, 611, 701.


28.     Several families who were members of the gatherings told their children not to talk about the molestation incidents. Ex. 8, 44:4-45:19.

**PLAINTIFFS' RESPONSE**: Undisputed that Tull made the alleged statement. Plaintiffs object to the statement as it lacks foundation and includes hearsay.  Fed. R. Evid. 602, 801.


29.     Dasha Nichols was shown Tull's letter by the Reno family. Dasha Nichols sent the email to Harpo Studio informing them of the molestation incidents by Josh Duggar. Ex. 8, 57:22-58-18.

**PLAINTIFFS' RESPONSE**: Undisputed that Tull acknowledged the alleged statement. Plaintiffs object to the statement as it lacks foundation and contains a hearsay.  Fed. R.

Evid. 602, 801.  Tull testified that Dasha Nichols called Tull's parents and told them that Nichols

was going to email Oprah or the Department of Human Services.  City Defs' Ex. 8, 58:15-18.

30.     On May 15, 2020, a Little Rock attorney named Abtin Mehdizadegan sent a

request under the Arkansas Freedom of Information Act ("FOIA") to the SPD via fax

transmission (the "FOIA Request"). The FOIA Request was erroneously placed into the office

in-box of a police officer who was on a vacation, thus the existence of the FOIA Request was not

known by SPD until the afternoon of May 19, 2015. Ex. 2, ¶ 8; Ex. 9, ¶ 4; Ex. 14, Affidavit of

Abtin Mehdizadegan ¶ 4.

**PLAINTIFFS' RESPONSE**: Undisputed.

31.     The FOIA Request sought SPD records from January 1, 1998 until December 31,

2008 related to Josh, Jim Bob and Michelle Duggar as well as all records related a series of 17

physical addresses. The FOIA Request specifically sought "an incident report…that was

responded to by Darrell Hignite." Ex. 10, FOIA Request 1-2.

**PLAINTIFFS' RESPONSE**: Undisputed.

32.     On May 19, 2015, at 3:12 pm, In Touch Weekly published a story on their

website that Josh Duggar was named in a police report as the "alleged offender" in an underage

sexual abuse probe. The story states that "multiple sources who have seen the police report and

are familiar with the case" provided In Touch Weekly with information. The story included

details of the Investigation, including the involvement of former State Trooper Police trooper and

that Sgt. Darrel Hignite was the officer who led the investigation. The story also quoted a source

that said "I saw and read the report and it clearly stated that Jim Bob brought his son Josh into the Arkansas State Police and spoke to a state trooper about Josh's involvement in alleged inappropriate touching with a minor." Ex. 11, Ex. A, 1, 15; Ex. 7, Ex. A.

**PLAINTIFFS' RESPONSE**: Undisputed.


33.    In Touch Weekly received the tip about the May 19, 2015 Josh Duggar story through Sherrl Colville ("Colville") (a/k/a Sherri Townsend, a/k/a Sherrl Colville) and Tandra Barnfield ("Barnfield"). Prior to May 15, 2015, Colville took a picture in front of the Duggar residence in Tontitown, Arkansas in which Barnfield and her same-sex girlfriend were kissing. The photo was taken in protest due to Michelle Duggar's opposition to a proposed anti-discrimination ordinance in Fayetteville, Arkansas and in response to a call from Michelle Duggar on Facebook to receive photos of other married couples kissing. The photo was placed on social media and went "viral". A reporter from In Touch contacted Barnfield to ask why the photo had gone viral and Barnfield revealed to the reporter the story of the molestation by Josh Duggar. The reporter then contacted Colville who confirmed that she had been reminded of the story by a retired high school teacher and that the molestation incidents were known in the community. Colville's nephew was friends with a former SPD dispatcher, Cecil Clifton ("Clifton"), and Clifton had knowledge of the SPD Offense Report. Colville contacted the reporter for In Touch and provided her the information about Clifton and his knowledge of the SPD Offense Report. Ex. 12, Affidavit of Colville ¶¶ 2-7; Ex. 15, Affidavit of Tandra Barnfield ¶¶ 3-6.

