# EXHIBIT A

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF ARKANSAS
2                          FAYETTEVILLE DIVISION

3                                          )
    JILL DILLARD, JESSA SEEWALD,           )
4   JINGER VUOLO, and JOY DUGGAR,          )
                                           )
5                   PLAINTIFFS,            )
                                           )
6   VS.                                    )
                                           ) CASE NO.
7   CITY OF SPRINGDALE, ARKANSAS;          ) 5:17-5089-TLB
    WASHINGTON COUNTY, ARKANSAS;           )
8   KATHY O'KELLEY, in her individual      )
    and official capacities;              )
9   ERNEST CATE, in his individual        )
    and official capacities; RICK          )
10  HOYT, in his individual and            )
    official capacities; STEVE ZEGA,       )
11  in his official capacity;              )
    BAUER PUBLISHING COMPANY, L.P.;        )
12  BAUER MAGAZINE, L.P.; BAUER MEDIA      )
    GROUP, INC.; BAUER, INC.;             )
13  HEINRICH BAUER NORTH AMERICA,          )
    INC.; BAUER MEDIA GROUP USA, LLC;      )
14  and DOES 1-10, inclusive               )
                                           )
15                  DEFENDANTS.            )

16

17  ORAL AND VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE OF

18                        JILL DILLARD

19                      SEPTEMBER 1, 2021

20

21

22

23

24

25



```
 1        ORAL AND VIDEOTAPED DEPOSITION OF JILL DILLARD,

 2  produced as a witness at the instance of the

 3  Defendants, and duly sworn remotely was taken in the

 4  above-styled and numbered cause on the 1st day of

 5  September, 2021, from 10:04 to 5:47, before Dee Ann

 6  Adkins, CCR in and for the State of Arkansas, reported

 7  by machine shorthand, via video conference, pursuant

 8  to the Federal Rules of Civil Procedure.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                  A P P E A R A N C E S
 2   APPEARING ON BEHALF OF THE PLAINTIFFS:
 3        Shawn B. Daniels, Esq.
 4        Daniels Firm
 5        129 W. Sunbridge Drive
 6        Fayetteville, Arkansas 72703
 7        Shawn@danielsfirm.com
 8
 9        Steven E. Bledsoe, Esq.
10        Larson O'Brien, LLP
11        555 S. Flower Street, Suite 4400
12        Los Angeles, CA 90071
13        Sbledsoe@larsonobrienlaw.com
14
15   APPEARING ON BEHALF OF WASHINGTON COUNTY DEFENDANTS:
16        Jason Owens, Esq.
17        Jason Owens Law Firm, P.A.
18        1023 Main Street, Suite 204
19        Conway, AR 72033
20        Owens@jowenslawfirm.com
21
22
23
24
25
```



```
 1                    APPEARANCES (continued)

 2    APPEARING ON BEHALF OF SPRINGDALE DEFENDANTS

 3         Thomas N. Kieklak, Esq.

 4         Justin Eichmann, Esq.

 5         Harrington Miller Kieklak Eichmann & Brown, P.A.

 6         4710 S. Thompson, Suite 102

 7         Springdale, AR 72764

 8

 9         Ms. Susan Keller Kendall

10         Kendall Law Firm, PLLC

11         3706 Pinnacle Hills Parkway, Suite 201

12         Rogers, Arkansas 72758

13         (479) 464-9828

14         Skk@kendalllawfirm.com

15

16    ALSO PRESENT:

17       Julie Coulston, Legal Videographer

18

19

20

21

22

23

24

25
```



```
 1                    I N D E X

 2                                              PAGE

 3   Appearances                                   3

 4   Index                                          4

 5   Proceedings                                    7

 6   Examination by Mr. Owens                       8

 7   Examination by Mr. Kieklak                   112

 8   Changes and Signature                        222

 9   Court Reporter's Certification               223

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**www.ArkansasRealtimeReporting.com**

```
 1                        EXHIBIT INDEX

 2   NO.                   DESCRIPTION                    MARKED

 3   Exhibit 1    (Not introduced)

 4   Exhibit 2    (Not introduced)

 5   Exhibit 3    (Not introduced)

 6   Exhibit 4    (Not introduced)

 7   Exhibit 5    CONFIDENTIAL E-mail string         193
                  Re: Megyn Kelly, Bates-labeled
 8                JD009638 through JD009639

 9   Exhibit 6    CONFIDENTIAL E-mail string         196
                  Re: Interview thoughts Bates-labeled
10                JD009683 through JD009686

11   Exhibit 7    CONFIDENTIAL E-mail string         201
                  Re: Master list
12                Bates-labeled JD009645 through JD009646

