# EXHIBIT C

**In the Matter Of:**

JILL DILLARD

vs

CITY OF SPRINGDALE

---

**JINGER VUOLO**

*September 20, 2021*

---



Phone: 479-559-2866
Toll-Free: 800-259-7095
Fax: 479-559-2848

581 Madison 1539
Huntsville, Arkansas 72740
www.ArkansasRealtimeReporting.com

1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF ARKANSAS
2                    FAYETTEVILLE DIVISION

3  JILL DILLARD, JESSA SEEWALD,        )
   JINGER VUOLO, and JOY DUGGAR,       )
4             PLAINTIFFS,              )
   VS.                                 )
5  CITY OF SPRINGDALE, ARKANSAS;       )
   WASHINGTON COUNTY, ARKANSAS;        ) CASE NO.
6  KATHY O'KELLEY, in her Individual   ) 17-CV-05089-TLB
   and Official Capacities; ERNEST     )
7  CATE, in his Individual and         )
   Official Capacities; RICK HOYT,     )
8  in his Individual and Official      )
   Capacities; STEVE ZEGA, in his      )
9  Official Capacity;                  )
   Does 1-10, Inclusive,
10            DEFENDANTS.

11         -----------------------------------

12          ORAL AND VIDEOTAPED DEPOSITION OF

13                    JINGER VUOLO

14                 September 20, 2021

15         -----------------------------------

16

17         ORAL AND VIDEOTAPED DEPOSITION OF JINGER

18  VUOLO, produced as a witness at the instance of the

19  DEFENDANTS, and duly sworn, was taken in the

20  above-styled and numbered cause on the 20th day of

21  September, 2021, from 10:02 a.m. to 3:25 p.m., before

22  Tammie L. Foreman, CCR in and for the State of

23  Arkansas, RPR, CRR, reported by machine shorthand, via

24  audio-video conference, pursuant to the Federal Rules

25  of Civil Procedure.



```
 1                          APPEARANCES

 2   FOR THE PLAINTIFFS:
         STEVEN E. BLEDSOE
 3       Larson O'Brien, LLP
         555 South Flower Street, Suite 4400
 4       Los Angeles, California 90071
         213-436-4888
 5       sbledssoe@larsonobrienlaw.com

 6       SHAWN B. DANIELS
         Daniels Firm
 7       129 West Sunbridge Drive
         Fayetteville, Arkansas 72703
 8       479-521-7000
         shawn@danielsfirm.com

 9

10   FOR THE SPRINGDALE DEFENDANTS:
         THOMAS N. KIEKLAK
11       Harrington Miller Kieklak Eichmann Brown
         4710 South Thompson, Suite 102
12       Springdale, Arkansas 72764
         479-751-6464
13       tkieklak@arkansaslaw.com

14       SUSAN KELLER KENDALL
         Kendall Law Firm, PLLC
15       3706 Pinnacle Hills Parkway Suite 201
         Rogers, Arkansas72758
16       479-464-9828
         479-464-9768
17       skk@kendalllawfirm.com

18
     FOR THE WASHINGTON COUNTY DEFENDANTS:
19       JASON E. OWENS
         Jason Owens Law Firm, P.A.
20       1023 Main Street, Suite 204
         Conway, Arkansas 72032
21       501-764-4334
         owens@jowenslawfirm.com

22

23   ALSO PRESENT:
         Garrett Smelley, Certified Legal Video Specialist
24

25
```



1   Q.     Okay.  Have you done any post-high school

2   education, any college or anything?

3   A.     No.

4   Q.     Okay.  Do you work outside the home currently?

5   A.     No.

6   Q.     When were you married?

7   A.     November 5th, 2016.

8   Q.     Okay.  And how old were you at that time?

9   A.     23.

10  Q.     Since you've been married, have you ever worked

11  outside the home?

12  A.     No.

13  Q.     Have you -- have you ever worked for income?

14  A.     Yes.

15  Q.     What work have you done for income?

16  A.     TV show, brand partnerships, author, and a

17  company.

18              THE COURT REPORTER:  And what?  I'm

19        sorry.

20              THE WITNESS:  A company.

21  Q.     What's the name of this company?

22  A.     It's not -- it doesn't exist now.

23  Q.     What was the name of the company?

24  A.     Hope & Stead.

25  Q.     What did that company do?



1   A.      Products.

2   Q.      What kind of products?

3   A.      Hats, candles.

4   Q.      Okay.  And when did the company go out of

5   business?

