IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


JILL DILLARD; ET AL                                        PLAINTIFFS

VS.                              NO. 17-CV-05089-TLB

KATHY O'KELLEY; ET AL                                      DEFENDANTS

---

ORAL DEPOSITION

OF

ROBERT WYNNE, PH.D.

TAKEN SETPEMBER 10TH, 2021, AT 9:04 A.M.

---

# Bushman Court Reporting

---

EXHIBIT

3

9

1   bachelor's in psychology, I went to California Institute of

2   Integral Studies, I have a master's in counseling psychology, I

3   have a Ph. D from the same school in clinical psychology,

4   there's been trainings along the way, different varieties.

5   Q    Okay.  What medical or other licenses do you or

6   credentials do you hold?

7   A    I have an American Family Therapist license in the State

8   of California.

9   Q    Any other licenses or credentials?

10  A    No.

11  Q    You are a psychologist; is that right?

12  A    I'm a psychotherapist.

13  Q    I see.  Are you a psychologist?

14  A    No.  I don't have a psychology license, I have a marriage

15  and family therapist license in the State of California.

16  Q    Okay.  What is the difference between a psychologist and a

17  psychotherapist?

18  A    Well, a psychologist has a license in psychology in the

19  State of California.  Well, in this case, in the State of

20  California.

21  Q    What does a --

22  A    Different licensing.  Excuse me.

23  Q    Sure, sure.  What does a license -- a psychology license

24  entitle a psychologist to do that a psychotherapist cannot do?

25  A    You know, I just like couldn't tell you exactly, there

10

1  maybe some types of testing perhaps that a psychologist could

2  do, there maybe some particular positions of employment.

3  Q    Okay.  What's the difference in a psychotherapist and a

4  psychiatrist?

5  A    A psychiatrist has a medical degree.

6  Q    And a medical license; right?

7  A    Correct.

8  Q    You don't have a -- you haven't been to medical school and

9  don't have a medical license; is that right?

10  A    That's right.

11  Q    Okay.  How long have you held a license as a

12  psychotherapist in the State of California?

13  A    1990.

14  Q    Okay.  Have you ever held any license in any other state?

15  A    No.

16  Q    Before endeavoring to prepare a report with respect to

17  these four plaintiffs, Ms. Dillard, Seewald, Forsyth and Vuolo,

18  had you ever met any of them before?

19  A    No.

20  Q    Okay.  Certainly hadn't treated them in any professional

21  capacity; had you?

22  A    I have not.

23  Q    Okay.  Okay.  Let me dive in just for a minute on these

24  life care plans.  There are five columns in each life care plan

25  chart and the first one is entitle, Modality, what do you mean

17

1   for psychotherapy phase one, you say, 25 sessions at $275 an

2   hour for a total of $6,875.  So this is, as I understand it,

3   treatment that she would have needed even if no redacted police

4   reports had ever been disclosed; right?

5   A    Correct.

6   Q    Okay.  Do you know if Ms. Seewald ever received any

7   treatment for -- to deal with problems that arose from actually

8   being molested by her brother?

9   A    I'm not absolutely sure.  My understanding is that there

10  was very little, if any.

11  Q    Okay.  Certainly, insufficient in your opinion?

12  A    True.

13  Q    Okay.  The next row there under treatment needed if not

14  for disclosure of confidential information, you wrote, none,

15  for a total of $0.00, of course, for follow-up treatment.  Do

16  you think that 25 sessions of psychotherapy would have

17  essentially brought her back to 100 percent after a

18  molestation; is that fair?

19  A    I mean, it -- it's maybe -- I certainly have to concede an

20  argument being made that some follow-up treatment down the line

21  could have been useful.  I -- I concede that might have been,

22  you know, that could be recommended, no question.

23  Q    So if, I think you just said this is accurate, that --

24  that she didn't receive, Ms. Seewald, I think you said this on

25  all four of the ladies but if they didn't receive appropriate

18

1   or sufficient or any treatment after being molested by their

2   brother, and would that have an affect going forward?  In other

3   words, has that had an affect on the last 15 to 20 years?

