Deposition of

# Steven Zega

September 09, 2021

Dillard

vs.

City of Springdale



www.aptusCR.com

EXHIBIT

4

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF ARKANSAS
 2                   FAYETTEVILLE DIVISION

 3   JILL DILLARD, JESSA SEEWALD, JINGER VUOLO, and JOY DUGGAR,

 4          Plaintiffs,

 5   vs.                       No. 5:17-CV-05089-TLB

 6   CITY OF SPRINGDALE; WASHINGTON COUNTY; KATHY O'KELLEY;
     ERNEST CATE; RICK HOYT; STEVE ZEGA; BAUER PUBLISHING
 7   COMPANY, L.P.; BAUER MAGAZINE, L.P.; BAUER MEDIA GROUP,
     INC.; BAUER, INC.; HEINRICH BAUER NORTH AMERICA, INC.;
 8   BAUER MEDIA GROUP USA, LLC; and DOES 1-10, Inclusive,

 9          Defendants.

10

11   _____

12          VIDEOCONFERENCE DEPOSITION OF STEVEN ZEGA
             TAKEN ON BEHALF OF THE PLAINTIFFS
          ON SEPTEMBER 9, 2021, BEGINNING AT 10:03 A.M.
13             ALL PARTIES APPEARING REMOTELY
                REPORTED BY KERRI PIANALTO, CCR
14
                     APPEARANCES:
15
     By videoconference on behalf of the PLAINTIFFS
16
             Steven E. Bledsoe
17           Nicole J. Kim
             LARSON, LLP
18           555 South Flower Street, Suite 4400
             Los Angeles, California 90071
19           213-436-4888
             sbledsoe@larsonllp.com
20
             Shawn B. Daniels
21           DANIELS LAW FIRM, PLLC
             129 W. Sunbridge Drive
22           Fayetteville, Arkansas 72703
             479-521-7000
23           shawn@danielsfirm.com

24

25   JOB NO. 10087128
```

```
1    By videoconference on behalf of the DEFENDANTS CITY OF
     SPRINGDALE, KATHY O'KELLEY AND ERNEST CATE
2
              Susan Keller Kendall
3             KENDALL LAW FIRM, PLLC
              3706 Pinnacle Hills Parkway, Suite 201
4             Rogers, Arkansas 72758
              479-464-9828
5             skk@kendalllawfirm.com

6             Thomas N. Kieklak
              Morgan Doughty
7             HARRINGTON, MILLER, KIEKLAK, EICHMANN & BROWN
              4710 S. Thompson, Suite 102
8             Springdale, Arkansas 72764
              479-751-6464
9             tkieklak@arkansaslaw.com

10
     By videoconference on behalf of the DEFENDANTS WASHINGTON
11   COUNTY, RICK HOYT AND STEVE ZEGA

12            Jason E. Owens
              JASON OWENS LAW FIRM, P.A.
13            1023 Main Street, Suite 204
              Conway, Arkansas 72032
14            501-764-4334
              owens@jowenslawfirm.com
15

16

17

18

19

20

21

22

23

24

25
```

Steven Zega

```
 1                          INDEX

 2                                               Page

 3    Direct Examination by Mr. Bledsoe            4

 4

 5                         EXHIBITS

 6    Number         Description                  Page

 7    EXHIBIT 29    Washington County Sheriff's Office   17

 8                  Incident Report

 9    EXHIBIT 30    5/15/15 FOIA Request          28

10    EXHIBIT 31    CNN Article                   31

11

12                      STIPULATIONS

13         It is stipulated that the deposition of STEVEN

14    ZEGA may be taken pursuant to agreement and in accordance

15    with the Federal Rules of Civil Procedure on September 9,

16    2021, before Kerri Pianalto, CCR.

17

18

19

20

21

22

23

24

25
```

```
 1    WHEREUPON,

 2                      STEVEN ZEGA,

 3    after having been first duly sworn, deposes and says in

 4    reply to the questions propounded as follows, to-wit:

 5                    DIRECT EXAMINATION

 6    BY MR. BLEDSOE:

 7         Q    Mr. Zega, could you state your full name?

 8         A    Steven Stokely Kenneth Zega.

 9              THE COURT REPORTER:  I'm sorry, I didn't hear

10    your name, the middle name.

11         A    Steven Stokely Kenneth Zega.

12         Q    (BY MR. BLEDSOE)  Can you tell us your

13    educational background since high school?

14         A    I graduated from the University of Arkansas with

15    a bachelor of arts in 1990 and the University of Arkansas

16    School of Law with a JD in 1993 and I have a litany of

17    Army schools if you want to hear about those, military.

18         Q    Sure.

19         A    Let's see, in 1991, I graduated from the

20    Arkansas Military Academy which is National Guard Officer

21    Candidate School program.  In 1993, I graduated from the

22    field artillery officer basic course at Fort Sill,

23    Oklahoma.  In 2003 or four, I graduated from the judge

24    advocate general's, JAG, officer's basic course by

25    correspondence.  In 2005, I graduated from the judge
```

 1   advocate general's basic advanced course, officer advanced

 2   course.  In 2009, I graduated from something called the

 3   intermediate level education put on by the Army.  In 2012,

 4   I graduated from the military judge's course at the judge

 5   advocate general school.  I also, I've gone to other

 6   seminars, training, but those are the schools that I have

 7   been to for the Army and I'm having trouble recalling

 8   anything else at this moment.  Of course, lots of CLE.

 9        Q    Are you still in the Army?

10        A    I'm in the National Guard, yes.

11        Q    So what is your rank or position?

12        A    I'm a colonel and I am officially access -- I

13   was recently the state judge, state military judge.

14        Q    I have a brother that served in the Army as a

15   doctor, so I -- who doesn't love the Army, right?

16             All right.  Can you walk us through your work

17   background since you graduated from law school in 1993?

18        A    Sure.  When I graduated from law school, I

19   immediately went to the field artillery officer -- well,

20   that's not true.  I spent about three months studying for

21   the bar exam, took the bar exam in July of 1993, the

22   Arkansas bar, and then from July, the end of July of '93

23   to December of '93, I was at the field artillery school in

24   Fort Sill.  I spent about two months looking for a

25   civilian job when I returned home and in late January or

1   early February of 1994, I became the deputy prosecuting

2   attorney in the 19th judicial district which includes

3   Benton and Carroll Counties.  I held that job from

4   February -- late January of '94 or early February of '94

5   to September of '94.  I became an associate at the

6   Lincoln, Arkansas firm of Boyce R. Davis Associates,

7   B-o-y-c-e, R. Davis Associates.  I was an associate in

8   that firm from 1994 to 1999.  In 1999, I became a partner

9   of the firm.  We renamed the firm Davis and Zega, PLC.  I

10  remained in that firm from '99 until 2006.  In the

11  meantime, I deployed for the first time to Iraq.  So in

12  October of 2003, I got called and we spent six months

13  training up, essentially, in Little Rock, Fort Hood and

14  Fort Sill -- I mean, not Fort Sill, Fort Polk, Louisiana,

15  spent ten months in the Middle East in Kuwait and Iraq,

16  got back in December of '05, spent four months demobbing

17  the 39th Infantry Brigade, demobilized the 39th Infantry

18  Brigade, went to -- spent a month on leave from the Army

19  and went back to work with Boyce.  We hired an associate

20  and that firm -- that firm then became Davis, Parker &

21  Zega, PLC.  I was there for four years.  In 2010, Steve

22  Parker and I left and went to Prairie Grove, formed a firm

23  called Parker & Zega, PLC, was in that firm for a year

24  before I got called to Iraq again, spent basically

25  calendar year 2011 on active duty orders again, came home

```
 1   in 2012 and worked with Steve for another two years before
 2   the county judge at the time, Marilyn Edwards, called me
 3   and asked me if I was interested in becoming county
 4   attorney.  The other jobs, plural, that I had during that
 5   time, I was on the Washington County Quorum Court from the
 6   beginning of 2001 until the end of 2010 minus that
 7   deployment to Iraq in 2003 to 2005, and took a leave of
 8   absence from the quorum court during that time, and I
 9   also, because I don't have enough to do, umpire baseball
10   and I umpire high school baseball around here and I've
11   done that for years, since before I left law school.
12   Those are the things that I can think of that I've done
13   for money since 1993.
14           In 2014, I began the county attorney.  I'm
15   sorry, I did not finish answering your question.  I didn't
16   become the county attorney in 2014.  I accepted the job, I
17   became the county attorney in January of 2015 and held the
18   job until the end of 2016.  From January 2017 to
19   September 2017, I was a law clerk for the Honorable Joseph
20   J. Volpe, the United States magistrate judge in Little
21   Rock.  I did his habeas work for nine months and then I
22   got offered a position in this firm that I am with now in
23   July or August of 2017 and I've been here ever since.  I
24   was an associate for two years and now I'm a partner.
25       Q    What's the name of the firm you're working out
```

1   of now?

2     A    Crouch, Harwell, Fryar & Ferner, PLLC.

3         THE COURT REPORTER:  Mr. Bledsoe, there's a

4   really bad echo when you speak.

5         MR. OWENS:  I think someone -- I think someone

6   just joined and needs to mute probably.

7         MS. KENDALL:  This is Susan Kendall and I --

8   it's Susan Kendall, but I was muted, but it's Susan

9   Kendall.  I'm going to mute again and see if that helps.

10        MR. KIEKLAK:  Hi Susan.

11        MS. KENDALL:  Hi there.

12        MR. BLEDSOE:  Let's go off -- is this any

13   better?

14        THE COURT REPORTER:  Yes.

15     Q    (BY MR. BLEDSOE)  Okay.  Is the county attorney

16   an appointed position or elected position?

17     A    Appointed.

18     Q    And who appointed you as county attorney

19   beginning in January of 2015?

20     A    County Judge Marilyn Edwards.  There was a --

21   she's a former county judge.  At the time there was a

22   confirmation process through the quorum court as well.

23     Q    And were you appointed for a certain term?

24     A    No.

25     Q    When you were appointed as county attorney, was

1    it an open-ended position?

2         A    It was at the pleasure of the county judge.

3         Q    Okay.  What were your duties and

4    responsibilities as the Washington County attorney?

5         A    Basically, I was the civil attorney for the

6    county.  I handled everything that wasn't a criminal

7    matter with some exceptions.  So, for example, there was

8    no such thing as a typical day.  I would in a given week,

9    I would write ordinances, write resolutions, I would

10   provide on-the-spot advice to county officials, elected

11   officials and their deputies who needed or wanted legal

12   advice.  I was involved heavily in human resources issues.

13   I was required on four or five occasions to conduct -- to

14   be the investigator in the human resource complaints.  Any

15   civil rights litigation that the county was involved in,

16   especially in the jail, the Association of Counties

17   handled, I would try to monitor that, but I wasn't

18   involved in actually litigating it.  I did some litigation

19   for the county.  I assisted in some litigation when the

20   county judge was sued in a civil rights case, that was

21   kind of an unusual thing, that didn't happen a whole lot

22   and so she wanted me personally involved in that so I

23   entered an appearance in that case.  I would do some law

24   enforcement training on -- for the law enforcement, the

25   part time to law enforcement certification class the

1    sheriff's office put on.  I attended almost every

2    committee meeting of the quorum court, I attended all the

3    planning meetings from the planning commission, read

4    contracts, reviewed contracts, wrote some contracts.  I

5    did a lot of stuff.

6        Q    Did you have other attorneys on staff that

7    worked for you or under your direction?

8        A    I didn't have anyone -- I was a one-person show

9    as far as the attorney.  About four or five months into my

10   tenure as county attorney I hired a woman named Lainey

11   Miller to be my assistant.  My previous assistant got

12   promoted out of her position.  Lainey is a licensed

13   attorney, but she was my assistant, so I would use

14   Lainey's legal training to do things like proof my memos

15   and opinions and, you know, run behind me and see if I had

16   cited everything correctly, that kind of thing.

17       Q    But she was not hired in the capacity as a

18   lawyer for the county; is that correct?

19       A    That's correct.

20       Q    Was one of the entities to which you provided

21   legal advice the county sheriff's department?

22       A    Yes.

23       Q    In your position as Washington County attorney,

24   did you have the occasion to provide legal advice with

25   respect to FOIA requests that were sent to the county?

