# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF ARKANSAS
 2                     FAYETTEVILLE DIVISION

 3

 4   UNITED STATES OF AMERICA                        PLAINTIFF

 5   v.                  CASE NO. 5:21-CR-50014

 6   JOSHUA JAMES DUGGAR                             DEFENDANT

 7   _____

 8

 9              TRANSCRIPT OF MOTIONS HEARING

10         BEFORE THE HONORABLE TIMOTHY L. BROOKS

11                   NOVEMBER 29, 2021

12                  FAYETTEVILLE, ARKANSAS

13   _____
```

1  Q.   (BY MS. MARSHALL)  Mrs. Holt, let me ask you a
2  different question.
3       In March 2003, did you receive a call from Jim Bob
4  Duggar asking you to come to his house?
5  A.   He called my husband and asked us to come over, yes.
6  Q.   So he asked you and Mr. Holt to come over to his
7  residence, is that correct?
8  A.   Yes, ma'am.
9  Q.   Was it your understanding when you arrived there at
10 the residence -- first, who all -- without saying what
11 happened, who all was there at the residence when you
12 arrived?
13 A.   The only people I saw that I knew of was there were
14 myself, my husband, Jim Holt, Michelle Duggar, Jim Bob
15 Duggar and Joshua Duggar.
16 Q.   When you had -- did you subsequently have a
17 conversation that day with those parties?
18 A.   Yes.
19 Q.   When you had that conversation, were all of those
20 parties that you just mentioned -- Jim Bob Duggar,
21 Michelle Duggar, Josh Duggar, and your husband, Jim
22 Holt -- all present during that conversation?
23 A.   Yes.
24 Q.   Was it your understanding that that conversation was
25 happening because you were the parents of Joshua Duggar's

```
 1  showed that the statements made by the defendant to which
 2  the witness testified were not made by the defendant in
 3  professing religious faith or seeking spiritual comfort or
 4  guidance."
 5          The context here is not in the context of a
 6  confession and for priestly consolation.  The context is a
 7  conversation between the heads of two families who were
 8  best friends and who had children who were dating, or
 9  whatever the term used was, and they were summoned not to
10  the church, but to their best friend's house to discuss
11  what no doubt was a serious matter.  But there's nothing
12  in the context here that would suggest that it was for the
13  purpose of the penitent, or a penitent seeking priestly
14  consolation.  Instead, the context here is more a
15  conversational statement in the context of this dating
16  relationship and the circumstances were such that the
17  content of the conversation apparently was of such a
18  nature that it was anticipated that it could lead to the
19  breakup of the couples' children.  That is not the sort of
20  context, as best I can tell from quick study, where the
21  clergy privilege would apply.
22          Beyond that, there's no suggestion that Bobye
23  Holt was a clergy.  There's no suggestion that Jim Holt
24  was a pastor or reverend of the church.  It is suggested
25  that he was an elder, but the conversation teed up here is
```

```
 1  not between the defendant and a church elder.  It's a
 2  conversation in which the church elder's wife was invited.
 3  And, arguably, that would render it a waiver, to the
 4  extent that there was a privilege that extended to church
 5  elders, which the Court doubts to be the case.
 6          Also present was their friends, Jim Bob and
 7  Michelle, so multiple people present.  This wasn't
 8  strictly in the context of seeking penitence.  It was
 9  parents talking about a significant issue involving their
10  respective children in the context of being long-time best
11  friends and in the context of these best friends having
12  children who were dating.
13          So barring the Court's ability to take a deeper
14  look at *Trammel* and some of the other cases in this
15  jurisprudence, the Court will make a preliminary finding
16  that there is no applicable privilege in this context.
17          And you may inquire.
18          MS. MARSHALL:  Thank you, Your Honor.
19  Q.   (BY MS. MARSHALL)  Mrs. Holt, did you have a
20  conversation with Joshua Duggar in March of 2003?
21  A.   Yes, ma'am.
22  Q.   Do you remember the date of that conversation?
23  A.   March 30th, 2003.
24  Q.   And this is the conversation that we've been speaking
25  about for a while now that both you, Mr. Holt, Jim Bob
```

1  Duggar, Michelle Duggar, and Josh Duggar were present for,
2  correct?
3  A.   Correct.
4  Q.   Can you please tell the Court what Joshua Duggar told
5  you in regards to him sexually touching minor females?
6  A.   Yes, ma'am.  When we went over, Jim Bob and Michelle
7  explained --
8           MR. GELFAND:  Objection, Your Honor.  I'm sorry.
9  I would object to any hearsay about what anyone said other
10 than Mr. Duggar, meaning Josh Duggar.
11          THE COURT:  Well, Ms. Marshall, it is potentially
12 hearsay what other persons said, to the extent that you're
13 offering that testimony for its truth.
14          At this point, there's not enough foundation for
15 the Court to understand where you're going, so I'll ask
16 you to rephrase and carefully delve into that.
17          MS. MARSHALL:  Yes, Your Honor.
18 Q.   (BY MS. MARSHALL)  Mrs. Holt, can you please tell me
19 what Joshua Duggar told you in regards to him sexually
20 touching minor females on March the 30th, 2003?
21 A.   Yes.  He explained that Jane Doe Number 4 was sitting
22 on his lap during Bible time and he touched her
23 inappropriately at that time.  And then he had said --
24 because we had asked him several questions about that.
25 And then he had said that he had previously, in previous