**PLAINTIFFS' RESPONSE**: Undisputed that In Touch Weekly received a tip about general molestation allegations against Josh Duggar from Sherrl Colville and Tandra Barnfield.

Prior to May 15, 2015, Colville took a picture in front of the Duggar residence in Tontitown, Arkansas in which Barnfield and her same-sex girlfriend were kissing.  Undisputed that the Affidavit of Colville states that the photo was taken in protest due to Michelle Duggar's opposition to a proposed anti-discrimination ordinance in Fayetteville, Arkansas and in response to Michelle Duggar's request for others to post photos of married couples on Facebook. Undisputed that the Affidavit of Barnfield states that a reporter from In Touch contacted Barnfield about the photo and Barnfield revealed to the reporter something about molestation by Josh Duggar.  Undisputed that the Colville Affidavit states that the reporter contacted Colville and Colville told the reporter something about the allegations involving Josh Duggar and informed her that she knew of an individual who had read the police report regarding the allegations of molestation.  Disputed as to the remainder.  The cited evidence does not support the alleged statement.

34.     Rumors alleging Josh Duggar's molestation of his sisters were known in the community and on the internet for years. Ex. 12, ¶¶ 1, 8; Ex. 15, ¶ 7; Ex. 14, ¶¶ 8-9; Ex. 8, 59:7-60, 60:10-17, 44:4-45:19.

**PLAINTIFFS' RESPONSE**: Undisputed that rumors about Josh Duggar sexually molesting some persons were known by some in the community and by some on the internet. Plaintiffs object to the statement and the underlying evidence, Colville Declaration, as the evidence lacks foundation, is argumentative, and is improper opinion testimony.  Fed. R. Evid. 602, 701.

35.     In the afternoon of May 19, 2015, O'Kelley became first aware of the Investigation and the SPD Offense Report by Capt. Ron Hritz who informed her that there was an FOIA request for the report. Capt. Hritz informed O'Kelley that he believed that the response to the FOIA request was late. O'Kelley asked for a copy of the report and read it that night of May 19, 2015. Ex. 2, ¶ 5; Ex. 9, ¶¶ 4-6.

**PLAINTIFFS' RESPONSE**: Undisputed that O'Kelley testified that in the evening or night of May 19, 2015, she became aware of the Investigation and the SPD Offense Report, and Capt. Ron Hritz informed her that the SPD had received a FOIA request for the report. Undisputed that Capt. Ron Hritz provided a copy of the report to O'Kelley that night. Disputed as to the remainder. The cited evidence does not support the alleged statement. Hritz's declaration states that the SPD became aware of the FOIA request, following a phone call by Abtin Mehdizadegan that the request was due per Arkansas law. City Defs' Ex. 9, ¶ 4.

36.     Also on the night of May 19, 2015, O'Kelley was sent an email that had been sent to Sgt. Hignite from a producer with NBC Universal/Access Hollywood that copied the May 19, 2015 article about Josh Duggar. O'Kelley noted that the email to Sgt. Hignite contained information from the SPD Offense Report. Ex. 2, ¶ 5; Ex. 9, ¶ 7.

**PLAINTIFFS' RESPONSE**: Undisputed that on the night of May 19, 2015, O'Kelley was sent an email that had been sent to Sgt. Hignite from a producer with NBC Universal/Access Hollywood indicating that there was a tabloid article regarding sexual misconduct allegations against Josh Duggar. Disputed as to the remainder. The email asked whether NBC Universal could "get a police report or some sort of documentation that's tied to the case" and does not mention the Offense Report. Ex. A to City Defs' Ex. 9.