13   Exhibit 8    (Not introduced)

14   Exhibit 9    CONFIDENTIAL E-mail              202
                  Re: Jill/Jessa Interview Notes
15                Bates-labeled JD009666 through JD009669

16   Exhibit 10   (Not introduced)

17   Exhibit 11   (Not introduced)

18   Exhibit 12   CONFIDENTIAL E-mail Re: Touching base211
                  Bates-labeled JD009657 through JD009658
19
     Exhibit 13   CONFIDENTIAL E-mail              214
20                Re: Filming with the Dillards
                  Bates-labeled JD009675 through JD009676
21

22

23

24

25
```



```
 1                    P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  I'm Julie Coulston,
 3         the videographer, representing Arkansas
 4         Realtime Reporting.  Today's date is
 5         September the 1st, 2021.  The time is 10:04
 6         a.m.  The case style is Jill Dillard, et al
 7         versus City of Springdale, et al.
 8              The witness is Jill Dillard.  Our court
 9         reporter is Dee Ann Adkins.
10              If counsel will introduce yourself, then
11         the witness will be sworn.
12              MR. DANIELS:  Shawn Daniels for the
13         plaintiff, and cocounsel Steve Bledsoe will
14         be in and out throughout today's deposition.
15              MR. OWENS:  Jason Owens for the separate
16         Washington County defendants.
17              MR. KIEKLAK:  And Tom Kieklak for the
18         separate Springdale defendants, and Justin
19         Eichmann who is in the room, and Susan
20         Keller Kendall is in the room as well.
21              (Witness is sworn)
22                  JILL DILLARD,
23  after having first been sworn remotely, testified on
24  her oath as follows:
25
```



```
 1   outside the house is sort of an interesting question
 2   these days with -- with all of the Internet and social
 3   media and that sort of thing.  Do you do any work for
 4   income?
 5   A.     Yes, sir.
 6   Q.     What -- what work is that?
 7   A.     Mostly social media.  I would say just social
 8   media right now, yeah.
 9   Q.     And what -- what social media platforms do you
10   work on or do you derive income from?
11   A.     Instagram, YouTube, and our blog.
12               THE COURT REPORTER:  I'm sorry.  What
13          was the last one?
14               THE WITNESS:  Our blog.
15               THE COURT REPORTER:  Okay.
16   Q.     What's the title of your blog?
17   A.     Dillardfamily.com.
18   Q.     Okay.
19   A.     Oh, and --
20   Q.     And --
21   A.     -- Facebook.  I'm sorry.  Facebook, too.
22   Q.     Yeah.  How do you -- how do you make money on
23   these -- set the blog aside for just a second.  How do
24   you make money on these various social media
25   platforms?
```



1    A.    Ads.

2    Q.    So, you are -- when you say ads, do you mean

3    that advertisers place ads in the midst of content

4    that you create?

5    A.    Kind of.

6    Q.    Okay.  Explain that for me, if you can.  I

7    just -- I'm not familiar with the way all that works.

8    A.    Yeah.  So, we have Google Ads, which is like a

9    simple, easy way to make revenue from like -- it's

10   basically like a standard setup.  You just -- I don't

11   know.  It's like a simple way to make revenue from

12   something that's just existing.  Basically there's

13   no -- there's not really a whole lot of interaction

14   there.

15            You just, like, check boxes and then,

16   like, there are advertisements that I may not even be

17   aware of exactly, you know, what's being on there.

18   It's not like I'm communicating with somebody

19   directly, so that's one way.

20            And then another way would be where

21   sometimes occasionally I will interact with people

22   directly and they -- and I'll do a product placement.

23   Q.    I see.  But these are ads that third parties are

24   placing kind of like a TV commercial is interspersed

25   during the TV show.  These would be ads placed by



1  third parties, interspersed in the midst of content

2  that you create on these platforms, right?

3  A.    The Google Ads are more -- it depends on the

4  platform, I guess.  The Google Ads are more like third

5  party -- it depends.  Like, if you're on YouTube, it

6  would pop up during the video.

7  Q.    I see.

8  A.    On the blog, it would just be a placement on the

9  blog.  And then the other ones that I would work out

10 would be something that I would post with -- with the

11 product or something.

12 Q.    And so how do you get advertisers to advertise

13 in -- in your content?  What I've -- what I've found,

14 I'm just telling you personally, nobody is much

15 concerned with my content on Facebook when I post

16 pictures bragging on my kids.  Nobody wants to

17 advertise.  How do you -- how do you do that?  Is that

18 based on page views or what?

19 A.    Not necessarily.

20 Q.    Are those contractual arrangements that you're

21 making with these advertisers?

22 A.    Sometimes.

23 Q.    Yeah.  You mentioned product placements.  Are

24 there any other times -- so, that would be where

25 you're actually going on one of these platforms and



1  saying this shampoo or whatever other product you

2  might be promoting is what I use or it's a really good

3  product, whatever you might say.  Are there any other

4  scenarios where you're contracting directly with an

5  advertiser?

6  A.    Other -- what do you mean?

7  Q.    So, you do product placements, and did I

8  describe it correctly, basically that you're going on

9  one of these platforms and actively promoting a

10 product.  Is that what you're talking about when you

11 said "product"?

12 A.    Correct.  That's a definition of a product

13 placement is I think probably --

14 Q.    Yeah --

15 A.    -- in layman terms.

16 Q.    Well, so I've heard product placement in a --

17 in a different form and since, like, in some big

18 feature film where they've -- you know, the lead

19 actor, just in the midst of the movie, drinks a Pepsi

20 just to -- you know, without saying anything about it,

21 just drinks a Pepsi.  So --

22 A.    Correct.

23 Q.    But when you're talking product placement,

24 you're talking about actively promoting some brand or

25 product, right?