6   A.      This year.

7   Q.      Okay.  You and your husband wrote a book called

8   The Hope We Hold; is that correct?

9   A.      Correct.

10  Q.      Have you written any other books or published

11  materials?

12  A.      Yes.

13  Q.      What else have you written?

14  A.      Growing Up Duggar.

15  Q.      Okay.  Anything else?

16  A.      No.

17  Q.      Okay.  I can't recall which, but one of your

18  sisters indicated in her deposition that there was a

19  ghostwriter, to use the term, for Growing Up Duggar.

20  Do you recall that?

21  A.      Yes.

22  Q.      Did you and your husband have a ghostwriter on

23  The Hope We Hold?

24  A.      Yes.

25  Q.      Who was that person?



1   A.    Bethany Mauger.

2   Q.    Bethany.  Can you spell that last name for me,

3   or try?

4   A.    M-a-u-g-e-r.

5   Q.    Okay.  You indicated that you made some income

6   through brand partnerships.  What brands have you

7   partnered with?

8   A.    A lot.

9   Q.    Do you remember any of them?

10  A.    Yes.

11  Q.    What would those be?

12  A.    Skillshare, Bombay Hair.  I'm trying to think.

13  Sorry.

14  Q.    Sure.

15  A.    I'm sorry.

16  Q.    On those two, or as many as you remember, Bombay

17  Hair, I assume, is hair products?

18  A.    Yes.

19  Q.    Okay.  What is Skillshare?  Did I hear that

20  right?

21  A.    Yes.

22  Q.    What is that?

23  A.    It's an online thing where people can learn

24  about, just, different things that they want to

25  explore, whether art, photography, cooking.  And it



 1  just has, like, online videos that people can sign up
 2  for to watch and learn more.  Yeah.  Learning skills
 3  online.
 4  Q.    That's a subscription service, it looks like?
 5  A.    Yes, it is.
 6  Q.    Okay.  How did you -- let's talk specifically
 7  with respect to these two brands.  How did you partner
 8  with them?  What form did that take?
 9  A.    CEG.
10  Q.    What is CEG?
11  A.    It's where influencers can go to get
12  partnerships.
13  Q.    Okay.  CEG is, like, an agency?
14  A.    Correct.
15  Q.    Okay.  So what did you do for Skillshare, for
16  instance?
17  A.    I did a short Instagram story talking about the
18  program and how I learned photography from it, and
19  then I posted that on my Instagram.
20  Q.    Okay.  Same thing for Bombay Hair, did a social
21  media post about it?
22  A.    Yes.  Yes.
23  Q.    And would that be true for all of your brand
24  partnerships?  Is that how you partnered with them?
25  A.    Most all of them, yes.



```
 1   Q.    Okay.  So would you enter into a contract with

 2   these brands before you did these posts?  You pay me X

 3   and I'll do a post or two or ten?

 4   A.    Most of the time, yes.

 5   Q.    Okay.  What social media platforms are you on?

 6   A.    Facebook and Instagram and TikTok.

 7   Q.    Okay.  Ballpark, what did you make last year,

 8   all income for you?  Not your husband, but for you.

 9   A.    Not exactly sure right now off the top of my

10   head.

11   Q.    Yeah.  More or less than 100,000?

12   A.    More.

13   Q.    Okay.  More or less than 200,000?

14   A.    Less.

15   Q.    Okay.  Is most of that income the social media

16   partnerships, or is most of that coming from somewhere

17   else?

18   A.    Yes.

19   Q.    Most of it coming from the social media?

20   A.    Social media is the majority.

21   Q.    Okay.  I'm trying to recall your husband's

22   deposition.  It's been a minute.  Y'all live in

23   California, correct?

24   A.    Correct.

25   Q.    And where he pastors a church, if I recall; is
```



1   A.   It's been much harder knowing that people know

2   things they weren't supposed to.

3   Q.   Okay.  How has that made your life harder?

4   A.   In every way.  Just emotionally, physically.

5   It's been difficult.

6   Q.   Okay.  Well, let's -- let's talk about that.

7   Financially, you're making substantially more money

8   than you made in 2015, correct?