4   A    I -- I believe it has.

5   Q    What -- what kind of affect do you think?

6   A    Well, I think I state Indiscernible maybe my follow-up

7   report, you know, to some extent these were traumas of betrayal

8   and their brother betrayed their trust.  I mean, Indiscernible

9   serious moral boundaries in molesting them and you kind of

10  alluded to this before, you know, in some ways, you know, we --

11  we keep things unconscious or keep things sort of subconscious

12  or compartmentalize things and to a point that can be adaptive,

13  to a point in their case maybe so their brother continues

14  living in the home and rather than stir things up even more

15  than they are, they learn to compartmentalize whatever happened

16  to a point.  And in trauma of betrayal they talk about betrayal

17  blindness or a need to not know or dissociation so that in many

18  ways, those symptoms get kind of stashed to the side.  They

19  still know consciously but there's -- it's kind of, again,

20  compartmentalized.  And so, that -- so the trauma's still

21  there, it's not -- the trauma, you know, if you will.  And I

22  think that's largely what happened to each of them to a point,

23  that it remains somewhat dormant inside them and in the case of

24  trauma, time does not heal all wounds.  So I do believe when

25  the -- when all that was disclosed that had some more -- it was

19

1    more catastrophic as a result of unresolved issues.

2    Q    Wasn't that -- yeah, wasn't that betrayal of trust you

3    mentioned by their brother but didn't -- didn't their parents

4    also betray trust by not getting them sufficient treatment for

5    what they'd been through?

6                    MR. BLEDSOEN:  Object to the form.

7    A    (By Mr. Owens) Well I think it's a very complicated

8    dynamic with their parents, I would imagine.  And I -- my sense

9    it -- my understanding from listening to some of the plaintiffs

10   that, you know, the parents hold a lot of guilt for, you know,

11   putting them in place, for not protecting them in the first

12   place.  I imagine they must feel they're not to blame by

13   Indiscernible.  I imagine they must feel some deep regret so

14   they might feel their parents betrayed them on some level but

15   again I think this is a very complicated dynamic and parents

16   did what they thought was best.  You know, I'm sure they feel,

17   again, they were betrayed by their son as well.  And so, their

18   -- their response may have not been the most adaptive but I

19   trust they were doing what they thought was -- was best.

20   Q    Whatever trauma occurred before May of 2015, would not

21   attributable to any of the defendants in this lawsuit, was it?

22   A    No, it was not.

23   Q    Okay.  So isn't the whole goal of psychotherapy

24   particularly about old traumas or harms more than a decade old,

25   let's say, isn't it about dispensing the secrets and getting

20

1    things out in the open?

2    A    Well, at that -- that could be part of it, sure.

3    Q    Because isn't that healing and therapeutic in the end even

4    if it's difficult in the moment?

5                    MR. BLEDSOEN:   Object to form.

6    A    (By Mr. Owens) Well healing and therapeutic in a private

7    venue.  It's not healing and therapeutic in the context of

8    spreading the news to the world.  So, and it not be paparazzi

9    stalking you, that would call out the Indiscernible feeling.

10   Q    Okay.  Okay.  So let me -- going back to these

11   psychotherapy thoughts, in the psychiatric life care plan,

12   again, referring specifically to your report on Jessa Seewald,

13   on the second -- on the last two columns of these first two

14   rows under "additional treatment needed due to disclosure of

15   confidential information," what confidential information are

16   you referring to in that heading?

17   A    I think I'm probably speaking to concerns of the

18   disclosure of the sexual abuse.

19   Q    Did you review the reports that were actually disclosed?

20   A    No, I don't believe I did.

21   Q    Okay.  So do you know what confidential information was

22   disclosed or not?

23   A    My understanding, at least from their report, is

24   information that they were easily or at least they were

25   identifiable, what happened and who they were.