```
1          A     Yes.

2          Q     Why did you leave the county attorney's -- or

3    withdrawn.

4                Why did you leave your position as county

5    attorney in December of 2016?

6          A     I was fired.

7          Q     By whom?

8          A     The county judge elect, Joseph Wood.  He was a

9    county judge elect at the time.  He's the county judge

10   now.

11         Q     And did Mr. Wood ever tell you why he fired you

12   in December of 2016?

13         A     Mr. Wood did not communicate his reasons to me

14   directly.  I found some other things out, but, no is the

15   answer to your question.

16         Q     When you say you found some other things out,

17   what did you find out about why County Judge Elect Joseph

18   Wood fired you in December of 2016?

19         A     I'm a Democrat and he's a Republican.  He had a

20   Republican attorney that he wanted to appoint.  That

21   gentleman he did appoint -- he offered the job to him --

22   he offered the job to my successor before he won the

23   election and when he won the election, he, you know,

24   confirmed his offer of the job to him and that gentleman

25   took the job.
```

1      Q      What were your responsibilities as Washington

2   county attorney in connection with FOIA requests made to

3   the county?

4      A      So it varied depending on the request.  When I

5   became aware of a particular request, I would provide

6   guidance directly to the person who asked me the question.

7   In other words, if we got a request to the county judge's

8   office in particular and the county judge's office was the

9   custodian of the records, whoever got the request, and

10  that might have been Judge Edwards herself, it might have

11  been her executive assistant, would bring me the request

12  and say, how do we answer this?  And I would assist them

13  in formulating the answer.  When it came to -- in

14  particular, when it came to the sheriff's office, I rarely

15  before this incident saw FOIA requests made to the

16  sheriff's office.

17     Q      During the time that you were the county

18  attorney, was there a policy that when a FOIA request came

19  into the county that the department or county entity that

20  received the FOIA request was supposed to get legal advice

21  from you --

22     A      There was not a policy -- there was not a

23  policy.  I attempted to -- I encouraged through a couple

24  of e-mails and a couple face-to-face visits that that's

25  what they should do, but there was not a formal policy to

1    that effect, no.

2        Q    So from the time you were county attorney, is it

3    true that you would provide legal advice and respond to

4    FOIA requests when you were asked to do so by the

5    particular county entity who received the FOIA request?

6        A    That evolved, Mr. Bledsoe.  Probably a year into

7    my tenure as county attorney, the county purchased --

8    entered into a contract with an entity that provided us

9    with a portal, a web-based portal, to make Freedom of

10   Information Act requests.  I was -- I don't know if I was

11   an administrator in that portal, but I had -- I had access

12   to the portal full time so I would see web-based requests

13   as part of my daily whatever and part of what I did at

14   that time, once those web-based requests started coming in

15   is I would follow up to make sure that we had responded to

16   the requester.  There are, you know, time limitations on

17   when you're supposed to get to somebody what they've asked

18   for and so part of what I tried to do was to make sure we

19   were tracking -- that the county was tracking the --

20   whether we closed out requests on time or not and I would

21   also look at that web-based portal to see if there were

22   what I considered to be particularly troublesome or

23   controversial, you know, exemptible Freedom of Information

24   Act requests that would require us to either deny the

25   request or to redact a bunch of things from requested

1    documents.

2          THE COURT REPORTER:   Mr. Bledsoe, can we go off

3    the record for a minute?

4          (Short break from 10:22 a.m. to 10:24 a.m.)

5     Q    (BY MR. BLEDSOE)   Is it your best recollection,

6    Mr. Zega, that the web-based portal system you just

7    described was implemented about a year after you became

8    county attorney, so sometime in early 2016?

9     A    Early 2015, yes.   That's my recollection.

10    Q    You testified earlier you became city attorney

11   beginning in January 2015?

12    A    You're right, you're right.   It would have been

13   2016.   I got fired in -- at the end of 2016.   My

14   apologies, you're correct.

15    Q    No, it's okay.   Just so we have a clear record,

16   is it true that your best recollection that the web-based

17   portal system for tracking and addressing FOIA requests

18   that was implemented by the county was implemented about a

19   year after you started, so sometime in early 2016?

20    A    Late 2015 or early 2016, yes, sir.   And Mr. -- I

21   want to be clear, you know, not all FOIA requests came

22   through that portal.   That was just a way to manage some

23   requests.

24    Q    What was the county's method for handling FOIA

25   requests in the May 2015 time frame?

Steven Zega                                                    Dillard vs.
                                                     City of Springdale

```
 1        A     I don't know is the best answer to that
 2   question.  It varied from department to department and it
 3   varied from elected official to elected official.
 4        Q     Prior to the end of May 2015, had the county
 5   implemented any training system for how to respond to FOIA
 6   requests?
 7        A     I'm not aware of any.
 8        Q     And is it true as of May 2015, in your position
 9   as county attorney you would offer legal advice in
10   connection with the FOIA requests when you were asked to
11   do so by individuals at a county agency or division, but
12   otherwise that's not something that you would do?
13        A     Again, that involved depending on my awareness
14   of the request.  Here's what I mean by that.  In May of
15   2015, that's definitely true.  If I wasn't the person who
16   got the request personally, then it was a passive system
17   for me where someone would come to me and ask for advice.
18   When we implemented the web-based portal, I was monitoring
19   -- I was trying to actively monitor those requests and
20   stay on top of them and would volunteer advice when I
21   perceived a particular request to maybe be controversial
22   or troublesome.
23        Q     So as -- withdrawn.  We're hearing the feedback.
24        A     Is it me?
25        Q     Well, if you have a -- happen to have a cell
```

1    phone that's on or something close to the computer,

2    sometimes that will cause a problem, but I'm not going to

3    accuse anybody.

4         A    I turned everything off except for my, you know,

5    my computer.

6         Q    Okay.  All right.  Let's -- I want to focus just

7    on May 2015.  So I do understand that your system changed

8    either in late 2015 or early 2016, but I just want to ask

9    about the system in May 2015, okay?

10        A    Yes, sir.

11        Q    Is it true that as of May 2015 in connection

12   with your position as the county attorney, you would

13   provide legal advice with respect to FOIA requests only

14   when you were asked by someone in the county who had

15   received a FOIA request, correct?

16        A    That is correct.

17        Q    And as of May 2015, there was not a system in

18   place where recipients of FOIA requests were supposed to

19   ask you for legal advice in connection with those

20   requests, correct?

21        A    That's correct.

22        Q    So before we talk about the specific FOIA

23   request that's at issue or requests that are at issue in

24   this case, I want to ask you some questions just about the

25   Duggar family, okay?

1      A      Okay.

2      Q      Prior to May 20, 2015, did you know any of the

3    Duggars personally?

4      A      Very, very casually, yes.

5      Q      Okay.  Can you tell us which of the Duggars you

6    knew and how you knew them prior to May 20, 2015?

7      A      I knew Jim Bob and Michelle.  The quorum court

8    is an elected position.  Jim Bob was a state

9    representative for some time so sometimes they would be at

10   election watch parties that I would also be at.  The very

11   most interaction personally I ever had with either Jim Bob

12   or Michelle was a handshake to say I'm Steve Zega.

13     Q      So you wouldn't characterize yourself as being

14   friends with the Duggars prior to May 20, 2015, correct?

15     A      That's correct.

16     Q      And did you have any animosity towards the

17   Duggars as of May 20, 2015?

18     A      I disagree with them politically and

19   theologically, Mr. Bledsoe, but personal animosity, no.

20   This is a, you know -- no.

21     Q      All right.  Let me refer you to a document

22   that's been premarked as Exhibit 29.

23            (WHEREUPON, Exhibit 29 was marked for

24   identification.)

25     A      All right.

1      Q    It's the Washington County Sheriff's Office

2   incident report.

3      A    Okay, I have it up.

4      Q    You see Exhibit 29 is a Washington County

5   Sheriff's Office incident report.  It's Bates numbered --

6   well, it's actually not Bates numbered.  At the bottom it

7   says, "Form Incidents WCSO," and it's a four page

8   document.  Do you see that?

9      A    Yes.

10      Q    When is the first time you saw a copy of the

11   Washington County Sheriff's Office incident report which

12   has been marked as Exhibit 29?

13      A    May of 2015.

14      Q    Do you recall whether you saw a copy of the

15   incident report prior to the time it was released?

16      A    Yes.

17      Q    Pursuant to the FOIA request?

18      A    Yes, I recall, and, no, I did not see it before

19   then.

20      Q    Okay.  In May of 2015, did you ever see an

21   unredacted copy of the incident report that's been marked

22   as Exhibit 29?

23      A    I don't know.  I know I have seen an unredacted

24   copy, but I don't know if I saw one in May.

25      Q    Okay.  What were the circumstances under which

1   you first saw the Washington County Sheriff's Office

2   incident report that's been marked as Exhibit 29?

3       A    My recollection is that Matt Durrett, who was

4   and remains the elected prosecuting attorney for the

5   Fourth Judicial District, which is Washington and Madison

6   Counties, texted me, e-mailed me or called me and asked me

7   to review the report and provide guidance on whether we

8   should release the report in the first place and whether

9   we should continue to release it in response to more FOIA

10  requests.

11      Q    And do you recall what date that happened?

12      A    No, sir.  I know that I was in Little Rock

13  actually on National Guard duty, North Little Rock on

14  National Guard duty and I think, but I do not recall

15  specifically, that it was the third week of May of 2015.

16      Q    Okay.  So is it true that Matt Durrett, the

17  prosecuting attorney, either texted, e-mailed or called

18  you after the county had released the incident report in

19  response to a FOIA request and asked you in words or

20  substance, you know, to advise whether the report had been

21  properly released in the first instance and whether the

22  county should continue to release the report; is that

23  correct?

24      A    That is my recollection, yes.  I know Matt and I

25  had multiple conversations about this particular topic and

1    I'm pretty sure I first learned about this from Matt.

2         Q    **Did you do legal research to determine whether**

3    **the county had properly released the incident report in**

4    **the first place pursuant to the incident -- the FOIA**

5    **request?**

6         A    Yes.

7         Q    **And what research did you do?**

8         A    I looked at statutes.

9         Q    **Anything else?**

10        A    I may have read some AG's opinions and some

11   FOIA, Arkansas FOIA case law, but I was focused on

12   statutory exceptions to the Freedom of Information Act.

13        Q    **Do you recall which statutes you looked at?**

14        A    Initially, I looked at the Arkansas Child

15   Maltreatment Act codified at Arkansas code annotated

16   12-18-101, et seq.

17        Q    **Do you recall any other statutes?**

18        A    Not initially.  Later on, much later on and I

19   can't remember where I learned this, I learned that this

20   report formed the basis of a family in need of services

21   petition in juvenile court and I can't remember if someone

22   asked me to give an opinion about whether the Arkansas

23   juvenile code, and I'm not sure exactly what -- which

24   statute this is, but it's in Title 9, Chapter 27 of the

25   Arkansas juvenile code prohibited the release of the

1    report as well, but that was weeks, if not months, after

2    May of 2015.

3         Q    After Mr. Durrett --

4              THE COURT REPORTER:  I'm sorry, I just can't

5    understand you.  That feedback is bad.

6         Q    (BY MR. BLEDSOE)  Well, we'll try again.  Did

7    you respond to Mr. Durrett's question concerning whether

8    the report had been properly released in the first

9    instance and whether the county should continue to release

10   the report?

11        A    I did.

12        Q    Do you recall when you responded to

13   Mr. Durrett's questions?

14        A    No.

15        Q    What did you tell Mr. Durrett in response to

16   questions he raised with you concerning whether the report

17   had been properly released in the first instance and

18   whether the county should continue to release the report?

19        A    It was my opinion that we should not have

20   released the report in the first instance and that we

21   would not continue, on my advice, to release it to anyone

22   else, we would deny further requests.

23        Q    And why did you reach those conclusions?

24        A    My read of the Arkansas Child Maltreatment Act

25   together with this report led me to the conclusion that

1   this was a report of child maltreatment as defined in the

2   statute and this was a document record data compilation

3   that was not just exempt from disclosure, but prohibited

4   from disclosure and that, you know, the statute

5   specifically refers to the Arkansas Freedom of Information

6   Act and says it's not -- you're not to release it pursuant

7   to the Arkansas Freedom of Information Act and there is

8   a -- you know, finally in that analysis I read through

9   chapter two of the Child Maltreatment Act and there is a

10  criminal prohibition, it's a misdemeanor to release these

11  records that qualify as child maltreatment records

12  unlawfully.

13       Q    **How many hours of legal research did it take you**

14  **to reach those conclusions?**

15       A    I don't remember.

16       Q    **Was it an hour or two or was it something that**

17  **took you all day, what's your best estimate?**

18       A    I don't know --

19            MR. OWENS:  Object to form.

20       A    -- Mr. Bledsoe.

21            Sorry, Jason.

22       Q    **(BY MR. BLEDSOE)  Can you estimate for me how**

23  **long it took you to reach the conclusion that the report**

24  **should not have been released and that the county should**

25  **not continue to release the report after Mr. Durrett asked**