```
 1   Q.   What is his birth date?
 2   A.   March 3rd, 1990 -- sorry -- March 3rd, 1988.
 3   Q.   Is Josh Duggar at least three years older than Jane
 4   Doe 1?
 5   A.   Yes.
 6   Q.   Did Joshua Duggar tell you anything else on that date
 7   regarding the touching -- inappropriate touching of Jane
 8   Does 1 through 4?
 9   A.   Yes, but it wasn't involving the girls.
10   Q.   Was it in regards to another individual?
11   A.   Yes.
12   Q.   Was that individual less than three years -- or more
13   than three years younger than Josh Duggar?
14   A.   No.
15   Q.   Did you ever have any other conversations with Joshua
16   Duggar regarding him sexually assaulting, inappropriately
17   touching Jane Doe -- either Jane Doe 1, 2, 3, or 4?
18   A.   Yes.
19   Q.   Before we talk about that conversation, can you
20   please tell me when that would have been?
21   A.   The beginning of 2005, from January to, I believe,
22   maybe the middle of March or April of 2005, yeah.
23   Q.   Can you tell the Court where you were when this
24   conversation happened?
25   A.   Yes.  We were in Little Rock at our home during
```

1  session.  My husband had session, so he was with us.  He
2  stayed with us the whole time during session.
3  Q.  It's cutting out a little bit and I want to break it
4  down.  So you say "in session".  What does "in session"
5  mean?
6  A.  Legislative session.
7  Q.  Why were you there for a legislative session?
8  A.  My husband was a state senator for our area.
9  Q.  So you had a home there in Little Rock?
10 A.  We did.
11 Q.  You said "he" came to stay.  Who is "he"?
12 A.  Joshua Duggar.
13 Q.  So he came to stay with you and your husband while
14 you were in Little Rock?
15 A.  Yes, ma'am.
16 Q.  How come?
17 A.  Because we loved him.  And Caley and Josh still liked
18 each other and they were hoping to still be married one
19 day, so we wanted to give him that opportunity to be with
20 us and get to know him better and us be able to help him
21 if he had something he wanted to get off of his chest or
22 different ideas that he had had and temptations that he
23 wanted to confess, so we gave him that opportunity to be
24 that outlet for him.
25 Q.  In 2005, were you an elder of the church you were