37.     The following morning on May 20, 2015, O'Kelly informed Cate about the FOIA request and asked Capt. Hritz to contact the Duggar family to inform them of the FOIA request and to keep them updated. O'Kelley also instructed her staff not to release the SPD Offense Report until legal advice was received from Cate. O'Kelley asked Capt. Hritz to make redactions to the SPD Offense Report. Ex. 2, ¶6; Ex. 9, ¶¶ 9-10.

**PLAINTIFFS' RESPONSE**: Undisputed that the O'Kelley and Hritz's declaration state the above.

38.     Capt. Hritz spoke to Jim Bob Duggar on the morning of May 20, 2015 and advised Mr. Duggar that SPD may be required to release the redacted SPD Offense Report. Ex. 9, ¶ 11.

**PLAINTIFFS' RESPONSE**: Undisputed that the Hritz declaration states the above.

39.     Later that morning, O'Kelley informed Cate of the FOIA request and Cate was provided with a copy of the redacted SPD Offense Report. This was the first time that Cate became aware of either the Investigation or the SPD Offense Report. Ex. 1, ¶ 4.

**PLAINTIFFS' RESPONSE**: Disputed.  Cate stated that he was first made aware of the existence of the May 15, 2015 FOIA request from Mehdizedegan when Cpt. Hritz informed him of the request in the late morning of May 20, 2015 and provided him with a redacted version of the SPD Offense Report to review.  City Defs' Ex. 1, ¶ 6.  Cate stated that he first became aware of the investigation in the afternoon of May 20, 2015.  (*Id.*, ¶ 5.)

40.     Cate reviewed the redacted SPD Offense Report in the late morning of May 20, 2015 and was unable to ascertain the identity of either the suspect or any of the victims. Cate remained unaware of the identity of the victims until Dillard and Seewald publicly disclosed their identity on the Megyn Kelley Show on or about June 3-5, 2015. Ex. 1, ¶ 5.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged statement.  The cited evidence states that Cate first became aware of the allegations that Josh Duggar had molested members of his family and possibly another person on May 20, 2015.  City Defs' Ex. 1, ¶ 5.  Cate testified that he conducted an Internet search in the morning of May 20, 2015 and learned about the rumors about Josh Duggar's molestation.  See Bledsoe Decl., Ex. 3 [Cates Dep. Tr.] 11:15-23.

41.     Cate was asked at that time by O'Kelley for his legal advice regarding the FOIA request and the release of the SPD Offense Report. Cate informed O'Kelley that he believed that the report would have to be redacted and released, but he also suggested that they seek out other officials and attorneys for their opinions since he was aware that there was already an article online that included facts of the Investigation and the SPD Offense Report. Ex. 1, ¶ 6; Ex. 9, ¶ 12.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged statement.  Cate's declaration states that Captain Hritz asked him to review the redacted Offense Report to see if any further redactions were necessary.  City Defs' Ex. 1, ¶ 6.  Hritz's declaration states that prior to the release of the Offense Report, O'Kelley referred the matter to the City Attorney for an opinion as to whether the requested records were subject to public disclosure under the FOIA.  City Defs' Ex. 9, ¶ 12.  Hritz's declaration also states that O'Kelley and Cate

contacted the Arkansas Municipal League, the Arkansas State Police, the Washington County

Juvenile Prosecuting Attorney and made unsuccessful attempts to contact appropriate officials

within the Arkansas Department of Human Services.  *Id.*, ¶ 12.  Plaintiffs object to the portions

of the Hritz Declaration cited above as it lacks foundation.  Fed. R. Evid. 602.


42.      On May 20, 2015 in the early afternoon, Abtin Mehdizadegan sent a letter to the

Arkansas Department of Corrections seeking to interview Joseph T. Hutchins. Ex. 14, ¶ 5.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged

statement.  The Mehdizadegan declaration states that he made the FOIA requests under his law

firm's letterhead City Defs' Ex. 14, ¶ 5 and he "sent a letter by fax to the Warden's Office of the

Wrightsville Hawkins for Males Unit, requesting an interview with Joseph T. Hutchens" on May

20, 2015, at 1:09 p.m.  *Id.*, ¶ 6.