```
 1   A.     There is a little bit of both.  So, yeah.  I

 2   mean, it depends on what they want you to do.

 3   Sometimes it's outright and sometimes it's not.

 4   Q.     So other than that, what you would define as

 5   product placement, are there any other scenarios where

 6   you're contracting or entering into agreements

 7   directly with advertisers?

 8   A.     I mean, generally, I think that's it.

 9   Q.     Okay.

10   A.     It's advertising.

11   Q.     So, how do you get together with these product

12   placement advertisers on the front end?  In other

13   words, how do they get to you to say, hey, we would

14   like you to promote our makeup or shampoo or whatever

15   the product may be?

16   A.     Sure, yeah.  We have, like, "contact us" buttons

17   on most of our social media and blog.  So they can

18   reach out to us that way, or direct messaging, but

19   sometimes I don't always see it.

20   Q.     Yeah, I understand.  Do y'all have any third

21   party, an agent or anything like that that's helping

22   you coordinate these relationships?

23   A.     No, sir.

24   Q.     Have you ever had such a person to help you

25   with something like that?
```



```
 1   perspective, why was she unable to set up any deals?
 2   A.     I believe she said she couldn't get anybody.
 3   Q.     Okay.  So, outside of product placements where
 4   you're making agreements directly with the advertisers
 5   to promote products in one way or another actively on
 6   social media, you get these -- these ads that either
 7   pop up or -- or play maybe before your video or
 8   whatever where you're not contracting directly with
 9   the advertiser.  How do you get those ads?
10   A.     What are you referring to exactly?
11   Q.     Yeah.  So my understanding from your earlier
12   testimony was that, for instance, Google Ads that you
13   mentioned --
14   A.     Oh, yeah.
15   Q.     -- and pop-up ads on YouTube that y'all derive
16   some revenue from those ads.  Are those just based
17   on -- on views and that sort of thing?
18   A.     So there's basically, when you set up your
19   social media, there's an option to apply for different
20   kinds of -- I think it's, like, different kinds of
21   accounts or something.
22              There's a process, and in that process
23   you have the option to select the box and, like, it's
24   different on different platforms.  So, like, Instagram
25   you don't make money directly but, like, on YouTube
```



```
 1   you can set up a Google account and get -- like, check
 2   the box, then they'll put ads in your YouTube
 3   video and then you're not, like, managing necessarily
 4   every single video ad.  It's just, like, they
 5   automatically come on there or whatever.  I don't
 6   know.
 7              Anyways, you have a Google account
 8   associated with your YouTube channel and then, yes,
 9   it's like you -- the ads -- I don't know.  I don't
10   know exactly how all of it works, but I know that,
11   like, yeah, it's associated with your Google account,
12   I guess.
13   Q.    So, how much income are you deriving on social
14   media efforts annually?
15   A.    It varies.
16   Q.    How about last year?
17   A.    I'm not sure exactly.
18   Q.    Do you know a ballpark?
19   A.    Possibly.
20   Q.    Yeah.  What would that ballpark amount be?
21   A.    It'd be, like, 10k.
22   Q.    Okay.  And would that be separate and apart
23   from your husband, or would that be all of your
24   income, whatever that number is?
25   A.    I mean, it's our joint account on there a lot
```