9          MR. BLEDSOE:  Object to the form.

10   A.   No.  I don't know.  I don't know.

11   Q.   You think you made more than $100,000 in 2015?

12   A.   I don't recall.

13   Q.   Okay.  Would your tax returns show that?

14   A.   Yes.

15   Q.   Okay.  What about relationally; is your marriage

16   worse than it was six years ago?

17   A.   No.

18   Q.   Okay.  It's better, isn't it?

19          MR. BLEDSOE:  Object to the form.

20   A.   It's great.

21   Q.   Okay.  How about your relationship with your

22   children?  Has it gotten better or worse since 2015?

23   A.   They weren't born.

24   Q.   They weren't even around, were they?  Okay.

25   Have your -- your children have certainly made your



1   anguish?

2   A.    A little bit.

3   Q.    Okay.  I understand that your grandmother passed

4   away suddenly several years ago; is that correct?

5   A.    Yes.

6   Q.    Did that cause you emotional distress or mental

7   anguish?

8   A.    I was sad.

9   Q.    Okay.  Does your book discuss your abuse by

10  Josh?

11  A.    I don't say that, no.

12  Q.    Okay.  Does your book discuss the redacted

13  disclosures and this lawsuit?

14  A.    No.

15  Q.    Okay.  Shouldn't the public be aware of a sexual

16  predator in their community who has sexually abused at

17  least five people?

18              MR. BLEDSOE:  Object to the form.

19  A.    Yes.

20  Q.    Okay.  Have you ever been diagnosed by a

21  physician with any mental or emotional health

22  problems?

23              MR. BLEDSOE:  Object to the form.

24  A.    I don't know.

25  Q.    You don't know.  Okay.



1  to, like, do videos for, then I'll record those.  And

2  then it depends on the day because we are pretty

3  flexible.  My husband has school.  So some days, it's,

4  like, we'll do Hebrew studies in the evening together.

5  Not because I'm good at it, but he's in Hebrew class.

6  So we'll do flashcards.

7           And then we'll have dinner together.  And

8  oftentimes, we'll go out on a family drive, go see a

9  site in LA.  And then, yeah.  I don't know.  That's

10  our typical day.  Put the kids to bed, relax, and play

11  a game of Uno.

12  Q.   Good.  Okay.  You had mentioned partnerships.  I

13  am going to bounce around.  I'm going back to social

14  media because you had mentioned partnerships.  How

15  many partnerships do you have right now?

16  A.   How many right now?  Well, it's not -- they're

17  not continual, like continuing.  So it is -- the way

18  that works, they are random partnerships.

19           So if -- sometimes, you will have a block

20  of partnerships that it's, like, you're going to do

21  five of these.  And a lot of those are the ones that

22  end up getting canceled.  And then you'll have some

23  single ones that people don't want to be associated

24  with us because of all that stuff, and they will drop

25  out as well.



1  Q.    Okay.  I'm sorry.  I didn't -- I'm going to have
2  to break that down.  And I apologize.  It's really
3  kind of a lingo I don't speak, so -- because I'm a lot
4  older than you.  So let me start off by saying this.
5  You said there was a block of partnerships.  Would
6  there be five of those?
7  A.    That you do for one company, you'll do five ads
8  over five months or so.  For instance, I -- yeah.
9  Because I had -- I've had multiple ones of those where
10 they say, "Okay.  You're going to do three
11 partnerships.  Once a month, you'll post on --
12 something on hair."  You know, like a hair product.
13 So once a month, I do a post on it.
14 Q.    Okay.  So are you currently -- but you were
15 saying that these kind of are cyclical, that you'll do
16 it for a while and then not?
17 A.    No.  I'm constantly -- I continually do them.
18 So I'll do about four a month maybe, if not more.
19 Q.    Okay.  And which ones are you currently -- who
20 are you currently working with?
21 A.    I'm currently -- well, as of, like, something
22 hasn't been posted yet, PatPat kid's clothing.  I just
23 got another one for a vacuum cleaner.  It's, like, a
24 Robot vacuum cleaner-type thing.  It's not Robot.
25 It's -- oh, what is the name?  Jessa just did this

 1  one, too.  I can't remember what's called though.

 2  It's -- because I haven't done it yet.  It's just like

 3  another month.  But then I'm trying to think of the

 4  recent ones that I just had posted.  I did -- I did a

 5  ton with my BrushX.