21

1    Q    Okay.  And that's based on your -- the reports of these

2    ladies and your evaluations; right?

3    A    Correct.

4    Q    Okay.  There you say that Ms. Seewald needs 100 -- "100

5    sessions by an experienced psycho dynamic psychotherapist at

6    $275 per session for a total of $27,500 in the -- in the row of

7    individual psychotherapy phase one.  In the second row,

8    psychotherapy phase two, follow-up treatment, you say 50

9    sessions at $275 per session for a total of $13,750.  So when I

10   compare those I think your opinion is that she needs four times

11   as much psychotherapy to deal with the disclosure of redacted

12   police reports than she needed for her actual molestation by

13   her brother; is that fair?

14   A    Well, you know, these are, if you will, ballpark figures

15   and I, again, I do think this was not a one and done situation.

16   This was a genie out of the bottle that continues to haunt them

17   today.  Yes, they've got -- they look better in many respects,

18   at least to some degree or lesser degrees but this is something

19   ongoing dynamic that -- you know, they -- as they -- some of

20   them have said, it's changed their lives and maybe their lives

21   may never be the same so I think, you know, again, you can't

22   separate the molestation from the disclosure of the molestation

23   so they're entwined and you throw in, as they put  -- put out,

24   you know, their brother -- now their -- I think as Jinger said,

25   roped into any kind of scandal he's involved in so it just gets

25

1   terms of what that individual needs and what other continuing

2   stressors are arising and how -- how capable they feel feeling

3   those stressors in a more adaptive way.

4   Q    So how would you know, in Jessa Seewald's case for

5   instance, how would you know when you had achieved your goal --

6   goals in terms of psychotherapy?  How would you know, you know,

7   67 sessions is enough, we don't need to have 68?  How would you

8   know when to stop?

9   A    We'd have to look at Jessa's report again to say exactly

10  what would need to be accomplished, but again, I think a lot

11  also depends on what continuing stressors she's -- she

12  experiences and whether it's, you know, ongoing news coverage,

13  you know, paparazzi news coverage that includes her or, you

14  know, it's hard to know how the -- the current conflicts made

15  morph into other types of problems in whether that's with her

16  children, with her marriage, whether it's in her work, in her

17  relationships, so it's -- with her family, any number of

18  measures to address and -- and, you know, how she feels what's

19  enough.

20  Q    To date, as we sit here today on September 10th of 2021,

21  have any of these four women, to your knowledge, sought or

22  received any psychotherapy at all?

23  A    Let's see, I believe -- was it, Jill?  I think Jill or

24  Jinger, I'm sorry.

25  Q    Okay.  Do you believe that one of them has?

1    A    Right.

2    Q    What to your understanding and not particularly

3    Indiscernible point it is, I kind of think it's Jill as well

4    based on my recollection but what psychotherapy has she sought

5    or received?

6    A    She sought out couples therapy.

7    Q    Okay.  Is that the kind of psychotherapy you're talking

8    about in this report?

9    A    I think I mentioned couples therapy.  I trust that it's

10   helpful for her but I think -- I think she could benefit from

11   an individual process as well.

12   Q    Do you know whether or not her husband would allow that?

13   Would allow her to attend individual psychotherapy?

14   A    I don't know.  It's a good question.

15   Q    Do you know why she sought or received psychotherapy?

16   A    I believe the initial Indiscernible was family conflict.

17   Q    If I told you that she testified the other day in her

18   deposition that her father was verbally abusive to her and that

19   that was a toxic relationship in her life, would that surprise

20   you?

21              MR. BLEDSOEN:  Object to the form.

22   A    (By Mr. Owens) I think she told me the same thing and it

23   wouldn't surprise me at all given what this family has been

24   through.  I mean, it's been -- I mean, I'm sure for the parents

25   as well, extremely toxic and stressful and traumatic.  And so,

27

1    again, the -- the trauma has a ripple affect and it affects

2    each family member and I'm sure it creates greater tensions and

3    conflict and it's not a surprise.