```
 1   you to look into those issues?

 2              MR. OWENS:  Object to form.

 3        A    Jason, do you want me answer the question?

 4              MR. OWENS:  Yes, unless I instruct you

 5   otherwise.

 6        A    Thank you.

 7              Mr. Bledsoe, I don't remember because the legal

 8   research was one component of solving this problem and the

 9   legal research, I don't remember whether I settled across

10   the Arkansas Child Maltreatment Act on my own or whether

11   Matt directed me to it specifically and that would drive

12   part of the answer to your question.  This was a

13   comprehensive problem-solving exercise in which -- for me

14   in which legal research was one component because although

15   I did not personally know the Duggars, I knew they were --

16   I knew that they had a television program, I knew that

17   they were celebrities, and given the contents of this

18   particular report, I recognized that it had the potential

19   to be a really, really big deal, and so part of what I did

20   was read the report, analyze the contents of the report.

21   I don't know whether Matt told me because this is -- what

22   you showed me is redacted, whether he told me this

23   involved the Duggars or not.  I learned it very shortly

24   thereafter.  And so part of the back and forth was should

25   we have released it under the Freedom of Information Act.
```

1   You know, I like to go back every time I get a FOIA

2   request that I think might be controversial and read the

3   act itself and then read the Arkansas Child Maltreatment

4   Act and there was a multifaceted approach to this issue,

5   not only was it -- you know, should we have released it in

6   the first place and should we continue to release it, is

7   what do we do now that it has been released and those were

8   all things that were on my mind.  I do not remember how

9   much time and can't answer the question intelligently how

10  much time I spent on legal research.  I will tell you that

11  the United States Army had me on orders for a week, five

12  days at Fort -- at Camp Robinson and they did not get

13  their money's worth out of me that week because I

14  basically dealt with this issue that entire week.  I

15  remember that distinctly.

16      Q    (BY MR. BLEDSOE)  Is it true that if the

17  sheriff's office had asked you prior to releasing the

18  report whether they should release the incident report in

19  response to the FOIA request that you would have told

20  them, no, they should not release the report?

21      A    I don't know.

22           MR. OWENS:  Form.

23      A    I don't know.

24      Q    (BY MR. BLEDSOE)  In your position as county

25  attorney, what would you have done if the sheriff's office

1    prior to releasing the report had sought your legal advice

2    concerning whether to release the incident report in

3    response to the FOIA request?

4            MR. OWENS:  Object to the form.

5        A    I'm sorry.

6            MR. OWENS:  I was just registering my objection,

7    Steve.  Go ahead.

8        A    Thank you.  I would have done legal research and

9    much like I did with the after-the-fact question because

10   my recollection of Matt's question to me was twofold, did

11   we do right in the first place and can we continue to

12   release it.  Should we release it is the same question as

13   the second part of Matt's question.  I would have done the

14   legal research, that would have been my first step.

15       Q    (BY MR. BLEDSOE)  And when you did the legal --

16   actually did the legal research, your conclusion was, no,

17   the report should not have been released, correct?

18       A    That is correct.

19       Q    Did anyone from the county sheriff's department

20   or anyone else from the county ask you in your position as

21   county attorney whether the Washington County Sheriff's

22   Office incident report which has now been marked

23   Exhibit 29 should have been released in response to the

24   FOIA request prior to the time they released it?

25       A    Not before it was released, no.

1        Q      After the release of the incident report, did

2    you conduct any investigation to determine how it happened

3    that the report was released without -- withdrawn.

4               After the release of the incident report, did

5    you conduct any investigation to determine how it occurred

6    that the report was released without anyone asking for

7    your legal advice?

8        A      Yes.

9        Q      What did you find out?

10       A      That the sheriff's office has or had two

11   full-time employees, civilian employees, who do nothing

12   but process FOIA requests and that if I personally laid

13   eyes on every request and passed on their legal

14   sufficiency, I would do nothing else in my capacity as

15   county attorney.  So because the Freedom of Information

16   Act in Arkansas and the case law around the Freedom of

17   Information Act in Arkansas provides that disclosure is

18   the rule and nondisclosure is the exception and that

19   narrowly tailored statutory exceptions exist and you must

20   rely upon one of those narrowly tailored statutory

21   exceptions in order to refuse a FOIA request, that they

22   process five or six or eight or a dozen of these things a

23   day, FOIA requests in general, and didn't run it by me

24   because they didn't see any reason to run it by me.

25       Q      As far as you know, who were the employees in

1   the sheriff's department who worked on the FOIA request

2   with regard to the incident report?

3        A    My two contacts primarily at the sheriff's

4   office for this were Major Rick Hoyt and Public

5   Information Officer Kelly Cantrell.  I do not know the

6   names of the clerks and still don't know the names of the

7   clerks or clerk who handled this particular request.

8        Q    You testified earlier that with respect to the

9   incident report, you understood because the Duggars had a

10  TV show that this was going to be a big or important

11  issue.  Do you recall that generally?

12       A    Yes, sir.

13       Q    And was there any policy within Washington

14  County if there was a FOIA request that was going to

15  involve big or important or sensitive issues that those

16  should be run by the county attorney prior to releasing

17  information in connection with those types of FOIA

18  requests?

19       A    No.

20            MR. OWENS:  Object to form.

21       Q    (BY MR. BLEDSOE)  As part of your review of how

22  the incident report in this case got released, did you

23  learn who at the county processed the FOIA request and who

24  made the decision, for example, to release the incident

25  report?

1      A    As I said earlier, Mr. Bledsoe, I don't know the

2  clerk who worked on this.  I know that at some point Rick

3  Hoyt had something to do with it, but I'm not sure exactly

4  what it was.

5      Q    Do you know, for example, who made the

6  redactions to this report prior to the time it was

7  released?

8      A    I do not.

9      Q    Let me refer you to the FOIA request from the

10  Cross Gunter law firm dated May 15, 2015.  It's been

11  marked as Exhibit 30 in this case.

12          (WHEREUPON, Exhibit 30 was marked for

13  identification.)

14      A    Okay.

15      Q    You see Exhibit 30 is a FOIA request from the

16  Cross Gunter law firm dated May 15, 2015 addressed to the

17  records division of the Washington County Sheriff's

18  Office?

19      A    I do.

20      Q    When is the first time you saw a copy of this

21  FOIA request?

22      A    Yesterday.

23      Q    You said yesterday?

24      A    Yes, sir.

25      Q    So is it true that you never saw a copy of the

1  FOIA request that the Cross Gunter law firm sent to the

2  Washington County Sheriff's Office in the May 2015 time

3  frame, correct?

4      A    Not this one, Mr. Bledsoe.  I saw I think one or

5  two after this, much later when it appeared that they were

6  -- Abtin Mehdizadegan, the attorney whose name appears on

7  this request, was looking for other things involving the

8  Duggars, but those happened July, August, September of

9  2015.  This -- this exhibit, the first time I saw it was

10 yesterday when Mr. Owens forwarded it to me, Mr. Owen

11 rather.

12     Q    After you advised Matt Durrett that --

13          THE COURT REPORTER:  I didn't catch that,

14 Mr. Bledsoe, sorry.

15          MR. BLEDSOE:  Pardon me?

16          THE COURT REPORTER:  I didn't hear the first

17 part.

18          MR. BLEDSOE:  Sure.

19     Q    (BY MR. BLEDSOE)  After you advised Matt Durrett

20 that the county should not have released the incident

21 report in response to the May 15, 2015 FOIA request and

22 that it should not continue to release the incident

23 report, did the county, in fact, follow your advice and

24 stop any further release of the incident report which has

25 been marked Exhibit 29?

```
 1        A    As far as I know, it did.

 2        Q    After the release of the incident report in

 3   May 2015 in response to the Cross Gunter FOIA request, did

 4   the county change its policies with respect to how to deal

 5   with FOIA requests?

 6        A    Yes.

 7        Q    What are you referring to?

 8        A    The web portal that I mentioned is one of the --

 9   one of the changes we made that would allow me to have at

10   least passive visibility of freedom of information

11   requests.  The public information officer at -- Kelly

12   Cantrell at the sheriff's office, anything that remotely

13   had a child, an incident report or anything else that the

14   sheriff's office handled that involved a child victim,

15   survivor, witness, she ran it by me.  There was no

16   formal -- I didn't issue a memorandum.  I did -- as I

17   said, I think I sent out a couple e-mails that said please

18   run any FOIA requests by me that you think -- you know,

19   and I don't know if I set out my criteria, but please

20   bring FOIA requests to me, and, in particular, I held at

21   least one and maybe two meetings with command staff and

22   Kelly Cantrell at the sheriff's office in which I in

23   person said this is how we need to handle this going

24   forward.