```
 1  asleep because it would be in the evening after the
 2  children were in bed.
 3  Q.    In early 2005, when you say you had a conversation
 4  with Josh Duggar, is it your memory that your husband had
 5  fallen asleep whenever you had this conversation?
 6  A.    Yes, ma'am.
 7  Q.    So was it just you, as a family friend of Josh
 8  Duggar, and Josh Duggar having this conversation?
 9  A.    Yes, ma'am.
10  Q.    To be clear, there was no sort of clergical role that
11  you were fulfilling in having Josh Duggar at your home or
12  talking to him, is that --
13  A.    No.  Correct.
14  Q.    Can you please tell the Court what Josh Duggar told
15  you that evening?
16  A.    Yes, ma'am.  He was explaining the night of
17  March 30th, 2003, with Jane Doe Number 4, that during
18  Bible time, he had her sitting on his lap and he --
19  Q.    Mrs. Holt, there's some tissue behind you if you need
20  that.
21  A.    Thank you.  I'm sorry.
22  Q.    That's okay.  Take your time.
23  A.    While she was sitting on his lap, he put his hands
24  under her pantaloons and under her panties and he touched
25  her vagina.  And I asked him, I said, "Did you touch it?
```

1  Q.   Now, you testified that during this time period, this
2  was basically a home church, for lack of a better way of
3  putting it, correct?
4  A.   Correct.
5  Q.   And there were approximately how many families in
6  2003 and 2005 at the Bible Grace Fellowship Church?
7  A.   I don't remember.
8  Q.   Can you ballpark it for us?
9  A.   Six, seven, eight.  I'm not sure.
10 Q.   It was a small church?
11 A.   Yes.
12 Q.   You were there to witness some of the functions that
13 your husband, Jim Holt, performed as a church elder with
14 this church, correct?
15 A.   Describe "functions".
16 Q.   You understood what he did as a church elder,
17 correct?
18 A.   Yes.
19 Q.   This is a leadership role in the church, is it not?
20 A.   For him, yes.
21 Q.   It's a religious function within the church, is it
22 not?
23 A.   I'm not sure it would be considered a function.  I
24 mean, maybe I'm getting hung up on that word.
25 Q.   Fair enough.  I'll rephrase.  Maybe "function" is an

1  you don't remember here 15 years later, or whatever it is,
2  correct?
3  A.   Right.
4  Q.   18 years later, correct?
5  A.   Correct.
6  Q.   Now, I want to break this down for a second. You
7  testified that there's essentially two instances in which
8  you claim my client, Josh, made statements directly to you
9  about this subject matter, is that correct?
10 A.   Yes.
11 Q.   The first was on March 30th of 2003, correct?
12 A.   Correct.
13 Q.   And the second was this time on a date you don't
14 recall specifically in 2005, over the first couple of
15 months of 2005, correct?
16 A.   Yes.  Specifically -- about one person specifically.
17 But for the two years, it was off and on because we saw
18 each other every day.
19 Q.   What I'm asking you about, though, is you
20 testified -- if I heard your testimony correctly -- about
21 two specific statements, one in 2003 and one in 2005,
22 correct?
23 A.   Yes.
24 Q.   So let's talk about the March 30th, 2003, statement.
25 A.   Uh-huh.

```
 1  Q.  What is it word-for-word that you claim Josh said to
 2  you with respect to Jane Doe Number 4 in 2005?
 3  A.  He told me that while Jane Doe Number 4 was on his
 4  lap during Bible time, that he put his hands under her
 5  dress, under her pantaloons, under her panties, and
 6  touched her vaginal area.  And I asked him, "Did you put
 7  your fingers inside her vagina?"  And he said he did both,
 8  not just touch it, but put his fingers inside her vagina.
 9  Q.  Now, we have testified about this two-year time
10  period, essentially 2003 to 2005, correct?
11  A.  Correct.
12  Q.  Without getting into the details of anything, is it
13  fair to say that Jim Holt, your husband, regularly
14  counseled Josh during this time period?
15  A.  Yeah.  I would say yes.
16  Q.  So you testified to these essentially two -- your
17  word -- "confessions," quote, unquote, correct?
18  A.  Yes.
19  Q.  Now, when this all happened, who did you tell?
20  A.  I went to go tell Jim Bob and Michelle, but they said
21  they didn't want to hear it.
22  Q.  Who else did you tell?
23  A.  I told my husband.
24  Q.  Did you tell anyone else in the world?
25  A.  Did you say at this time?  Like during this time
```

```
 1  frame?
 2  Q.   Yes.
 3  A.   No.
 4  Q.   At some point, did that change?
 5  A.   Yes.
 6  Q.   When did you first tell someone other than your
 7  husband and the Duggars?
 8  A.   I can't remember.
 9            MS. MARSHALL:  Your Honor, I would object.
10            MR. GELFAND:  On what grounds?
11            MS. MARSHALL:  Relevance, Your Honor.  I'm not
12  sure why it matters who she told these statements.
13            THE COURT:  Well, it could be a foundation for
14  inconsistency, so overruled.
15  Q.   (BY MR. GELFAND)  You can answer the question.
16  A.   Can you repeat it?
17  Q.   Sure.  Let's be organized for a second.  You've
18  testified that you told the Duggars and your husband --
19  all of you all were involved in what you claim happened in
20  2003 and 2005, correct?
21  A.   Yes.
22  Q.   After that point, is there someone out of that circle
23  that you told Josh allegedly made statements to you, these
24  statements?
25  A.   It began to be aware -- people began to be aware of
```