43.      Cate then spoke with the Deputy City Attorney Sarah Sparkman who agreed that

the SPD Offense Report would have to be redacted and released pursuant to the FOIA. Cate then

called the Washington County Juvenile Prosecutor, Terra Stephenson, who offered her opinion

that the SPD Offense Report would have to be redacted and released pursuant to the FOIA. Cate

also called District Judge Jeff Harper who offered his opinion that the SPD Offense Report

would have to be redacted and released pursuant to the FOIA. Cate attempted throughout the day

to contact attorneys at the Arkansas Department of Human Services, but did not receive return

call that day. Ex. 1, ¶ 7.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged

statement.  Plaintiffs object to the portion of the Cate Declaration cited above on the grounds that

it includes improper opinion testimony and is an improper legal conclusion.  Fed. R. Evid. 701,

704.

44.     Cate and O'Kelley then participated in a conference call with Colonel Bill Bryant,

the Director of the Arkansas State Police, Bill Sadler the information officer for the Arkansas

State Police and the legal counsel for the Arkansas State Police, who all offered their opinion

that the SPD Offense Report would have to be redacted and released pursuant to the FOIA. Ex.

1, ¶ 8.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged

statement.  The Cate Declaration also states that "after providing Colonel Bryant and the legal

counsel for the Arkansas State Police with the relevant facts related to the FOIA Request and the

SPD Offense Report," he was informed that "they were not aware of any exemption in law that

would prohibit the release" of the Offense Report and that "it was their opinion that the SPD

Offense Report must be redacted and released to the requestor."  City Defs' Ex. 1, ¶ 9.

45.     Cate and O'Kelley then spoke to Mark Hayes, the then General Counsel and now

the current Executive Director of the Arkansas Municipal League about the FOIA request and

the SPD Offense Report. Cate and O'Kelley were informed by Mr. Hayes that he believed that

they would need to redact and release the SPD Offense Report. Mr. Hayes informed Cate and

O'Kelley that he would continue to review the question. Ex. 1, ¶ 10.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged

statement.  The Cate Declaration states that "[a]fter providing Mr. Hayes with the relevant facts

related to the FOIA request and the SPD Offense Report, we were informed by Mr. Hayes that

he was not aware of any exemption in law that would prohibit the release of the SPD Offense

Report" and that Mr. Hayes stated he "would look further into the issue." City Defs' Ex. 1, ¶ 11.

46. O'Kelley had several phone calls with Abtin Mehdizadegan in the afternoon of

May 20, 2015. In the first phone call, O'Kelley asked Mr. Mehdizadegan if he had confirmation

that SPD had received his FOIA request because they could not find that it had been received by

the department. Mr. Mehdizadegan informed O'Kelley that his May 15, 2015 letter was received

by fax and that he had the fax confirmation sheet that it had been received by SPD. After having

reviewed the May 15, 2015 FOIA Request, O'Kelley called back Mr. Mehdizadegan to inform

him that SPD would need more time to fulfill the request since it would require a search of

several names as well as many addresses. Mr. Mehdizadegan indicated that he only wanted the

SPD Offense Report and would not require a search of any other documents. O'Kelley informed

Mr. Mehdizadegan that she had a copy of the SPD Offense Report, but was waiting on legal

advice on whether it could be released. Ex. 2, ¶ 8.

**PLAINTIFFS' RESPONSE**: Disputed that in the first phone call O'Kelley asked Mr.

Mehdizadegan if he had confirmation as the cited evidence states that it was in the second phone

call that O'Kelley asked Mr. Mehdizadegan for the FOIA request and the fax confirmation sheet.

City Defs' Ex. 2, ¶ 8. Undisputed that the O'Kelley declaration states the remainder.