```
 1    of times, so I can't really --
 2    Q.    I see.  Okay.
 3    A.    Right.
 4    Q.    So you said it varies.  Has that number, that
 5    social media number, gone up or down over the last
 6    five years, let's say?
 7    A.    I guess it's hard to tell.
 8    Q.    Sure.
 9    A.    There's lots of --
10    Q.    Has that number ever exceeded, say, 15- or
11    20,000?
12    A.    I don't know.
13    Q.    Okay.  You mentioned you were married in 2014;
14    is that right?
15    A.    Yes, sir.
16    Q.    How old are you today?
17    A.    Today I'm 30.
18    Q.    Okay.  Okay.  How many children do you have?
19    A.    Two.
20    Q.    And what are their ages?
21    A.    Six and four.
22    Q.    Okay.  We -- as I recall, we took your husband's
23    deposition earlier, Derick.  He is in law school or
24    just graduated.  Is he still in law school?
25    A.    No, sir.
```



 1  kind of thing was, like, a lot of it.  Not -- yeah,
 2  not being -- if you are -- like, if we were under it,
 3  then not having as much inability to decide, like,
 4  what we wanted to film and what we don't want to film
 5  and that kind of thing and those types of things.
 6  Q.    Okay.  You don't blame yourself at all in
 7  relation to the molestation, do you?
 8              MR. DANIELS:  Object to form.
 9              Go ahead.
10  A.    Do what?
11  Q.    So, with respect to Josh's molestation of you
12  and your sisters, you don't blame yourself in any way
13  related to any of that, do you?
14              MR. DANIELS:  Object to form.
15  A.    I don't know.
16  Q.    Okay.  How did Josh's recent arrest affect you,
17  if at all?
18  A.    Obviously it was sad to hear about what had
19  happened or what was transpiring, but I wouldn't say
20  that it deeply affected me.
21  Q.    Okay.  Do you have any -- let me ask you this
22  way.  Have you had any interaction with Josh
23  personally, I mean, face to face, in the last year?
24  A.    Yes.
25  Q.    Where -- where have you seen Josh in the last



```
 1              know if -- if you like that.
 2                   MR. OWENS:  Pardon me.  I didn't even
 3              know that existed.
 4                   MS. DILLARD:  At least it's not a cat.
 5   Q.    Yeah.  This therapy or counseling you started
 6   at the Joshua Center, did you seek that therapy
 7   because of problems with your family relationships
 8   and, in particular, problems with your father being
 9   too controlling?
10   A.    We initially sought out counseling as more of,
11   like, a mediation-type thing and that's why we
12   initially sought it out, a mediation thing with my
13   parents, yeah.
14   Q.    Yeah.  Did your parents ever go to the Joshua
15   Center with you?
16   A.    No.
17   Q.    Okay.  Did they ever go at some other time that
18   you know of?
19   A.    I don't know.
20   Q.    Okay.  Were they just not interested in
21   mediation?
22                   MR. DANIELS:  Object to form.
23   A.    Not exactly.
24   Q.    What -- what would exactly be the truth about
25   that?
```



**www.ArkansasRealtimeReporting.com**

1  Q.    That relationship got pretty toxic at one
2  point, didn't it?
3           MR. DANIELS:  Object to form.
4  Q.    Do you think that's improved now?
5  A.    A little bit.
6  Q.    Okay.  Is it triggering for you to see your
7  parents?
8  A.    I don't know.
9           MR. OWENS:  Okay.  Ms. Dillard, I think
10          that's all I have.  I know Mr. Kieklak,
11          who's cocounsel for Springdale, will have
12          some questions for you.  Thank you so much
13          for your time.  I hope I've been respectful
14          with you.  I sure appreciate you giving us
15          the time.  Thank you.
16          MS. DILLARD:  Thank you, Mr. Owens.
17          MR. KIEKLAK:  Let's try that again.
18          Hey, Jason, could we get a break and maybe
19          come back about 2:45?  He's already off.
20          Shawn, is that okay.
21          MR. DANIELS:  That's fine.
22          Jill, is that okay for you?
23          MS. DILLARD:  2:45, you said?
24          MR. KIEKLAK:  Yeah, please.
25          MS. DILLARD:  Sure.

JILL DILLARD vs CITY OF SPRINGDALE
DILLARD, JILL on 09/01/2021

180