 6  Q.    With what?  I'm sorry.

 7  A.    My BrushX

 8  Q.    My BrushX?

 9  A.    Yeah.

10  Q.    Okay.  Go ahead.  And you had just stated that

11  there were some that you get canceled, and I can't

12  remember the terminology as to why.  Are there

13  partnerships that have been -- that you had that have

14  been canceled?

15  A.    Yes.

16  Q.    Okay.  Is canceled the right terminology?

17  A.    I think so.  I don't know actually.  I mean,

18  because they -- they just decided to drop out.

19  Q.    Okay.

20  A.    Because of -- not because of anything we've done

21  but because of the all of this stuff in the family, my

22  family, my --

23  Q.    Tell me what that -- tell me more about that.

24  When you say because of --

25  A.    I'm not saying -- no.  I put myself in with that



1  because when I was younger, like, a lot of those

2  things would happen.  We would have those

3  partnerships.  But now, that is a recurring theme from

4  the molestation, all of those documents being

5  released, they're, like, we don't want to be

6  associated with all of what happened.  And so we've

7  had that happen to us and lost partnership deals.

8  Q.    Which partnerships deals have you lost?

9  A.    I can't remember the names of those right now,

10  but yeah.  I could try to recall those, given time.

11  Q.    Okay.  How were you provided information that

12  the partnership -- as to why the partnership deals

13  were lost?  That was a bad question, but what I'm

14  trying to figure out is, when you said, "We lost

15  partnerships" because of us and your family?

16  A.    Through a manager.

17  Q.    Who is that?

18  A.    Well, now, I mean, I think at that time, there

19  was Chad Gallagher for a while, and then The Gift

20  Shop.

21  Q.    Did you work with the Gift Shop at one point?

22  Did you work with The Gift Shop?

23  A.    We are working with the Gift Shop.

24  Q.    You are currently?  But The Gift Shop, whoever

25  your contact is at The Gift Shop has told you that you



 1  lost partnerships because of the release of the

 2  information?

 3  A.    I don't know entirely, but I know that it was --

 4  yeah.  They had mentioned that it was because of a lot

 5  of that family stuff.  So I didn't -- you would have

 6  to ask -- I don't know.  I'd have to ask them and see.

 7  Q.    Okay.  Do you recall which partnerships with The

 8  Gift Shop were lost?

 9  A.    I know there was -- there was one -- there were

10  two, but I don't want to get them wrong.  I was going

11  to do an event and then I was going to do another

12  partnership over the holidays.

13  Q.    And when was the event that you were supposed to

14  do?

15  A.    I can't recall the exact date, but I think

16  December.

17  Q.    Of what year?  December of what year?

18  A.    Of -- what's that?  2020, I believe.

19  Q.    So you were going to do that.  That was arranged

20  for you to do after the release of the 2015 report,

21  correct?

22  A.    Correct.

23  Q.    Okay.  And it was canceled, did you say, in

24  December of 2020?

25  A.    Yes.



1  Q.     Do you know what happened in December of 2020
2  that would have --
3  A.     I don't recall.
4  Q.     Let me just get my question out.  Just because
5  we're --
6  A.     Sorry about that.
7  Q.     You're just fine.  What happened in December of
8  2020 that would have caused the partnership to cancel
9  the event you were supposed to do?
10  A.     I don't recall what happened then, but I know
11  what happened before.
12  Q.     What happened before?
13  A.     The release of records that were not supposed to
14  be made public, and it's still affecting us every day.
15  Q.     Have you been advised that you lost partnerships
16  for reasons other than the release of the information?
17  A.     I don't know.
18  Q.     Have you been advised that you've lost
19  partnerships because of your family's views on LGBTQ
20  issues?
21  A.     I don't know.  Potentially.
22  Q.     When you say, "I don't know," I'm sorry.  I'm
23  trying to understand what part of that you don't know.
24  Do you -- have you ever been advised that you -- you
25  have lost partnerships because of your family's views



1  on LGBTQ issues?

2  A.    That we have because of my family?  I mean, yes.

3  They have.  They have that.

4  Q.   I don't mean to talk over you.  I'm sorry.  Go

5  on.

6  A.    No.  I just said yes.  They have -- they have --

7  you know, I know they've lost because of that.