4    Q    You would agree that there is toxicity in this family,

5    that there are conflicts in this family that have absolutely

6    nothing to do with Josh Duggar, molestation, or the disclosure

7    of police reports; right?

8                    MR. BLEDSOEN:  Object to the form.

9    A    (By Mr. Owens) I would imagine that's the case but I --

10   again, I would say it's hard to separate out what's happened

11   with Josh, what he's done, what's happening these days, the

12   media coverage, and that should not -- contaminates everything.

13   So Indiscernible hard to fully separate out tensions, conflict,

14   trauma, associated with those ongoing dynamics.

15   Q    I don't disagree with that.  I think it's probably

16   impossible.  The -- you would agree that they have suffered

17   other stressors and/or trauma; right?  All four of these

18   ladies?

19                   MR. BLEDSOEN:  Object to form.

20   A    (By Mr. Owens) Yes.

21   Q    And, I mean --

22                   MR. OWENS:  -- those are good objections, I

23        didn't say other -- other than what; right?

24   Q    (By Mr. Owens) Other than their molestation by their

25   brother, Josh, and then the disclosure of these redacted police

32

```
 1    six month, one year period are you talking about?

 2    A    Well, many of them mentioned there was a period of where

 3    it was most intense, the paparazzi was the most intense and it

 4    was hell.  I was insane, you know, to quote them.  Out of

 5    control.  So, I think, you know, that the Indiscernible is

 6    continuing but it was -- it was not quite as intense after

 7    Indiscernible.

 8    Q    Did any of the ladies seek or receive psychotherapy, group

 9    therapy, couples therapy or any other care or treatment during

10    that six months to a year?

11    A    I don't believe they did.

12    Q    Okay.  You used a couple words about parenting deficits

13    that might result from stressors and trauma, one I heard was

14    inattentive the other was over protective, aren't those the

15    opposite of one another?

16    A    Yeah, both can be true.

17    Q    Did you observe either one in your evaluations of these

18    ladies?

19    A    I didn't observe their parenting but I did pick up that

20    they're moments where some of them felt anxious and preoccupied

21    and weren't as attentive, I believe, as they would have like to

22    have been and maybe weren't as attuned, if you will, to their

23    infants, you know, the nuances and so it's -- it can be a very

24    subtle thing and certainly I think they're preoccupation with

25    safety and trust and so -- for their children.  And so, whether
```

34

1    family group therapy prior to the disclosure of these redacted
2    police reports?
3    A    I don't know.
4    Q    Other than --
5    A    -- no.
6    Q    Other than any therapy that Jill and Derrick Dillard may
7    have participated in in the last few years, do you know of any
8    family group therapy that any members of the Duggar family have
9    ever participated in?
10   A    Not that I know of.
11   Q    Okay.  You would agree that you have not interviewed any
12   of the plaintiffs' children in this case and don't have any
13   opinion about their relative or adjustment status or anything
14   like that; right?
15   A    All is I just mentioned the risk factors associated with
16   their parents.
17   Q    I've talked about the structure of this chart that it
18   breaks down into treatment needed if not for the disclosure of
19   confidential information and additional treatment needed due to
20   -- due to the disclosure of confidential information, the
21   column, treatment needed if not for the disclosure of
22   confidential information, in other words, if this confidential
23   information had never occurred, this release of these redacted
24   police reports had never occurred, you are attributed or assert
25   that the defendants in this case ought to be liable for any of

35

1    those amounts, do you?

2    A    As far as that they shouldn't be liable for treatment that

3    prior to the disclosure of information?

4    Q    Right.  That would have been needed whether or not the

5    information had ever been disclosed?

6    A    Correct, yep.

7    Q    Okay.  The next row is, couple's therapy -- "couple's

8    therapy focused on managing cumulative situations, stresses,

9    and Indiscernible, other than the Dillards, are you aware of

10   any the other plaintiffs in this case ever seeking or receiving

11   any couple's therapy?