25        Q    Any other changes you can recall?
```

1       A     No.

2       Q     And why did you implement those changes after

3  the release of the incident report in response to the FOIA

4  request in May of 2015?

5       A     Because it was my belief that we had made a,

6  what I call a hustle mistake, a good faith mistake in

7  releasing this and that we needed not to repeat that

8  mistake.

9       Q     Let me refer you to -- now, this is an article

10  that we circulated this morning.  Its been marked

11  Exhibit 31.  Did you get a copy of that, Mr. Zega?

12            (WHEREUPON, Exhibit 31 was marked for

13  identification.)

14       A     No, I did not.

15            MR. BLEDSOE:  Jason, can you shoot him an e-mail

16  with that?

17            MR. OWENS:  I'm sorry, you said Exhibit 31.  I

18  think I only saw 29 and 30.

19            MR. BLEDSOE:  Nicole circulated an e-mail about

20  15 minutes before the deposition.  It's just a CNN article

21  that Mr. Zega --

22            MR. OWENS:  Okay.  Let me see.  Oh, here it is.

23       A     Okay.

24       Q     (BY MR. BLEDSOE)  Mr. Zega, let me know when you

25  have a copy of the CNN news article which has been marked

1   Exhibit 31.

2       A    Okay.

3       Q    I'm really just going to ask you some questions

4   about the first couple of paragraphs.

5           MR. OWENS:   I just sent it to you by e-mail,

6   Steven.

7           THE WITNESS:   Okay.

8           MR. BLEDSOE:   Well, why don't -- let's take our

9   first -- you know, let's take a ten minute break.  I think

10  when we come back it will be the last session.  Let's take

11  a ten minute break, take a moment to review the article

12  and we'll come back and we'll do our last session, okay?

13          (Short break from 10:59 a.m. to 11:13 a.m.)

14      Q    (BY MR. BLEDSOE)  Mr. Zega, do you have a copy

15  of the news article which is marked as Exhibit 31 in front

16  of you?

17      A    Yes.

18      Q    You see the article is from money.CNN.com and

19  it's dated June 4th, 2015.  Do you see that?

20      A    Yes.

21      Q    The article is entitled, "Duggar records

22  shouldn't have been released, Arkansas official says."  Do

23  you see that?

24      A    Yes.

25      Q    It reads, at least the first two paragraphs,

1   "Police records about Josh Duggar's history of molestation

2   should not have been released an Arkansas County official

3   said Thursday.  'If I could build a time machine, this

4   wouldn't have come out in the first place,' Washington

5   County Attorney Steven Zega told CNNMoney."  Do you see

6   that?

7       A    Yes.

8       Q    Did you tell a reporter from CNN on about

9   June 4th, 2015 that, "If I could build a time machine,

10  this wouldn't have come out in the first place?"

11      A    I think so.

12      Q    And the "this" you were referring to was the

13  incident report that was released by the county, correct?

14      A    Yes.

15      Q    Is it true that the incident report would not

16  have been released if the sheriff's department had asked

17  you ahead of time?

18          MR. OWENS:  Object to form.

19      A    I don't know, Mr. Bledsoe.  Even when I was

20  county attorney, my clients didn't always follow my

21  advice.

22      Q    (BY MR. BLEDSOE)  Is it true that if the

23  sheriff's department had asked you ahead of time whether

24  to release the incident report, you would have told them

25  not to release it?

```
1              MR. OWENS:  Object to form.
2         A    Armed with the information I had after the fact,
3    yes, that would have been my advice.
4         Q    (BY MR. BLEDSOE)  Now, the next sentence of the
5    news article which is marked as Exhibit 31 says, "'I don't
6    know the sequence of events of what happened to get it
7    released.  I'm looking into it myself,' Zega said."  Do
8    you see that?
9         A    Yes.
10        Q    What did you learn of the sequence of events
11   that happened to get the incident report released?
12        A    When I got back from North Little Rock from
13   guard duty, I had a meeting with Rick Hoyt, Kelly
14   Cantrell, I think her husband, Jay, who was the chief
15   deputy, Jay Cantrell was the chief deputy at the sheriff's
16   office, and I either met with Sheriff Helder then or at a
17   meeting sort of immediately after where we discussed what
18   happened.  This is -- the meeting with Major Hoyt was the
19   one in which I said -- he said to me, basically, there
20   are, you know, dozens of FOIA requests a week, Steve.  If
21   you -- if we sent every one of them to you, you're going
22   to do nothing but tell us whether to release or not,
23   that's all you're going to do all day.  What I learned was
24   that the sheriff's office gets multiple Freedom of
25   Information Act requests a day and that their policy,
```

1   because this is Arkansas law, is to release records and if

2   they don't release them, to have a narrow exception based

3   in statute to release.  What I understood with this

4   particular -- to not release, rather.  What I understood

5   to have happened with this was it was treated as a routine

6   FOIA request and that -- the sheriff's office treated it

7   as a routine FOIA request, that because the subject matter

8   of the request involved sexual assault, they redacted

9   information relating to the people involved.

10      Q    Did you learn anything else as part of your

11  investigation?

12      A    I probably did, but that's all I remember.

13      Q    You testified earlier about speaking with Matt

14  Durrett concerning his question about whether the report

15  should have been released in the first place and whether

16  the county should continue to release it.  Do you recall

17  that generally?

18      A    Yes.

19      Q    Did you respond to Mr. Durrett's inquiry in

20  writing?

21      A    I don't remember.  There's a real good chance

22  that I didn't given the fact that I was in North Little

23  Rock on guard duty and this was sort of a triage operation

24  at the moment.

25      Q    Do you still have copies of any e-mails or text

1    messages you exchanged with Matt Durrett or anyone else in

2    the county in connection with the release of the incident

3    report that's at issue in this case?

4         A    I know I don't have e-mails.  I would have to

5    check my phone for texts, but the e-mail -- all my e-mails

6    when I ceased being county attorney resided there.  I

7    didn't bring them with me.

8         Q    And you didn't delete any of those e-mails while

9    you were county attorney, correct?

10        A    You are correct.  No, sir, I didn't delete

11   e-mails.

12        Q    And you didn't delete any text messages

13   purposely, correct?

14        A    That is correct.

15        Q    Have you looked to see if you had any text

16   message exchanges with Matt Durrett or anyone else at the

17   county in connection with the release of the incident

18   report?

19        A    No.

20        Q    We'll ask you to do that.  I'm not going to bust

21   anybody's chops right now, but, Jason, if you will follow

22   up with that, we would appreciate it.

23             All right.  Prior to May 2015, were you aware

24   there had been an investigation concerning Josh Duggar

25   molesting his sisters --

1      A     No.

2      Q     -- years earlier?

3      A     No.

4      Q     Is it true that you first learned about that in

5   connection with the release of the incident reports?

6      A     That is correct.

7      Q     I'm going to read you and we'll put it on the

8   screen, but I'm going to read you part of an interrogatory

9   response that you made in this case and I just want to ask

10  you some questions about that.  So referring to your

11  interaction with the Don Lemon and CNN in early June 2015,

12  it says, "Shortly after that appearance," this is your

13  response to interrogatory number 15, by the way, so it

14  says, "Shortly after that appearance, Kelly Cantrell, the

15  public information officer of the sheriff's office,

16  contacted me to express her displeasure at what I said.

17  Kelly and her husband, Jay, who is the city deputy

18  sheriff, are long-time friends of mine and I went to see

19  Kelly as soon as I could to apologize for the way I

20  handled myself.  I also went to Sheriff Helder in a

21  separate meeting and apologized to him."  So I'm going to

22  ask you some questions about that, okay?

23     A     Okay.

24     Q     Is the statement that is referred to that Kelly

25  Cantrell is unhappy with your statement that, "If I could

1    build a time machine, this wouldn't have come out the

2    first place?"

3            MR. OWENS:   Object to form.

4       A    I don't remember.   Mr. Bledsoe, I know she was

5    angry with me in general about my CNN appearance and

6    comments.

7       Q    (BY MR. BLEDSOE)   So did you actually make an

8    appearance on the Don Lemon show?

9       A    Yes.

10      Q    And do you recall generally what you told Don

11   Lemon during that appearance?

12      A    Generally, I told him that we did not -- we

13   should not -- we, the county, should not have released the

14   report, that we were not going to repeat that mistake in

15   relation to other outlets.   He probably asked -- I'm not

16   going to speculate.   That's the general gist of it.

17   Everything that I've told you today is I don't think we

18   should have released the report and we were not going to

19   repeat the mistake of releasing it again.

20      Q    And after you made those statements to Don

21   Lemon, is it true that Kelly Cantrell, the public

22   information officer for the sheriff's office, contacted

23   you to express her displeasure with what you said?

24      A    Yes.

25      Q    What did Ms. Cantrell tell you?

1      A    I -- I don't remember the details, Mr. Bledsoe.

2  What I remember is she was unhappy with me because it made

3  it seem like the sheriff's office had done something wrong

4  in releasing the information.

5      Q    But at the time, you did believe the sheriff's

6  office had done something wrong in releasing the

7  information, correct?

8      A    That's correct, a mistake.  I want to be clear

9  about that.  I believe they made a mistake, not a -- you

10  know, there was no plot to, that I was ever aware of, to

11  hurt somebody.

12      Q    I'm going to move to strike after that is

13  correct as nonresponsive, but that's for the judge.

14          Do you recall anything else Kelly Cantrell told

15  you about being unhappy with the statements you had made

16  to Don Lemon on CNN?

17      A    No.

18      Q    And did you apologize to Ms. Cantrell?

19      A    Yes.

20      Q    Why did you apologize?

21      A    Because I could have handled myself and simply

22  not commented to the press and it would have -- I made a

23  mistake in going on Don, I could have told him no.  I

24  should have told him no.

25      Q    When you said you made a mistake, you believe

1    you made a mistake by talking to Don Lemon at all about

2    this issue?

3        A    Yes.

4        Q    And why do you believe it was a mistake to talk

5    to Don Lemon about the issue?

6        A    Because it inflamed the -- well, one, it

7    inflamed my relationship with people I like an awful lot,

8    I trust and had a really good working relationship at the

9    sheriff's office; two, it wasn't necessary to do the job.

10       Q    And did you also apologize to Sheriff Helder?

11       A    Yes.

12       Q    And why did you apologize to Sheriff Helder?

13       A    Because, you know, he's the elected official.

14   Tim's a longtime friend of mine, somebody for whom I have

15   an awful lot of respect in a really, really difficult job

16   and I liked him and it was the same reasons that I

17   apologized to Kelly first and then apologized to the

18   sheriff, I want to say two or three days later.

19       Q    At any time during the second half of May or the

20   June 2015 time frame, did anyone at the county sheriff's

21   office ever express regret to you for having released the

22   incident report?

23       A    I don't remember.

24       Q    At any time during -- you know, after May --

25   well, withdrawn.

Steven Zega

Dillard vs.<br>City of Springdale

1      At any time between May 2015 and the end of

2  June, for example, 2015, did anyone at the sheriff's

3  office apologize or admit that they had made a mistake in

4  releasing the incident report?

5      A    So it seems to me there are two parts to that

6  question.

7      Q    Well, let me ask you -- that's fair, so I'm

8  going to sustain your objection, not that you made an

9  objection.

10     A    I'm not making an objection, I'm a witness.

11     Q    I know, I'm kidding.  But at any time between

12  May 20, 2015 and the end of June 2015, did anyone at the

13  county sheriff's department ever tell you that you were

14  right, they had made a mistake in releasing the incident

15  report?

16     A    I don't remember words like that, no.

17     Q    What do you remember?

18     A    I remember what I told you before, Mr. Bledsoe,

19  which is whenever -- it's sort of a remedial thing going

20  forward, whenever there was a report that involved a child

21  victim, a child survivor or even a child witness and that

22  report was the subject of a Freedom of Information Act

23  request, Kelly, in particular, would reach out to me

24  whenever and say, Steve, I've got this, should we release

25  it.  And so the behavior changed at the sheriff's office,