```
 1    the statement that he made to you?
 2    A.   I mean, he didn't use that -- I don't remember
 3    exactly the wording that he used.
 4    Q.   But you stated that he had -- what did he state to
 5    you?  Go ahead.
 6    A.   I can't remember exactly how he said it.
 7    Q.   Okay.  But what do you remember him saying?
 8    A.   I can't recall exactly how he said it.
 9    Q.   But just a minute ago, you said that he came to you
10    and said that he had inappropriately touched them on the
11    breast while they were sleeping?
12    A.   Correct.  But he didn't say it in that exact -- I
13    don't remember exactly how he said it, but that was the
14    synopsis of what happened, yes.
15    Q.   So he made those statements to you.  What did you do?
16    A.   I mean, it's been, like, 18, 19 years ago, so I don't
17    remember exactly all the details.  I mean, it's been a
18    long time ago.  But, I mean, there was a -- there was kind
19    of a sequence of what we did as parents.  And, I mean, we
20    were shocked that this had happened, but we were thankful
21    that he came on his own and told us, because we wouldn't
22    have known had he not told us.  So my wife and I got
23    together and we -- you know, over a period of time there,
24    we ended up -- we eventually ended up calling the elder of
25    our church.
```

```
 1   A.   No.
 2   Q.   Do you remember talking to an investigator in 2006
 3   regarding this incident?
 4   A.   Well, we did eventually take Josh to the Arkansas
 5   State Police on the recommendation of Jim Holt, and Jim
 6   Holt went with me.
 7   Q.   But in 2006 --
 8   A.   And I'm not sure when that was.  We went and Josh
 9   confessed everything to the State Trooper.  Okay.  I'm not
10   sure if he made a police report or not, but that's what
11   happened.
12   Q.   Do you remember talking to an investigator in 2006 at
13   the Children's Safety Center in Springdale?
14   A.   We did go, yes, yes.
15   Q.   Do you remember telling that investigator that there
16   was an incident where someone was sitting on the lap and
17   had touched the breast and vaginal area?
18   A.   I can't remember.  I didn't write the police report.
19   I don't remember what was stated.  And I haven't read that
20   police report in many, many years.
21             MS. MARSHALL:  May I approach, Your Honor?
22             THE COURT:  You may.
23             MR. GELFAND:  Your Honor, can we approach, side
24   bar, please?
25             (Bench Conference)
```

```
 1   to yourself.
 2   A.   I don't know.  I don't know anything about that.
 3   Q.   Does that refresh --
 4   A.   I did not write the police report.  I don't know what
 5   all was put in that.  I don't know who put -- you know, I
 6   don't know what investigator.  You will have to bring them
 7   in and ask them.
 8   Q.   Does that refresh your recollection as to whether
 9   Josh Duggar told you that he had inappropriately touched
10   the vaginal area of Jane Doe 1, 2, 3, or 4?
11   A.   I don't know.  I don't remember.  I really don't
12   remember.  It's been many, many years ago and --
13           THE COURT:  There's no question on the table
14   right now.
15           THE WITNESS:  Okay.
16   Q.   (BY MS. MARSHALL)  Mr. Duggar, is it your testimony
17   under oath today that the only statements that Josh Duggar
18   ever made to you in regards to the inappropriate touching
19   on the breast or vaginal area of Jane Doe 1, Jane Doe 2,
20   Jane Doe 3, or Jane Doe 4 was that he inappropriately
21   touched their breast while they were sleeping?
22   A.   That's all I recall.
23   Q.   This wasn't a big event in your life that stands out
24   to you?
25   A.   That's all I recall.
```

```
 1                    C E R T I F I C A T E
 2
 3
 4         I, Paula K. Barden, CCR, RPR, RMR, Federal
 5   Official Court Reporter, in and for the United States
 6   District Court for the Western District of Arkansas, do
 7   hereby certify that pursuant to Section 753, Title 28,
 8   United States Code that the foregoing is a true and
 9   correct transcript of the stenographically reported
10   proceedings held in the above-entitled matter and that the
11   transcript page format is in conformance with the
12   regulations of the Judicial Conference of the United
13   States.
14         Dated this 30th day of November 2021.
15
16
17   _____
18   PAULA K. BARDEN, CCR, RPR, RMR #700
     Federal Official Court Reporter
19   Western District of Arkansas
20
21
22
23
24
25
```