47. In the afternoon of May 20, 2015, O'Kelley was notified that Doug Thompson, a

reporter with the Arkansas Democrat-Gazette had submitted an FOIA request for the SPD

Offense Report. O'Kelley called Mr. Thompson and explained that they were waiting on legal

advice as to whether the SPD Offense Report could be released. Ex. 2, ¶ 9.

**PLAINTIFFS' RESPONSE**: Undisputed.

48.     All persons who were contacted by Cate and O'Kelley on May 20, 2015 agreed that the SPD Offense Report must be redacted and released later that evening, O'Kelley was informed by Cate that the SPD Offense Report must be released. O'Kelley, Cate and Capt. Hrtiz reviewed the report several times for additional redactions in an effort to over-redact in order to make sure that any identifying information was redacted. Ex. 1, ¶ ¶ 7-11; Ex. 2, ¶ 10; Ex. 9, ¶¶ 13-14.

**PLAINTIFFS' RESPONSE**: Disputed. The cited evidence does not support the alleged statement that "all persons" who were contacted by Cate and O'Kelley on May 20, 2015, agreed that the report must redacted and released later that evening nor that there were efforts to "over-redact." *See* Bledsoe Decl., Ex. 3 [Cate Dep. Tr.] 62:25-63:8; Ex. 2 [O'Kelley Dep. Tr.] 110:13-111:4.


49.     At approximately a few minutes for 9:00 pm on May 20, 2015, O'Kelley sent the redacted SPD Offense Report to Mr. Mehdizadegan by email transmission. A few minutes later, O'Kelley sent the same redacted SPD Offense Report to Mr. Thompson by email transmission. Mr. Mehdizadegan testifies that the redacted SPD Offense Report confirmed much of the information that had been already made public before that date. Ex. 2, ¶ 11; Ex. 14, ¶ 7.

**PLAINTIFFS' RESPONSE**: Undisputed that on May 20, 2015, O'Kelley sent a copy of the Offense Report to Mehdizedegan and Thompson by email.  Disputed as to the remainder as the Mehdizadegan affidavit lacks foundation and constitutes improper opinion testimony.  Fed. R. Evid. 602, 701.

50.     The next morning on May 21, 2015, a communication from the Arkansas Municipal League to Cate indicated that that it was their opinion that out of an abundance of caution, the names of Jim Bob and Michelle Duggar should be redacted from the SPD Offense Report.  O'Kelley contacted Mr. Mehdizadegan and Mr. Thompson to ask them to accept a new version of the SPD Offense Report with the redaction of the name of Jim Bob and Michelle Duggar. Ex. 1, ¶ 12.

**PLAINTIFFS' RESPONSE**: Disputed as the cited evidence does not support the alleged statement.  On May 21, 2015, the Arkansas Municipal League emailed Cate and informed that the Offense Report was exempt from the FOIA under Ark. Code Ann. § 16-90-1104.  *See* Bledsoe Decl., Ex. 10 [O'Kelley Dep. Ex. 10.]

51.     On May 21, 2015, Joseph T. Hutchins was interviewed by a paralegal for Abtin Mehdizadegan. The interview was audio-recorded and Mr. Mehdizadegan listened to the interview that day. Joseph T. Hutchins' interview "told the whole story of the molestations, including, but not limited to the fat that Josh Duggar's sisters were among his victims." The details of this interview were made public. Ex. 14, ¶ 10.

**PLAINTIFFS' RESPONSE**: Undisputed that this is what Mehdizadegan's testimony states as above.  Plaintiffs object to the statement above and underlying evidence as it contains hearsay and improper opinion testimony and lacks foundation.  Fed. R. Evid. 602, 701, 801.

52.     Later in the day of May 21, 2015, an attorney for the Duggar family emailed to Cate a copy of an ex parte order from the Juvenile Court of Washington County to destroy the

SPD Offense Report and related case files. The order was from Case No. J 2007-38, which was case that neither Springdale or its officers were a party. Neither Cate, O'Kelley or Capt. Hrtiz had any knowledge of In Re: J.D. et al. (Case No. J 2007-38). Subsequently, Springdale received a series of ex parte orders and letters from the Juvenile Court containing various advisory opinions on the release of the SPD Offense Report. Ex. 1, Declaration of Cate ¶ 14; Ex. 2, ¶ 13; Ex. 9, ¶ 15.