```
 1   A.     Probably, like, because he was working for my
 2   dad mostly.
 3   Q.     Uh-huh.
 4   A.     Like, for the TV show and stuff like that.
 5   Q.     So, what kind of compliance do you mean?  What
 6   did you have to comply with?
 7   A.     I guess talent management-type stuff.
 8   Q.     Okay.  Did you ever have occasion to meet with
 9   him just you, just you by yourself?
10   A.     Possibly, yes.
11   Q.     Did you and your husband ever have occasion to
12   meet with him just the two of you and him, to your
13   recollection?
14   A.     Possibly, yes.
15   Q.     And I think you mentioned already to Mr. Owens
16   about how you have different -- you -- you sought out
17   different representation eventually.  I think you
18   mentioned that?
19   A.     Yes.
20   Q.     Is it shop, gift -- Gift Shop?  No?
21   A.     No.
22   Q.     Sorry.  What was it again?
23   A.     Julia Mason, that -- yeah.
24   Q.     So, you probably have never actually paid --
25   yourself -- Chad Gallagher out of your own money for
```

```
 1                    MR. DANIELS:  Object to form.
 2    A.    No.
 3    Q.    Do you recall ever discussing that concept with
 4    Mr. Gallagher?
 5    A.    No.
 6    Q.    It appears there in number 11, subsection (1)?
 7    A.    Un-un.
 8    Q.    Do you recall ever discussing that concept with
 9    your dad?
10    A.    Un-un.
11    Q.    Or your mom?
12    A.    Un-un.
13    Q.    Okay.  Ms. Dillard, were you ever instructed by
14    anyone to forgive your brother?
15                    MR. DANIELS:  Object to form.
16    A.    No.
17    Q.    You don't -- I'm sorry?
18    A.    No, sir.
19    Q.    You weren't?  Okay.
20                    (Exhibit 7 previously marked for
21              identification.)
22    Q.    So we would go to Number 7. It seems that on
23    June the 1st, Mr. Gallagher wrote to you -- you
24    responded, "Very sweet of her.  We can go over today."
25    But would you go down a little lower to see what it
```

```
 1                IN THE UNITED STATES DISTRICT COURT
 2               FOR THE WESTERN DISTRICT OF ARKANSAS
                        FAYETTEVILLE DIVISION
 3
                                          )
 4   JILL DILLARD, JESSA SEEWALD,          )
     JINGER VUOLO, and JOY DUGGAR,         )
 5                                         )
                     PLAINTIFFS,           )
 6                                         )
     VS.                                   )
 7                                         ) CASE NO.
     CITY OF SPRINGDALE, ARKANSAS;         ) 5:17-5089-TLB
 8   WASHINGTON COUNTY, ARKANSAS;          )
     KATHY O'KELLEY, in her individual     )
 9   and official capacities;             )
     ERNEST CATE, in his individual        )
10   and official capacities; RICK         )
     HOYT, in his individual and           )
11   official capacities; STEVE ZEGA,      )
     in his official capacity;             )
12   BAUER PUBLISHING COMPANY, L.P.;       )
     BAUER MAGAZINE, L.P.; BAUER MEDIA     )
13   GROUP, INC.; BAUER, INC.;             )
     HEINRICH BAUER NORTH AMERICA,         )
14   INC.; BAUER MEDIA GROUP USA, LLC;     )
     and DOES 1-10, inclusive              )
15                                         )
                     DEFENDANTS.           )
16

17                  REPORTER'S CERTIFICATION

18       ORAL AND VIDEOTAPED DEPOSITION OF JILL DILLARD

19                       AUGUST 31, 2021

20       I, Dee Ann Adkins, Certified Court Reporter in

21   and for the State of Arkansas, hereby certifies the

22   following:

23       That the witness, JILL DILLARD, was duly sworn

24   remotely by me and that the transcript of the oral

25   deposition is a true record of the testimony given by
```



**www.ArkansasRealtimeReporting.com**

1   the witness;

2       I further certify that pursuant to FRCP Rule

3   30(e)(1) that the signature of the deponent was

4   requested by the deponent or a party before the

5   completion of the deposition and returned within 30

6   days from date of receipt of the transcript.

7       If returned, the attached Changes and Signature

8   Page contains any changes and the reasons therefor;

9     I further certify that I am neither attorney nor

10  counsel for, related to, nor employed by any of the

11  parties to the action in which this proceeding was

12  taken.

13      Further, I am not a relative or employee of any

14  attorney of record in this cause, nor do I have a

15  financial interest in the action.

16      Subscribed and sworn to on this the 10th day

17  of September, 2021.

18

19              s/Dee Ann Adkins

20              Dee Ann Adkins, CCR, CSR

21              Certificate #477, State of Arkansas

22              Arkansas Realtime Reporting

23              1130 E. Millsap Rd

24              Fayetteville, AR 72703

25              479-301-2040