8  Q.    What have they lost because of that?

9  A.    I'll let them answer that.

10  Q.    No.  I'm asking you.  As you sit here -

11  A.    What have I lost?

12  Q.    No.  What -- what -- what partnerships has your

13  family lost because of LGBTQ?

14  A.    I don't -- I don't know their stuff.  I don't

15  know of all the ins and out of all of that.

16  Q.    Do you know, as you sit here right now, if they

17  have lost partnerships because of --

18  A.    I don't know.  I don't know.  I'm saying some of

19  my siblings, though, they probably have.  I don't know

20  though.  I don't know all the ins and outs.

21  Q.    All right.  And I understand you don't know all

22  the ins and outs.  I'm just trying to know what

23  information you do have that --

24  A.    I don't have information.

25  Q.    Okay.  You mentioned earlier when you were



1   Q.    Okay.

2   A.    I've never been -- it's only been in, like, a

3   manager or someone else has done an occasional post.

4   But I haven't done that.

5   Q.    Okay.  Who does access -- which managers do have

6   access to your Facebook?

7   A.    It would have been The Gift Shop.

8   Q.    Okay.

9   A.    Yeah.

10  Q.    You mentioned another company earlier I thought.

11  I had written down CEG.

12  A.    CEG was -- yeah.  CEG, so I just went to them.

13  They didn't -- they're not -- like, they're a brand

14  company that was -- had -- they're an agency, I guess

15  is the word.  They have brands that, if you just want

16  to get a brand deal quickly, you just go to them and

17  they set it up with influencers.  You don't have to be

18  under them.  So I was never under them.  I just kind

19  of took one and off brand deals from them on occasion.

20  Q.    Okay.

21  A.    And I'm not working with them.

22  Q.    You're not working with them?

23  A.    No.  I'm not working alongside them.  I would

24  just take, like -- say, "Oh, yeah.  I want to do this

25  one brand partnership."  So they would -- they had



```
 1   just a couple of offers.  Every once in a while, they
 2   would have a brand partnership for me, but I was never
 3   working for them or under them.  It was just a single,
 4   like, oh, do just one partnership and be done.
 5   Q.    Is that how The Gift Shop operates?
 6   A.    No.
 7   Q.    How about Chad Gallagher?  Do you work with
 8   Chad Gallagher?
 9   A.    No.
10   Q.    Have you personally worked with Chad Gallagher?
11   A.    Yes, we did for a little bit.
12   Q.    When was that?
13   A.    Goodness, I don't remember the date.
14   Q.    Since you've been married?
15   A.    For a very short time.  Then we split ways.
16   Q.    Why did you decide to split ways?
17   A.    We just wanted to go a different direction.
18   Q.    What was the difference in the direction?
19   A.    I don't know.  Personality.
20   Q.    Yeah.
21   A.    Skills.
22   Q.    When you say "skills," are you referring to
23   Mr. Gallagher's?
24   A.    I'm just saying the direction that we were
25   going, we just wanted to go and have somebody who,
```

<pre>
 1                    REPORTER CERTIFICATION

 2   STATE OF ARKANSAS      )

 3   COUNTY OF PULASKI      )

 4          I, TAMMIE L. FOREMAN, Certified Court Reporter
     in and for the aforesaid county and state, do hereby
 5   certify to the following:

 6          1)   The foregoing deposition was taken before
     me at the time and place stated in the foregoing
 7   styled cause with the appearances as noted;

 8          2)   Being a Certified Court Reporter, I then
     reported the deposition in Stenotype to the best of my
 9   skill and ability, and the foregoing pages contain a
     full, true, and correct transcript of my said
10   Stenotype notes then and there taken;

11          3)   I am not in the employ of and am not
     related to any of the parties or their counsel, and I
12   have no interest in the matter involved;

13          4)   Signature of the witness is not waived.

14          IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 30th of
15   September, 2021.

16
             _____
17           TAMMIE L. FOREMAN, CCR, RPR, CRR
18           LS Certificate #305, State of Arkansas
             Arkansas Realtime Reporting
19           701 West 7th Street
             Little Rock, Arkansas
20           501-725-7963
             www.ArkansasRealtimeReporting.com
21           Tammie@ArkansasRealtimeReporting.com

22

23

24

25
</pre>



www.ArkansasRealtimeReporting.com