12   A    No, I'm not.

13   Q    Okay.  And here again, you recommend 10 sessions if not

14   for disclosure and 25 sessions due -- due to the disclosure.  I

15   was struck by when reading these reports and watching the

16   evaluations and things at how glowingly each of these ladies

17   describe their marriages.  I don't think I've heard anyone talk

18   so glowingly about their husbands, certainly not my wife.  I've

19   been married 21 years.  I wonder what fault do you see in any

20   of the marriages or marriage dynamics of any of these

21   plaintiffs?

22   A    Well, I mean, I think Jill eludes to tensions with her

23   husband and I think -- sorry, I lost my train of thought there.

24   I do think, you know, there's some idealizing of the

25   relationships and, you know, Joy got married when she was 19

43

1    over time.

2    Q    You don't know of any of these things -- you don't know of

3    any of these things that -- that you listed out, which you

4    called somatic symptoms, you don't know of any of those things

5    exist now in any of the plaintiffs -- you don't know if any of

6    things existed before the disclosure of the redacted police

7    reports and you certainly don't know if any of them will exist

8    in the future; isn't all that correct?

9    A    Yeah, I'm not a medical doctor.  I'm just speaking to what

10   the research and my professional experience has shown in terms

11   of risk factors associated with cumulative stress, that is my

12   point.

13   Q    Okay.  Let me break them down, you don't know anything

14   about the physical health profile of any of the plaintiffs in

15   this lawsuit before May of 2015, do you?

16   A    Yeah, there are some symptoms some of them experienced

17   something when you're a child during childhood Indiscernible

18   but generally speaking I don't have a very clear picture of

19   their medical history.

20   Q    Right.  Some of them had some issues as children like

21   wetting the bed and -- and I think one of them bit their

22   fingernails as a child, if I recall correctly, you know, a few

23   of those kind of anecdotal things from their discussions during

24   your tele-evaluation; right?

25   A    Yes.

44

1    Q    You've not reviewed any medical records of any of these
2    plaintiffs from any point in time, have you?
3    A    No, I have not.
4    Q    Okay.  And to the extent you know about any physical
5    health problems, symptoms, complaint, it's from them telling
6    you about them anecdotally during your evaluation; right?
7    A    Correct.
8    Q    Okay.  How did you arrive at the life expectancy figure on
9    this row, 80 years of age?
10   A    Yeah, that's a ballpark figure I think that Dr. Kleinman
11   put out some time ago.
12   Q    Okay.  You -- I think you use the same life expectancy for
13   all four of these ladies, you didn't attempt to customize that
14   life expectancy to each plaintiff, did you?
15   A    No, I did not.
16   Q    How did you arrive at the figure of $3,000 a year and what
17   does that figure represent?
18   A    You know, I'd have to look at my references but I think
19   there is some research by Greenberg but there's research in
20   terms of, again, cumulative stress, the affects of anxiety,
21   especially when there's been trauma and the estimated
22   healthcare cost over time.
23   Q    Okay.  So what this figure represents is the amount that
24   Jessa Seewald would have to spend on physical healthcare
25   treatment each year for the remainder of her life that she

50

1    A    I'm not a psychologist but as a marriage and family
2    therapist or clinic or Ph. D, I can, yes.
3    Q    Okay.  I'm sorry, I apologize for misspeaking.  My
4    understanding is you cannot prescribe any medications for any
5    of those diagnosis; is that right?
6    A    That's right.
7    Q    Okay.  The next row in -- in your report has to do with
8    psychopharmachologic consultation and then the next one is
9    psychotrophic medication, did you complete those rows in your
10    draft report?
11    A    Dr. Kleinman completed those rows.
12    Q    Okay.  Did he tell you what psychotrophic medications he
13    thought any of the plaintiffs might need?
14    A    I don't believe he specified exact medications but I
15    assume he was moving to medications that might lean towards
16    helping with anxiety and maybe depression.
17    Q    Okay.
18    A    Indiscernible medications.
19    Q    Do you know whether any of the plaintiffs had been
20    prescribed any psychotrophic medications to date?
21    A    I don't believe they have.  Not to my knowledge.
22    Q    The inclusion of a row or psychologic --
23    psychopharmachologic consultation Indiscernible to me that a
24    determination would have to be made at some point in the future
25    whether any of them need psychotrophic medications; is that