```
 1   but not -- I don't remember anybody ever saying we messed
 2   this up.  I don't know that it didn't happen either.  My
 3   concern during that whole mess was how can I repair, if I
 4   could repair, the relationships I had with good people at
 5   the sheriff's office.
 6       Q    And you felt like you needed to repair
 7   relationships with people you had at the sheriff's office
 8   because you had probably said that releasing the incident
 9   report was a mistake and they were unhappy with that,
10   correct?
11       A    Mr. Bledsoe, I'll stand on my former testimony
12   with that.  I felt like I needed to apologize, one,
13   because, frankly, I pissed them off and, two, because I as
14   a practical matter besides the fact that they were friends
15   of mine whose friendship and relationships I value
16   professionally, it was imperative to me to have a good
17   working, trusting relationship with them and, as I said, I
18   could have done the job without going on Don Lemon to talk
19   about we had screwed up.
20           MR. BLEDSOE:  Let me check with my colleagues
21   here.  Let's just take about two minutes and then I think
22   we'll be -- we'll finish up, okay?
23           THE WITNESS:  Very well.
24           (Short break from 11:30 a.m. to 11:31 a.m.)
25           MR. BLEDSOE:  I don't have any further
```

Steven Zega

Dillard vs.
City of Springdale

1    questions.  Thank you for your time, Mr. Zega.  And go

2    Army.

3              THE WITNESS:  Thank you.  Beat Navy.

4              MR. BLEDSOE:  Although, I do have a good friend

5    who played quarterback at Navy for a couple years.

6              THE COURT REPORTER:  Are we off or did anyone

7    else have questions?

8              MR. OWENS:  I'll reserve.

9                (DEPOSITION CONCLUDED AT 11:31 A.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Steven Zega                                                    **Dillard vs.**
                                                          **City of Springdale**

```
 1                    C E R T I F I C A T E

 2

 3           I, Kerri Pianalto, Certified Court Reporter, do
     hereby certify that the above-named STEVEN ZEGA was by me
 4   first duly sworn to testify the truth, the whole truth, and

 5   nothing but the truth, in the case aforesaid; that the above
     and foregoing deposition was by me taken and transcribed
 6   pursuant to agreement, and under the stipulations

 7   hereinbefore set out; and that I am not an attorney for

 8   nor relative of any of said parties or otherwise

 9   interested in the event of said action.

10           IN WITNESS WHEREOF, I have hereunto set my hand

11   and official seal this 15th day of September, 2021.

12

13

14

15

16

17

18
                     _____
19                   KERRI PIANALTO, CCR

20                   State of Arkansas, No. 651

21

22

23

24

25
```

Steven Zega

**Dillard vs.
City of Springdale**

```
 1              DECLARATION UNDER PENALTY OF PERJURY
 2    Case Name: Dillard vs. City of Springdale
 3    Date of Deposition: 09/09/2021
 4    Job No.: 10087128
 5
 6                  I, STEVEN ZEGA, hereby certify
 7    under penalty of perjury under the laws of the State of
 8    _____ that the foregoing is true and correct.
 9                  Executed this _____ day of
10    _____, 2021, at _____.
11
12
13                        _____
14                              STEVEN ZEGA
15
16    NOTARIZATION (If Required)
17    State of _____
18    County of _____
19    Subscribed and sworn to (or affirmed) before me on
20    this _____ day of _____, 20__,
21    by_____,      proved to me on the
22    basis of satisfactory evidence to be the person
23    who appeared before me.
24    Signature: _____ (Seal)
25
```

Steven Zega

1 | DEPOSITION ERRATA SHEET

2 | Case Name: Dillard vs. City of Springdale
Name of Witness: Steven Zega
3 | Date of Deposition: 09/09/2021
Job No.: 10087128
4 | Reason Codes:  1. To clarify the record.
                  2. To conform to the facts.
5 |                3. To correct transcription errors.

6 | Page _____ Line _____ Reason _____

7 | From _____ to _____

8 | Page _____ Line _____ Reason _____

9 | From _____ to _____

10 | Page _____ Line _____ Reason _____

11 | From _____ to _____

12 | Page _____ Line _____ Reason _____

13 | From _____ to _____

14 | Page _____ Line _____ Reason _____

15 | From _____ to _____

16 | Page _____ Line _____ Reason _____

17 | From _____ to _____

18 | Page _____ Line _____ Reason _____

19 | From _____ to _____

20 | Page _____ Line _____ Reason _____

21 | From _____ to _____

22 | Page _____ Line _____ Reason _____

23 | From _____ to _____

24 | Page _____ Line _____ Reason _____

25 | From _____ to _____

**Steven Zega**

**Dillard vs.**
**City of Springdale**

```
 1    DEPOSITION ERRATA SHEET

 2    Page _____ Line _____ Reason _____

 3    From _____ to _____

 4    Page _____ Line _____ Reason _____

 5    From _____ to _____

 6    Page _____ Line _____ Reason _____

 7    From _____ to _____

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    _____ Subject to the above changes, I certify that the
               transcript is true and correct
23    _____ No changes have been made. I certify that the
               transcript  is true and correct.
24