**PLAINTIFFS' RESPONSE**: Undisputed that following the release of the report, the City of Springdale was provided with orders from Judge Zimmerman and that the City of Springdale was not a party to the case referenced above.  Disputed as to the remainder as the cited evidence does not support the alleged statement.  The Cate Declaration does not mention ex parte orders or letters from the Juvenile Court.  City Defs' Ex. 1, ¶ 14.  The O'Kelley Declaration states that she was informed of an order from Judge Zimmerman to destroy the Offense Report. City Defs' Ex. 2, ¶ 13.  Neither of the declarations cited mentions a series of ex parte orders or letters containing various advisory opinions.

53. After the receipt of subsequent ex parte orders and letters through attorneys for the Duggar family, and in one case from a member of the public, Springdale retained outside counsel to move for a limited intervention into In Re: J.D. et al. (Case No. J 2007-38) in order to challenge the basis and authority for the ex parte orders and letters that had been received and to address additional FOIA requests that had been received by Springdale for a wide range of documents which could be associated to the SPD Offense Report, including a recorded 911 call related to the subject matter of the SPD Offense Report. This motion to intervene was denied by the Juvenile Court. Ex. 1, ¶15.

**PLAINTIFFS' RESPONSE**: Undisputed.

54.     Outside counsel represented Springdale in a FOIA lawsuit filed by the Arkansas Democrat Gazette and Doug Thompson in the Washington Circuit Court seeking the release of the 911 call and the letters received from Juvenile Court. Springdale had withheld the release of those documents due to the orders received from the Juvenile Court. One of the Plaintiff's in this action intervened into this FOIA lawsuit seeking to oppose the release of these records. The Washington County Circuit Court ordered the redaction and release of the recorded 911 call as well as the letter from the Juvenile Court. Ex. 1, ¶ 16.

**PLAINTIFFS' RESPONSE**: Undisputed.

55.     The Plaintiffs testified that they have no knowledge of any evidence of a malicious basis or bad intention on behalf of Cate or O'Kelley for the release of the SPD Offense Report. Ex. 3, 114:11-116:17; Ex. 4, 36:20-23, 128:4-9; Ex. 5, 112:22-113:14, 114:22-23, 115:13-20, 117:3-19, 118:1-11; Ex. 6, 172:3-25, 173:15-174:24, 198:14-22.

**PLAINTIFFS' RESPONSE**: Disputed.  The cited evidence does not support this alleged statement.  In the cited evidence, Plaintiffs testify that they do not know Cate or O'Kelley personally and that they "do not know" about Cate's or O'Kelley's motives for their actions.

56.     O'Kelley and Cate believed that the redaction and release of the SPD Offense Report pursuant to a valid FOIA Request was required by law. Ex. 1, ¶ 7; Ex. 2, ¶ 14. O'Kelley and Cate both acted without malice or ill will towards the Plaintiffs or towards anybody in the Duggar family. Ex. 1, ¶ 4; Ex. 2, ¶ 17.

**PLAINTIFFS' RESPONSE**: Disputed.  O'Kelley and Cate were still in the midst of confirming whether or not the SPD Offense Report needed to be released when O'Kelley sent a redacted Offense Report to Abtin Mehdizadegan and Doug Thompson.  *See* Bledsoe Decl., Ex. 10

57.     O'Kelley sent the SPD Offense Report in response to the FOIA Request upon the advice of legal counsel. Ex. 2, ¶ 14; Ex. 1, ¶¶ 7-12.