66

1    mentioned increased tensions with the -- with the father, at
2    least.  It's affected the whole family, I'm sure.  I haven't
3    evaluated the whole family but my understanding is, and how
4    could they not, be affected?  So there's any number of levels
5    of pain and suffering that -- there's been ebb and flow but
6    continued.
7    Q     Why do you think Joy Forsyth might need twice as many
8    psychotherapy sessions in the future as Jessa Seewald?
9    A     You know, I'd have to kind of look at the report again but
10   I -- I think one thing that's significant I think in terms of
11   the timing of when this came out with Joy as a 17 year old.  I
12   think developmentally she was in -- they all were vulnerable
13   but I think she was a particularly vulnerable phase of her life
14   and how that may have, and I believe, can affect one so, you
15   know, I think -- again, I'd want to review the whole report but
16   that's based on my recollection of why I felt she --  that she
17   -- I recommended as what she needed or will need.
18   Q     Okay.  The same figures were included on the life care
19   plan chart for all four plaintiffs with respect to what they
20   might need as far as medication consultations and -- and the
21   potential for needing some medication in the future, does that
22   mean that they all have the same likelihood of a need for
23   medication?
24   A     Not, again, I wasn't part of the decision making in terms
25   of the pharmachological recommendations.  I trust that, again,

67

1   Dr. Kleinman was making more of a ballpark figure of what he

2   expects or any risk factors for each of them and so not to be

3   written in stone but certainly, you know, taking in risk

4   factors, his experience as a psychiatrist and what they may

5   need on an ongoing basis.

6   Q    And you wouldn't be qualified to be -- to testify about

7   medication decisions; right?

8   A    Correct.

9   Q    Okay.  Are you qualified to assess, diagnose and/or

10  testify about physical healthcare needs?

11  A    Not specifically but the -- in a diagnostic way.  I can

12  certainly, you know, talk about risk factors associated with

13  chronic stress and how that is related to increased need --

14  healthcare needs over time.  I certainly can, you know, speak

15  to the literature supporting that.

16  Q    Yeah, are -- are there any specific physical healthcare

17  needs that arise from chronic stressed based on study you

18  review?

19  A    You know, again, I think I spoke to this before, I'm --

20  I'm (Indiscernible) but there could be anything from

21  hypertension, could be cancer, could be heart issues, so, you

22  know, literature is with all kinds of new coverage of, you

23  know, risk factors associated with chronic stress.

24  Q    Do any of those studies address new single case studies or

25  are they all in the aggregate?  Are they looking at large

93

1   and what's motivating them but, again, I think this has been

2   part of their lifestyle and that they're continuing to try to

3   live their life, you know, as -- as they have, notwithstanding

4   some of the challenges around, you know, media commentary.

5   Q    Do you know when they started on -- on social media the --

6   the four plaintiffs when -- when they started being active on

7   social media?

8   A    I'm not sure.

9   Q    Did I hear earlier, and I may have misheard this, but did

10  I hear you express an idea that the plaintiffs might not be

11  willing to seek counseling because of their religious beliefs?

12  A    I may have mentioned that.  I know I suggested that in a

13  report.

14  Q    If that is the case, would there -- would it not be more

15  effective to explore or recommend a -- a different course of

16  treatment?

17  A    If that's the case, yeah, maybe.

18  Q    What other courses of treatment would there be?

19  A    I don't know if it's something more, you know, religious

20  based, Christian based, Christian forums, I'm not sure what the

21  options are but certainly maybe -- maybe it's something to

22  explore with them.

23  Q    Do you have concern that they will not seek the counseling

24  that you recommend?

25               MR. DANIELS:  Object to form.