25           _____
                       STEVEN ZEGA
```

**Page 47**

Steven Zega

---

**0**

**05** 6:16

---

**1**

**10:22** 14:4

**10:24** 14:4

**10:59** 32:13

**11:13** 32:13

**11:30** 42:24

**11:31** 42:24 43:9

**12-18-101** 20:16

**15** 28:10,16 29:21
31:20 37:13

**1990** 4:15

**1991** 4:19

**1993** 4:16,21 5:17,21
7:13

**1994** 6:1,8

**1999** 6:8

**19th** 6:2

---

**2**

**20** 17:2,6,14,17 41:12

**2001** 7:6

**2003** 4:23 6:12 7:7

**2005** 4:25 7:7

**2006** 6:10

**2009** 5:2

**2010** 6:21 7:6

**2011** 6:25

**2012** 5:3 7:1

---

**2014** 7:14,16

**2015** 7:17 8:19 14:9,
11,20,25 15:4,8,15
16:7,8,9,11,17 17:2,
6,14,17 18:13,20
19:15 21:2 28:10,16
29:2,9,21 30:3 31:4
32:19 33:9 36:23
37:11 40:20 41:1,2,
12

**2016** 7:18 11:5,12,18
14:8,13,19,20 16:8

**2017** 7:18,19,23

**27** 20:24

**29** 17:22,23 18:4,12,
22 19:2 25:23 29:25
31:18

---

**3**

**30** 28:11,12,15 31:18

**31** 31:11,12,17 32:1,
15 34:5

**39th** 6:17

---

**4**

**4th** 32:19 33:9

---

**9**

**9** 20:24

**93** 5:22,23

**94** 6:4,5

**99** 6:10

---

**A**

**a.m.** 14:4 32:13 42:24

---

43:9

**absence** 7:8

**Abtin** 29:6

**Academy** 4:20

**accepted** 7:16

**access** 5:12 13:11

**accuse** 16:3

**act** 13:10,24 20:12,15
21:24 22:6,7,9
23:10,25 24:3,4
26:16,17 34:25
41:22

**active** 6:25

**actively** 15:19

**addressed** 28:16

**addressing** 14:17

**administrator** 13:11

**admit** 41:3

**advanced** 5:1

**advice** 9:10,12 10:21,
24 12:20 13:3 15:9,
17,20 16:13,19
21:21 25:1 26:7
29:23 33:21 34:3

**advise** 19:20

**advised** 29:12,19

**advocate** 4:24 5:1,5

**after-the-fact** 25:9

**AG's** 20:10

**agency** 15:11

**ahead** 25:7 33:17,23

**allow** 30:9

**analysis** 22:8

**analyze** 23:20

**angry** 38:5

---

**animosity** 17:16,19

**annotated** 20:15

**answer** 11:15 12:12,
13 15:1 23:3,12 24:9

**answering** 7:15

**anybody** 16:3 42:1

**anybody's** 36:21

**apologies** 14:14

**apologize** 37:19
39:18,20 40:10,12
41:3 42:12

**apologized** 37:21
40:17

**appearance** 9:23
37:12,14 38:5,8,11

**appeared** 29:5

**appears** 29:6

**appoint** 11:20,21

**appointed** 8:16,17,
18,23,25

**appreciate** 36:22

**approach** 24:4

**Arkansas** 4:14,15,20
5:22 6:6 20:11,14,
15,22,25 21:24 22:5,
7 23:10 24:3 26:16,
17 32:22 33:2 35:1

**Armed** 34:2

**Army** 4:17 5:3,7,9,14,
15 6:18 24:11 43:2

**article** 31:9,20,25
32:11,15,18,21 34:5

**artillery** 4:22 5:19,23

**arts** 4:15

**asked** 7:3 12:6 13:4,
17 15:10 16:14 19:6,
19 20:22 22:25

---

Index: 05–asked

Steven Zega

Dillard vs.
City of Springdale

24:17 33:16,23
38:15

**asking** 26:6

**assault** 35:8

**assist** 12:12

**assistant** 10:11,13
12:11

**assisted** 9:19

**associate** 6:5,7,19
7:24

**Associates** 6:6,7

**Association** 9:16

**attempted** 12:23

**attended** 10:1,2

**attorney** 6:2 7:4,14,
16,17 8:15,18,25
9:4,5 10:9,10,13,23
11:5,20 12:2,18
13:2,7 14:8,10 15:9
16:12 19:4,17 24:25
25:21 26:15 27:16
29:6 33:5,20 36:6,9

**attorney's** 11:2

**attorneys** 10:6

**August** 7:23 29:8

**aware** 12:5 15:7
36:23 39:10

**awareness** 15:13

**awful** 40:7,15

---

**B**

**B-O-Y-C-E** 6:7

**bachelor** 4:15

**back** 6:16,19 23:24
24:1 32:10,12 34:12

**background** 4:13
5:17

**bad** 8:4 21:5

**bar** 5:21,22

**baseball** 7:9,10

**based** 35:2

**basic** 4:22,24 5:1

**basically** 6:24 9:5
24:14 34:19

**basis** 20:20

**Bates** 18:5,6

**Beat** 43:3

**becoming** 7:3

**began** 7:14

**beginning** 7:6 8:19
14:11

**behavior** 41:25

**belief** 31:5

**believe** 39:5,9,25
40:4

**Benton** 6:3

**best** 14:5,16 15:1
22:17

**better** 8:13

**big** 23:19 27:10,15

**Bledsoe** 4:6,12 8:3,
12,15 13:6 14:2,5
17:19 21:6 22:20,22
23:7 24:16,24 25:15
27:21 28:1 29:4,14,
15,18,19 31:15,19,
24 32:8,14 33:19,22
34:4 38:4,7 39:1
41:18 42:11,20,25
43:4

**Bob** 17:7,8,11

**bottom** 18:6

**Boyce** 6:6,19

**break** 14:4 32:9,11,13
42:24

**Brigade** 6:17,18

**bring** 12:11 30:20
36:7

**brother** 5:14

**build** 33:3,9 38:1

**bunch** 13:25

**bust** 36:20

---

**C**

**calendar** 6:25

**call** 31:6

**called** 5:2 6:12,23,24
7:2 19:6,17

**Camp** 24:12

**Candidate** 4:21

**Cantrell** 27:5 30:12,
22 34:14,15 37:14,
25 38:21,25 39:14,
18

**capacity** 10:17 26:14

**Carroll** 6:3

**case** 9:20,23 16:24
20:11 26:16 27:22
28:11 36:3 37:9

**casually** 17:4

**catch** 29:13

**cause** 16:2

**ceased** 36:6

**celebrities** 23:17

**cell** 15:25

**certain** 8:23

**certification** 9:25

**chance** 35:21

**change** 30:4

**changed** 16:7 41:25

**changes** 30:9,25 31:2

**chapter** 20:24 22:9

**characterize** 17:13

**check** 36:5 42:20

**chief** 34:14,15

**child** 20:14 21:24
22:1,9,11 23:10 24:3
30:13,14 41:20,21

**chops** 36:21

**circulated** 31:10,19

**circumstances** 18:25

**cited** 10:16

**city** 14:10 37:17

**civil** 9:5,15,20

**civilian** 5:25 26:11

**class** 9:25

**CLE** 5:8

**clear** 14:15,21 39:8

**clerk** 7:19 27:7 28:2

**clerks** 27:6,7

**clients** 33:20

**close** 16:1

**closed** 13:20

**CNN** 31:20,25 33:8
37:11 38:5 39:16

**CNNMONEY** 33:5

**code** 20:15,23,25

**codified** 20:15

**Index: asking–codified**

Steven Zega

Dillard vs.
City of Springdale

colleagues 42:20

colonel 5:12

come 15:17 32:10,12
33:4,10 38:1

coming 13:14

command 30:21

commented 39:22

comments 38:6

commission 10:3

committee 10:2

communicate 11:13

compilation 22:2

complaints 9:14

component 23:8,14

comprehensive
23:13

computer 16:1,5

concern 42:3

concerning 21:7,16
25:2 35:14 36:24

CONCLUDED 43:9

conclusion 21:25
22:23 25:16

conclusions 21:23
22:14

conduct 9:13 26:2,5

confirmation 8:22

confirmed 11:24

connection 12:2
15:10 16:11,19
27:17 36:2,17 37:5

considered 13:22

contacted 37:16
38:22

contacts 27:3

contents 23:17,20

continue 19:9,22
21:9,18,21 22:25
24:6 25:11 29:22
35:16

contract 13:8

contracts 10:4

controversial 13:23
15:21 24:2

conversations 19:25

copies 35:25

copy 18:10,14,21,24
28:20,25 31:11,25
32:14

correct 10:18,19
14:14 16:15,16,20,
21 17:14,15 19:23
25:17,18 29:3 33:13
36:9,10,13,14 37:6
39:7,8,13 42:10

correctly 10:16

correspondence
4:25

Counties 6:3 9:16
19:6

county 7:2,3,5,14,16,
17 8:15,18,20,21,25
9:2,4,6,10,15,19,20
10:10,18,21,23,25
11:2,4,8,9,17 12:2,3,
7,8,17,19 13:2,5,7,
19 14:8,18 15:4,9,11
16:12,14 18:1,4,11
19:1,18,22 20:3
21:9,18 22:24 24:24
25:19,20,21 26:15
27:14,16,23 28:17
29:2,20,23 30:4
33:2,5,13,20 35:16
36:2,6,9,17 38:13
40:20 41:13

county's 14:24

couple 12:23,24
30:17 32:4 43:5

course 4:22,24 5:1,2,
4,8

court 4:9 7:5,8 8:3,
14,22 10:2 14:2 17:7
20:21 21:4 29:13,16
43:6

criminal 9:6 22:10

criteria 30:19

Cross 28:10,16 29:1
30:3

Crouch 8:2

custodian 12:9

_____

D

daily 13:13

data 22:2

date 19:11

dated 28:10,16 32:19

Davis 6:6,7,9,20

day 9:8 22:17 26:23
34:23,25

days 24:12 40:18

deal 23:19 30:4

dealt 24:14

December 5:23 6:16
11:5,12,18

decision 27:24

defined 22:1

definitely 15:15

delete 36:8,10,12

demobbing 6:16

demobilized 6:17

Democrat 11:19

deny 13:24 21:22

department 10:21
12:19 15:2 25:19
27:1 33:16,23 41:13

depending 12:4
15:13

deployed 6:11

deployment 7:7

deposes 4:3

deposition 31:20
43:9

deputies 9:11

deputy 6:1 34:15
37:17

described 14:7

details 39:1

determine 20:2 26:2,
5

difficult 40:15

DIRECT 4:5

directed 23:11

direction 10:7

directly 11:14 12:6

disagree 17:18

disclosure 22:3,4
26:17

discussed 34:17

displeasure 37:16
38:23

distinctly 24:15

district 6:2 19:5

division 15:11 28:17

doctor 5:15

Index: colleagues–doctor

Steven Zega

Dillard vs.
City of Springdale

**document** 17:21 18:8 22:2

**documents** 14:1

**Don** 37:11 38:8,10,20 39:16,23 40:1,5 42:18

**dozen** 26:22

**dozens** 34:20

**drive** 23:11

**Duggar** 16:25 32:21 36:24

**Duggar's** 33:1

**Duggars** 17:3,5,14,17 23:15,23 27:9 29:8

**duly** 4:3

**Durrett** 19:3,16 21:3, 15 22:25 29:12,19 35:14 36:1,16

**Durrett's** 21:7,13 35:19

**duties** 9:3

**duty** 6:25 19:13,14 34:13 35:23

**E**

**e-mail** 31:15,19 32:5 36:5

**e-mailed** 19:6,17

**e-mails** 12:24 30:17 35:25 36:4,5,8,11

**earlier** 14:10 27:8 28:1 35:13 37:2

**early** 6:1,4 14:8,9,19, 20 16:8 37:11

**East** 6:15

**echo** 8:4

**education** 5:3

**educational** 4:13

**Edwards** 7:2 8:20 12:10

**effect** 13:1

**eight** 26:22

**either** 13:24 16:8 17:11 19:17 34:16 42:2

**elect** 11:8,9,17

**elected** 8:16 9:10 15:3 17:8 19:4 40:13

**election** 11:23 17:10

**employees** 26:11,25

**encouraged** 12:23

**enforcement** 9:24,25

**entered** 9:23 13:8

**entire** 24:14

**entities** 10:20

**entitled** 32:21

**entity** 12:19 13:5,8

**especially** 9:16

**essentially** 6:13

**estimate** 22:17,22

**et** 20:16

**events** 34:6,10

**evolved** 13:6

**exactly** 20:23 28:3

**exam** 5:21

**EXAMINATION** 4:5

**example** 9:7 27:24 28:5 41:2

**exception** 26:18 35:2

**exceptions** 9:7 20:12

26:19,21