**PLAINTIFFS' RESPONSE**: Disputed.  O'Kelley and Cate were still in the midst of confirming whether or not the SPD Offense Report needed to be released when O'Kelley sent a redacted Offense Report to Abtin Mehdizadegan and Doug Thompson.  *See* Bledsoe Decl., Ex. 10

58.     On May 26, 2015, O'Kelley ordered an internal investigation into whether there was an unauthorized release of the SPD Offense Report. Ex. 2, ¶ 16; Ex. 11, ¶ 6.

**PLAINTIFFS' RESPONSE:** Undisputed.

59.     The internal investigation report into the unauthorized release of the SPD Offense Report concluded that no current Springdale employee or official was involved in the release of information to In Touch Weekly. The investigation concluded after O'Kelley's retirement and found no wrongdoing on the part of O'Kelley or Cate. Ex. 11, ¶¶ 11,15; Ex. 13, Declaration of Mike Peters ¶¶ 7-9.

**PLAINTIFFS' RESPONSE**: Disputed.  First, the cited evidence does not support the alleged statement that the investigation found no wrongdoing on the part of Cate.  Additionally,

the IA report describes how Cecil Clifton played a role in the confirmation of the existence of the

Offense Report, which was relayed to *In Touch*.  City Defs' Ex. 11-A, 14-24.)


60.     On or about June 3-5, 2015, Jim Bob and Michelle Duggar and the Plaintiffs

Dillard and Seewald appeared on the Megyn Kelley Show on the Fox News Network. Dillard

and Seewald disclosed for the first time on this Megyn Kelley show that they were victims of

molestation by Josh Duggar. Ex. 3, 48:1-5; Ex. 6, 195:1-196:19; Ex. 5, 9:6-10, 115:21-23,

121:21-123:4; Ex. 16.

**PLAINTIFFS' RESPONSE**: Undisputed that Dillard and Seewald never voluntarily

disclosed that they were the victims of sexual assault before the Megyn Kelly Show.  Bledsoe

Decl., Ex. 22, at 98:4-6; Ex. 23, at 9:23-10:4; Ex. 27, at 38:15-17; Ex. 26, at 128:16-22.  Before

Dillard and Seewald appeared on the show, the Incident Report and Offense Report released to

In Touch and others included the personal identifying information that identified Dillard and

Seewald as the victims of Josh's molestation.  Following the release of the Incident and Offense

Reports, Plaintiffs' identities as the victims of sexual molestation became known based on the

personally identifying information in the Incident and Offense Reports.  *See* Bledsoe Decl., Exs.

1, 29 and City Defs' Ex. 2-A [Offense Report, Incident Report, May 19, 2015 article].


61.     The participation of Jim Bob and Michelle Duggar and the Plaintiffs Dillard and

Seewald was arranged by an agent and "PR person" named Chad Gallagher. Ex. 3, 129:19-

130:5; Ex. 6, 195:1-200:22, Ex. 6 to Dep.

**PLAINTIFFS' RESPONSE**: Disputed.  The cited evidence only supports the fact that

Chad Gallagher played a role in coordinating Jim Bob, Michelle Duggar, Jill Dillard, and Jessa

Seewald's appearance on the Megyn Kelley Show.

62.     The appearance of Jim Bob and Michelle Duggar and the Plaintiffs Dillard and Seewald was arranged by agent Chad Gallagher, who provided Jim Bob and Michelle Duggar, as well as the Plaintiffs Dillard and Seewald with the questions that they would be asked ahead of time in the interview. Id; Ex. 6, Ex. 8 to Dep., Ex. 9 to Dep.

**PLAINTIFFS' RESPONSE**: Disputed.  The cited evidence only supports the fact that Chad Gallagher played a role in coordinating Jim Bob, Michelle Duggar, Jill Dillard, and Jessa Seewald's appearance on the Megyn Kelley Show and provided some questions he would like them to "think on."

63.     Chad Gallagher arranged with the Megyn Kelly Show that Jessa Seewald and Jill Dillard would reveal their identify as victims on or about the June 3-5, 2015 television show. Ex. 3, 48:1-5, 129:19-130:5; Ex. 6, 195:1-200:22, Ex. 5 to Dep.