**exchanged** 36:1

**exchanges** 36:16

**executive** 12:11

**exempt** 22:3

**exemptible** 13:23

**exercise** 23:13

**exhibit** 17:22,23 18:4, 12,22 19:2 25:23 28:11,12,15 29:9,25 31:11,12,17 32:1,15 34:5

**exist** 26:19

**express** 37:16 38:23 40:21

**eyes** 26:13

**F**

**face-to-face** 12:24

**fact** 29:23 34:2 35:22 42:14

**fair** 41:7

**faith** 31:6

**family** 16:25 20:20

**far** 10:9 26:25 30:1

**February** 6:1,4

**feedback** 15:23 21:5

**felt** 42:6,12

**Ferner** 8:2

**field** 4:22 5:19,23

**finally** 22:8

**find** 11:17 26:9

**finish** 7:15 42:22

**fired** 11:6,11,18 14:13

**firm** 6:6,8,9,10,20,22, 23 7:22,25 28:10,16 29:1

**first** 4:3 6:11 18:10 19:1,8,21 20:1,4 21:8,17,20 24:6 25:11,14 28:20 29:9, 16 32:4,9,25 33:4,10 35:15 37:4 38:2 40:17

**five** 9:13 10:9 24:11 26:22

**focus** 16:6

**focused** 20:11

**FOIA** 10:25 12:2,15, 18,20 13:4,5 14:17, 21,24 15:5,10 16:13, 15,18,22 18:17 19:9, 19 20:4,11 24:1,19 25:3,24 26:12,21,23 27:1,14,17,23 28:9, 15,21 29:1,21 30:3, 5,18,20 31:3 34:20 35:6,7

**follow** 13:15 29:23 33:20 36:21

**follows** 4:4

**form** 18:7 22:19 23:2 24:22 25:4 27:20 33:18 34:1 38:3

**formal** 12:25 30:16

**formed** 6:22 20:20

**former** 8:21 42:11

**formulating** 12:13

**Fort** 4:22 5:24 6:13, 14 24:12

**forth** 23:24

**forward** 30:24 41:20

**forwarded** 29:10

found 11:14,16

four 4:23 6:16,21
9:13 10:9 18:7

Fourth 19:5

frame 14:25 29:3
40:20

frankly 42:13

freedom 13:9,23
20:12 22:5,7 23:25
26:15,16 30:10
34:24 41:22

friend 40:14 43:4

friends 17:14 37:18
42:14

friendship 42:15

front 32:15

Fryar 8:2

full 4:7 13:12

full-time 26:11

further 21:22 29:24
42:25

G

general 5:5 26:23
38:5,16

general's 4:24 5:1

generally 27:11 35:17
38:10,12

gentleman 11:21,24

gist 38:16

give 20:22

given 9:8 23:17 35:22

go 8:12 14:2 24:1
25:7 43:1

going 8:9 16:2 27:10,

14 30:23 32:3 34:21,
23 36:20 37:7,8,21
38:14,16,18 39:12,
23 41:8,19 42:18

good 31:6 35:21 40:8
42:4,16 43:4

graduated 4:14,19,
21,23,25 5:2,4,17,18

Grove 6:22

guard 4:20 5:10
19:13,14 34:13
35:23

guidance 12:6 19:7

Gunter 28:10,16 29:1
30:3

H

habeas 7:21

half 40:19

handle 30:23

handled 9:6,17 27:7
30:14 37:20 39:21

handling 14:24

handshake 17:12

happen 9:21 15:25
42:2

happened 19:11 26:2
29:8 34:6,11,18 35:5

Harwell 8:2

hear 4:9,17 29:16

hearing 15:23

heavily 9:12

held 6:3 7:17 30:20

Helder 34:16 37:20
40:10,12

helps 8:9

Hi 8:10,11

high 4:13 7:10

hired 6:19 10:10,17

history 33:1

home 5:25 6:25

Honorable 7:19

Hood 6:13

hour 22:16

hours 22:13

Hoyt 27:4 28:3 34:13,
18

human 9:12,14

hurt 39:11

husband 34:14 37:17

hustle 31:6

I

identification 17:24
28:13 31:13

immediately 5:19
34:17

imperative 42:16

implement 31:2

implemented 14:7,18
15:5,18

important 27:10,15

incident 12:15 18:2,5,
11,15,21 19:2,18
20:3,4 24:18 25:2,22
26:1,4 27:2,9,22,24
29:20,22,24 30:2,13
31:3 33:13,15,24
34:11 36:2,17 37:5
40:22 41:4,14 42:8

Incidents 18:7

includes 6:2

individuals 15:11

Infantry 6:17

inflamed 40:6,7

information 13:10,23
20:12 22:5,7 23:25
26:15,17 27:5,17
30:10,11 34:2,25
35:9 37:15 38:22
39:4,7 41:22

initially 20:14,18

inquiry 35:19

instance 19:21 21:9,
17,20

instruct 23:4

intelligently 24:9

interaction 17:11
37:11

interested 7:3

intermediate 5:3

interrogatory 37:8,13

investigation 26:2,5
35:11 36:24

investigator 9:14

involve 27:15

involved 9:12,15,18,
22 15:13 23:23
30:14 35:8,9 41:20

involving 29:7

Iraq 6:11,15,24 7:7

issue 16:23 24:4,14
27:11 30:16 36:3
40:2,5

issues 9:12 23:1
27:15

Steven Zega

**J**

**JAG** 4:24

**jail** 9:16

**January** 5:25 6:4 7:17,18 8:19 14:11

**Jason** 22:21 23:3 31:15 36:21

**Jay** 34:14,15 37:17

**JD** 4:16

**Jim** 17:7,8,11

**job** 5:25 6:3 7:16,18 11:21,22,24,25 40:9, 15 42:18

**jobs** 7:4

**joined** 8:6

**Joseph** 7:19 11:8,17

**Josh** 33:1 36:24

**judge** 4:23,25 5:4,13 7:2,20 8:20,21 9:2, 20 11:8,9,17 12:10 39:13

**judge's** 5:4 12:7,8

**judicial** 6:2 19:5

**July** 5:21,22 7:23 29:8

**June** 32:19 33:9 37:11 40:20 41:2,12

**juvenile** 20:21,23,25

**K**

**Kelly** 27:5 30:11,22 34:13 37:14,17,19, 24 38:21 39:14 40:17 41:23

**Kendall** 8:7,8,9,11

**Kenneth** 4:8,11

**kidding** 41:11

**KIEKLAK** 8:10

**kind** 9:21 10:16

**knew** 17:6,7 23:15,16

**know** 10:15 11:23 13:10,16,23 14:21 15:1 16:4 17:2,20 18:23,24 19:12,20, 24 22:4,8,18 23:15, 21 24:1,5,21,23 26:25 27:5,6 28:1,2, 5 30:1,18,19 31:24 32:9 33:19 34:6,20 36:4 38:4 39:10 40:13,24 41:11 42:2

**Kuwait** 6:15

**L**

**laid** 26:12

**Lainey** 10:10,12

**Lainey's** 10:14

**late** 5:25 6:4 14:20 16:8

**law** 4:16 5:17,18 7:11, 19 9:23,24,25 20:11 26:16 28:10,16 29:1 35:1

**lawyer** 10:18

**learn** 27:23 34:10 35:10

**learned** 20:1,19 23:23 34:23 37:4

**leave** 6:18 7:7 11:2,4

**led** 21:25

**left** 6:22 7:11

**legal** 9:11 10:14,21, 24 12:20 13:3 15:9 16:13,19 20:2 22:13 23:7,9,14 24:10 25:1,8,14,15,16 26:7,13

**Lemon** 37:11 38:8,11, 21 39:16 40:1,5 42:18

**let's** 4:19 8:12 16:6 32:8,9,10 42:21

**level** 5:3

**licensed** 10:12

**liked** 40:16

**limitations** 13:16

**Lincoln** 6:6

**litany** 4:16

**litigating** 9:18

**litigation** 9:15,18,19

**Little** 6:13 7:20 19:12, 13 34:12 35:22

**long** 22:23

**long-time** 37:18

**longtime** 40:14

**look** 13:21 23:1

**looked** 20:8,13,14 36:15

**looking** 5:24 29:7 34:7

**lot** 9:21 10:5 40:7,15

**lots** 5:8

**Louisiana** 6:14

**love** 5:15

**M**

**machine** 33:3,9 38:1

**Madison** 19:5

**magistrate** 7:20

**Major** 27:4 34:18

**making** 41:10

**maltreatment** 20:15 21:24 22:1,9,11 23:10 24:3

**manage** 14:22

**Marilyn** 7:2 8:20

**marked** 17:23 18:12, 21 19:2 25:22 28:11, 12 29:25 31:10,12, 25 32:15 34:5

**Matt** 19:3,16,24 20:1 23:11,21 29:12,19 35:13 36:1,16

**Matt's** 25:10,13

**matter** 9:7 35:7 42:14

**mean** 6:14 15:14

**meeting** 10:2 34:13, 17,18 37:21

**meetings** 10:3 30:21

**Mehdizadegan** 29:6

**memorandum** 30:16

**memos** 10:14

**mentioned** 30:8

**mess** 42:3

**message** 36:16

**messages** 36:1,12

**messed** 42:1

**met** 34:16

**method** 14:24

**Michelle** 17:7,12

**middle** 4:10 6:15

**military** 4:17,20 5:4,

Steven Zega

Dillard vs.
City of Springdale

13

**Miller**  10:11

**mind**  24:8

**mine**  37:18 40:14
42:15

**minus**  7:6

**minute**  14:3 32:9,11

**minutes**  31:20 42:21

**misdemeanor**  22:10

**mistake**  31:6,8 38:14,
19 39:8,9,23,25
40:1,4 41:3,14 42:9

**molestation**  33:1

**molesting**  36:25

**moment**  5:8 32:11
35:24

**money**  7:13

**money's**  24:13

**money.cnn.com**
32:18

**monitor**  9:17 15:19

**monitoring**  15:18

**month**  6:18

**months**  5:20,24 6:12,
15,16 7:21 10:9 21:1

**morning**  31:10

**move**  39:12

**multifaceted**  24:4

**multiple**  19:25 34:24

**mute**  8:6,9

**muted**  8:8

**myself,'**  34:7

**N**

**name**  4:7,10 7:25
29:6

**named**  10:10

**names**  27:6

**narrow**  35:2

**narrowly**  26:19,20

**National**  4:20 5:10
19:13,14

**Navy**  43:3,5

**necessary**  40:9

**need**  20:20 30:23

**needed**  9:11 31:7
42:6,12

**needs**  8:6

**never**  28:25

**news**  31:25 32:15
34:5

**Nicole**  31:19

**nine**  7:21

**nondisclosure**  26:18

**nonresponsive**  39:13

**North**  19:13 34:12
35:22

**number**  37:13

**numbered**  18:5,6

**O**

**Object**  22:19 23:2
25:4 27:20 33:18
34:1 38:3

**objection**  25:6 41:8,
9,10

**occasion**  10:24

**occasions**  9:13

**occurred**  26:5

**October**  6:12

**offer**  11:24 15:9

**offered**  7:22 11:21,22

**office**  10:1 12:8,14,16
18:1,5,11 19:1
24:17,25 25:22
26:10 27:4 28:18
29:2 30:12,14,22
34:16,24 35:6 37:15
38:22 39:3,6 40:9,21
41:3,25 42:5,7

**officer**  4:20,22 5:1,19
27:5 30:11 37:15
38:22

**officer's**  4:24

**official**  15:3 32:22
33:2 40:13

**officially**  5:12

**officials**  9:10,11

**Oh**  31:22

**okay**  8:15 9:3 14:15
16:6,9,25 17:1,5
18:3,20,25 19:16
28:14 31:22,23 32:2,
7,12 37:22,23 42:22

**Oklahoma**  4:23

**on-the-spot**  9:10

**once**  13:14

**one-person**  10:8

**open-ended**  9:1

**operation**  35:23

**opinion**  20:22 21:19

**opinions**  10:15 20:10

**order**  26:21

**orders**  6:25 24:11

**ordinances**  9:9

**outlets**  38:15

**Owen**  29:10

**Owens**  8:5 22:19
23:2,4 24:22 25:4,6
27:20 29:10 31:17,
22 32:5 33:18 34:1
38:3 43:8

**P**

**page**  18:7

**paragraphs**  32:4,25

**Pardon**  29:15

**Parker**  6:20,22,23

**part**  9:25 13:13,18
23:12,19,24 25:13
27:21 29:17 35:10
37:8

**particular**  12:5,8,14
13:5 15:21 19:25
23:18 27:7 30:20
35:4 41:23

**particularly**  13:22

**parties**  17:10

**partner**  6:8 7:24

**parts**  41:5

**passed**  26:13

**passive**  15:16 30:10

**people**  35:9 40:7
42:4,7

**perceived**  15:21

**person**  12:6 15:15
30:23

Index: Miller–person

Steven Zega

| | | | |
|---|---|---|---|
| **personal** 17:19 | **Prairie** 6:22 | **purposely** 36:13 | 14 20:13,17 21:12 27:11 30:25 35:16 38:10 39:14 |
| **personally** 9:22 15:16 17:3,11 23:15 26:12 | **premarked** 17:22 | **pursuant** 18:17 20:4 22:6 | **recalling** 5:7 |
| **petition** 20:21 | **press** 39:22 | **put** 5:3 10:1 37:7 | **received** 12:20 13:5 16:15 |
| **phone** 16:1 36:5 | **pretty** 20:1 | | **recipients** 16:18 |
| **pissed** 42:13 | **previous** 10:11 | **Q** | **recognized** 23:18 |
| **place** 16:18 19:8 20:4 24:6 25:11 33:10 35:15 38:2 | **primarily** 27:3 | **qualify** 22:11 | **recollection** 14:5,9, 16 19:3,24 25:10 |