**PLAINTIFFS' RESPONSE**:  Disputed as the cited evidence does not support this alleged statement.  Seewald testified at deposition that Chad Gallagher might have sent her an overview of what may be discussed during the interview.  City Defs' Ex. 3, 129:19-130:5. Dillard testified that prior to the interview, Gallagher wrote that Megyn Kelly agreed not to name the victims, but the victims can name themselves on the show.  City Defs' Ex. 6, 196:7-12. Following the release of the Incident and Offense Reports, Plaintiffs' identities as the victims of sexual molestation became known based on the personally identifying information in the Incident and Offense Reports.  *See* Bledsoe Decl., Exs. 1, 29 and City Defs' Ex. 2-A [Offense Report, Incident Report, May 19, 2015 article].

64.    On June 19, 2015, Chad Gallagher sent the Duggar family, including the
Plaintiffs, an email setting with an update and a public relations strategy. The email states that
Jim Bob and Michelle Duggar will be meeting with TLC "to discuss ideas on moving the series
forward". The email also explains that "we are slowing easing into posting again" but that they
"do not want to stir the pot." The email continues that this week "we posted a nice little blog post
from Ben and Jessa", will "next announce Jill and Derick's new adventure" and that "we will
also likely do our own announcing of Josh and Anna's sweet new baby." Finally, the email states
"we are also thinking about additional sit-down interviews at some point – especially for Josh
but are looking to see if we can get a read on TLCs plans to factor that in." Ex. 6, 195:1-200:22,
Ex. 12 to Dep.

**PLAINTIFFS' RESPONSE:** Undisputed that Chad Gallagher's email on June 19, 2015,
stated the quoted language.



████████████████████████████████████████████

66.     None of the Plaintiffs are identified in the SPD Offense Report. Ex. 9, Ex. B, 1-33. The Plaintiffs admit that their names and other identifying information was redacted from the SPD Offense Report. Ex. 3, 82:17-22, 13:2-5; Ex. 4, 29:22-24; Ex. 5 9:22-24; Ex. 6, 77:18-25.

**PLAINTIFFS' RESPONSE**: Disputed.  The unredacted portions of the SPD Offense Report included sufficient information to identify Plaintiffs as the victims of Josh Duggar's sexual assault.  See Bledsoe Decl., Ex. 29 [Offense Report].







72.     The City of Springdale does not carry insurance to cover the claims in this case.

Ex. 18, Affidavit of Mayor Doug Sprouse.

**PLAINTIFFS' RESPONSE**: Undisputed that the declaration of Doug Sprouse states the

above.  This statement does not address coverage provided by the Arkansas Municipal League or

other sources.


73.     On May 5, 2021, the molestation of Josh Duggar's sisters was considered in open

court during a detention hearing for Josh Duggar in his pending criminal trial. Ex. 17, Transcript

of Detention Hearing.

**PLAINTIFFS' RESPONSE**: Disputed.  The cited evidence shows that, "according to

the police reports" Josh Duggar admitted "to the conduct that he was alleged to have done to

minors when he was a minor."  It does not mention that the minors victims were his sisters or the

details of Josh Duggar's sexual assault.

Respectfully submitted,


By: */s/ Steven E. Bledsoe*

Stephen G. Larson (admitted *pro hac vice*)
*slarson@larsonllp.com*
Steven E. Bledsoe (admitted *pro hac vice*)
*sbledsoe@larsonllp.com*
Jen C. Won (admitted *pro hac vice*)
*jwon@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000

Shawn B. Daniels (Ark. Bar No. 99126)
*shawn@danielsfirm.com*
DANIELS FIRM
129 W. Sunbridge Drive
Fayetteville, AR 72703
Telephone: (479) 521-7000
Facsimile: (479) 437-2007

Attorneys for Plaintiffs JILL DILLARD, JESSA
SEEWALD, JINGER VUOLO, and JOY
DUGGAR