| **place,'** 33:4 | **prior** 15:4 17:2,6,14 18:15 24:17 25:1,24 27:16 28:6 36:23 | **quarterback** 43:5 | **record** 14:3,15 22:2 |
| **planning** 10:3 | **probably** 8:6 13:6 35:12 38:15 42:8 | **question** 7:15 11:15 12:6 15:2 21:7 23:3, 12 24:9 25:9,10,12, 13 35:14 41:6 | **records** 12:9 22:11 28:17 32:21 33:1 35:1 |
| **played** 43:5 | **problem** 16:2 23:8 | **questions** 4:4 16:24 21:13,16 32:3 37:10, 22 43:1,7 | **redact** 13:25 |
| **PLC** 6:9,21,23 | **problem-solving** 23:13 | **quorum** 7:5,8 8:22 10:2 17:7 | **redacted** 23:22 35:8 |
| **please** 30:17,19 | **process** 8:22 26:12, 22 | | **redactions** 28:6 |
| **pleasure** 9:2 | **processed** 27:23 | **R** | **refer** 17:21 28:9 31:9 |
| **PLLC** 8:2 | **professionally** 42:16 | **raised** 21:16 | **referred** 37:24 |
| **plot** 39:10 | **program** 4:21 23:16 | **ran** 30:15 | **referring** 30:7 33:12 37:10 |
| **plural** 7:4 | **prohibited** 20:25 22:3 | **rank** 5:11 | **refers** 22:5 |
| **point** 28:2 | **prohibition** 22:10 | **rarely** 12:14 | **refuse** 26:21 |
| **Police** 33:1 | **promoted** 10:12 | **reach** 21:23 22:14,23 41:23 | **regard** 27:2 |
| **policies** 30:4 | **proof** 10:14 | **read** 10:3 20:10 21:24 22:8 23:20 24:2,3 37:7,8 | **registering** 25:6 |
| **policy** 12:18,22,23,25 27:13 34:25 | **properly** 19:21 20:3 21:8,17 | **reads** 32:25 | **regret** 40:21 |
| **politically** 17:18 | **propounded** 4:4 | **real** 35:21 | **relating** 35:9 |
| **Polk** 6:14 | **prosecuting** 6:1 19:4, 17 | **really** 8:4 23:19 32:3 40:8,15 | **relation** 38:15 |
| **portal** 13:9,11,12,21 14:6,17,22 15:18 30:8 | **provide** 9:10 10:24 12:5 13:3 16:13 19:7 | **reason** 26:24 | **relationship** 40:7,8 42:17 |
| **position** 5:11 7:22 8:16 9:1 10:12,23 11:4 15:8 16:12 17:8 24:24 25:20 | **provided** 10:20 13:8 | **reasons** 11:13 40:16 | **relationships** 42:4,7, 15 |
| **potential** 23:18 | **provides** 26:17 | **recall** 18:14,18 19:11, | **release** 19:8,9,22 20:25 21:9,18,21 22:6,10,25 24:6,18, 20 25:2,12 26:1,4 |
| **practical** 42:14 | **public** 27:4 30:11 37:15 38:21 | | |
| | **purchased** 13:7 | | |

**Index: personal–release**

27:24 29:22,24 30:2
31:3 33:24,25 34:22
35:1,2,3,4,16 36:2,
17 37:5 41:24

**released** 18:15 19:18,
21 20:3 21:8,17,20
22:24 23:25 24:5,7
25:17,23,24,25 26:3,
6 27:22 28:7 29:20
32:22 33:2,13,16
34:7,11 35:15 38:13,
18 40:21

**releasing** 24:17 25:1
27:16 31:7 38:19
39:4,6 41:4,14 42:8

**rely** 26:20

**remained** 6:10

**remains** 19:4

**remedial** 41:19

**remember** 20:19,21
22:15 23:7,9 24:8,15
35:12,21 38:4 39:1,2
40:23 41:16,17,18
42:1

**remotely** 30:12

**renamed** 6:9

**repair** 42:3,4,6

**repeat** 31:7 38:14,19

**reply** 4:4

**report** 18:2,5,11,15,
21 19:2,7,8,18,20,22
20:3,20 21:1,8,10,
16,18,20,25 22:1,23,
25 23:18,20 24:18,
20 25:1,2,17,22
26:1,3,4,6 27:2,9,22,
25 28:6 29:21,23,24
30:2,13 31:3 33:13,
15,24 34:11 35:14
36:3,18 38:14,18

40:22 41:4,15,20,22
42:9

**reporter** 4:9 8:3,14
14:2 21:4 29:13,16
33:8 43:6

**reports** 37:5

**representative** 17:9

**Republican** 11:19,20

**request** 12:4,5,7,9,
11,18,20 13:5,25
15:14,16,21 16:15,
23 18:17 19:19 20:5
24:2,19 25:3,24
26:13,21 27:1,7,14,
23 28:9,15,21 29:1,
7,21 30:3 31:4 35:6,
7,8 41:23

**requested** 13:25

**requester** 13:16

**requests** 10:25 12:2,
15 13:4,10,12,14,20,
24 14:17,21,23,25
15:6,10,19 16:13,18,
20,23 19:10 21:22
26:12,23 27:18 30:5,
11,18,20 34:20,25

**require** 13:24

**required** 9:13

**research** 20:2,7
22:13 23:8,9,14
24:10 25:8,14,16

**reserve** 43:8

**resided** 36:6

**resolutions** 9:9

**resource** 9:14

**resources** 9:12

**respect** 10:25 16:13
27:8 30:4 40:15

**respond** 13:3 15:5
21:7 35:19

**responded** 13:15
21:12

**response** 19:9,19
21:15 24:19 25:3,23
29:21 30:3 31:3
37:9,13

**responsibilities** 9:4
12:1

**returned** 5:25

**review** 19:7 27:21
32:11

**reviewed** 10:4

**Rick** 27:4 28:2 34:13

**right** 5:15,16 14:12
16:6 17:21,25 25:11
36:21,23 41:14

**rights** 9:15,20

**Robinson** 24:12

**Rock** 6:13 7:21 19:12,
13 34:12 35:23

**routine** 35:5,7

**rule** 26:18

**run** 10:15 26:23,24
27:16 30:18

--------

**S**

**saw** 12:15 18:10,14,
24 19:1 28:20,25
29:4,9 31:18

**saying** 42:1

**says** 4:3 18:7 22:6
32:22 34:5 37:12,14

**school** 4:13,16,21
5:5,17,18,23 7:10,11

**schools** 4:17 5:6

**screen** 37:8

**screwed** 42:19

**second** 25:13 40:19

**see** 4:19 8:9 10:15
13:12,21 18:4,8,18,
20 26:24 28:15
31:22 32:18,19,23
33:5 34:8 36:15
37:18

**seen** 18:23

**seminars** 5:6

**sensitive** 27:15

**sent** 10:25 29:1 30:17
32:5 34:21

**sentence** 34:4

**separate** 37:21

**September** 6:5 7:19
29:8

**seq** 20:16

**sequence** 34:6,10

**served** 5:14

**services** 20:20

**session** 32:10,12

**set** 30:19

**settled** 23:9

**sexual** 35:8

**sheriff** 34:16 37:18,
20 40:10,12,18

**sheriff's** 10:1,21
12:14,16 18:1,5,11
19:1 24:17,25 25:19,
21 26:10 27:1,3
28:17 29:2 30:12,14,
22 33:16,23 34:15,
24 35:6 37:15 38:22
39:3,5 40:9,20 41:2,

**Steven Zega**

Dillard vs.
City of Springdale

13,25 42:5,7

**shoot** 31:15

**short** 14:4 32:13
42:24

**shortly** 23:23 37:12,
14

**show** 10:8 27:10 38:8

**showed** 23:22

**Sill** 4:22 5:24 6:14

**simply** 39:21

**sir** 14:20 16:10 19:12
27:12 28:24 36:10

**sisters** 36:25

**six** 6:12 26:22

**solving** 23:8

**somebody** 13:17
39:11 40:14

**soon** 37:19

**sorry** 4:9 7:15 21:4
22:21 25:5 29:14
31:17

**sort** 34:17 35:23
41:19

**sought** 25:1

**speak** 8:4

**speaking** 35:13

**specific** 16:22

**specifically** 19:15
22:5 23:11

**speculate** 38:16

**spent** 5:20,24 6:12,
15,16,18,24 24:10

**staff** 10:6 30:21

**stand** 42:11

**started** 13:14 14:19

**state** 4:7 5:13 17:8

**statement** 37:24,25

**statements** 38:20
39:15

**States** 7:20 24:11

**statute** 20:24 22:2,4
35:3

**statutes** 20:8,13,17

**statutory** 20:12
26:19,20

**stay** 15:20

**step** 25:14

**Steve** 6:21 7:1 17:12
25:7 34:20 41:24

**Steven** 4:2,8,11 32:6
33:5

**Stokely** 4:8,11

**stop** 29:24

**strike** 39:12

**studying** 5:20

**stuff** 10:5

**subject** 35:7 41:22

**substance** 19:20

**successor** 11:22

**sued** 9:20

**sufficiency** 26:14

**supposed** 12:20
13:17 16:18

**sure** 4:18 5:18 13:15,
18 20:1,23 28:3
29:18

**survivor** 30:15 41:21

**Susan** 8:7,8,10

**sustain** 41:8

**sworn** 4:3

**system** 14:6,17 15:5,
16 16:7,9,17

---

**T**

---

**tailored** 26:19,20

**take** 22:13 32:8,9,10,
11 42:21

**talk** 16:22 40:4 42:18

**talking** 40:1

**television** 23:16

**tell** 4:12 11:11 17:5
21:15 24:10 33:8
34:22 38:25 41:13

**ten** 6:15 32:9,11

**tenure** 10:10 13:7

**term** 8:23

**testified** 14:10 27:8
35:13

**testimony** 42:11

**text** 35:25 36:12,15

**texted** 19:6,17

**texts** 36:5

**Thank** 23:6 25:8 43:1,
3

**theologically** 17:19

**thing** 9:8,21 10:16
41:19

**things** 7:12 10:14
11:14,16 13:25 24:8
26:22 29:7

**think** 7:12 8:5 19:14
24:2 29:4 30:17,18
31:18 32:9 33:11
34:14 38:17 42:21

**third** 19:15

**three** 5:20 40:18

**Thursday** 33:3

**Tim's** 40:14

**time** 6:11 7:2,5,8 8:21
9:25 11:9 12:17
13:2,12,14,16,20
14:25 17:9 18:10,15
24:1,9,10 25:24
28:6,20 29:2,9 33:3,
9,17,23 38:1 39:5
40:19,20,24 41:1,11
43:1

**Title** 20:24

**to-wit** 4:4

**today** 38:17

**told** 23:21,22 24:19
33:5,24 38:10,12,17
39:14,23,24 41:18

**top** 15:20

**topic** 19:25

**tracking** 13:19 14:17

**training** 5:6 6:13 9:24
10:14 15:5

**treated** 35:5,6

**triage** 35:23

**tried** 13:18

**trouble** 5:7

**troublesome** 13:22
15:22

**true** 5:20 13:3 14:16
15:8,15 16:11 19:16
24:16 28:25 33:15,
22 37:4 38:21

**trust** 40:8

**trusting** 42:17

**try** 9:17 21:6

**trying** 15:19

Steven Zega

turned 16:4

TV 27:10

two 5:24 7:1,24 22:9, 16 26:10 27:3 29:5 30:21 32:25 40:9,18 41:5 42:13,21

twofold 25:10

types 27:17

typical 9:8

---

**U**

umpire 7:9,10

understand 16:7 21:5

understood 27:9 35:3,4

unhappy 37:25 39:2, 15 42:9

United 7:20 24:11

University 4:14,15

unlawfully 22:12

unredacted 18:21,23

unusual 9:21

use 10:13

---

**V**

value 42:15

varied 12:4 15:2,3

victim 30:14 41:21

visibility 30:10

visits 12:24

Volpe 7:20

volunteer 15:20

---

**W**

walk 5:16

want 4:17 14:21 16:6, 8,24 23:3 37:9 39:8 40:18

wanted 9:11,22 11:20

Washington 7:5 9:4 10:23 12:1 18:1,4,11 19:1,5 25:21 27:13 28:17 29:2 33:4

wasn't 9:6,17 15:15 40:9

watch 17:10

way 14:22 37:13,19

WCSO 18:7

we'll 21:6 32:12 36:20 37:7 42:22

We're 15:23

web 30:8

web-based 13:9,12, 14,21 14:6,16 15:18

week 9:8 19:15 24:11, 13,14 34:20

weeks 21:1

went 5:19 6:18,19,22 37:18,20

withdrawn 11:3 15:23 26:3 40:25

witness 30:15 32:7 41:10,21 42:23 43:3

woman 10:10

won 11:22,23

Wood 11:8,11,13,18

words 12:7 19:19 41:16

---

work 5:16 6:19 7:21

worked 7:1 10:7 27:1 28:2

working 7:25 40:8 42:17

worth 24:13

wouldn't 17:13 33:4, 10 38:1

write 9:9

writing 35:20

wrong 39:3,6

wrote 10:4

---

**Y**

year 6:23,25 13:6 14:7,19

years 6:21 7:1,11,24 37:2 43:5

yesterday 28:22,23 29:10

---

**Z**

Zega 4:2,7,8,11 6:9, 21,23 14:6 17:12 31:11,21,24 32:14 33:5 34:7 43:1

---