IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| JILL DILLARD; JESSA SEEWALD; JINGER VUOLO; and JOY DUGGAR | | PLAINTIFFS |
| V. | CASE NO. 5:17-CV-5089 | |
| CITY OF SPRINGDALE, ARKANSAS; WASHINGTON COUNTY, ARKANSAS; KATHY O'KELLEY, in her individual and official capacities; ERNEST CATE, in his individual and official capacities; and RICK HOYT, in his individual and official capacities | | DEFENDANTS |

## MEMORANDUM OPINION AND ORDER

Before the Court are two ripe Motions for Summary Judgment. The first (Doc. 137) was filed by Washington County, Arkansas; and Rick Hoyt, in his individual and official capacities (hereinafter, "the Washington County Defendants"). The second (Doc. 140) was filed by the City of Springdale, Arkansas; Kathy O'Kelley, in her individual and official capacities; and Ernest Cate, in his individual and official capacities (hereinafter, "the Springdale Defendants"). For the reasons explained below, both Motions are **GRANTED**.[1]

---

[1] In addition, Plaintiffs filed evidentiary objections to some of Defendants' facts, *see* Docs. 156 & 157. The Washington County Defendants then filed a Motion to Strike these objections (Doc. 165), and the Springdale Defendants filed a brief requesting that the Court overrule the objections (Doc. 169). Plaintiffs replied with an amended set of objections (Doc. 170), which appears to have addressed the arguments in the Washington County Defendants' Motion to Strike. Therefore, the Motion to Strike (Doc. 165) is **DENIED**.

1

## I.  BACKGROUND

Most of the material facts relevant to the issues on summary judgment are undisputed by the parties,[2] and the Court has relied on those agreed facts in resolving the dispositive motions.  However, the parties obviously dispute some of the remaining material facts, and those are stated and considered here in the light most favorable to Plaintiffs, who are the non-movants on summary judgment.

The Plaintiffs are Jill Dillard, Jessa Seewald, Jinger Vuolo, and Joy Duggar (now Forsythe).  They are adult sisters who hail from a very large, religious family. Though they are now married with families of their own, they once shared the last name "Duggar" and lived in a household with their mother, father, and many siblings.  This case involves what happened to Plaintiffs when they were children.

From approximately March of 2002 until March of 2003, the Plaintiffs were sexually abused by their brother, Joshua.  He was 14 years old when the abuse began and 15 years old when it ended.  At the time of the abuse, the Plaintffs ranged in age from 5 to 11 years old.  Their parents, Jim Bob and Michelle Duggar, discovered the abuse but did not report it to the police or any state agency.  Instead, they decided to keep it a secret and discipline Joshua privately.  Unfortunately, whatever Mr. and Mrs. Duggar tried to do to stop Joshua's behavior did not work, and by 2003, they turned to their closest friends, Jim and Bobye Holt, for advice and support. The Holts and Duggars were leaders in their

---

[2] First, the parties each filed their own, supposedly "undisputed," statements of fact. Then, they exhaustively responded to one another's statements of fact.  Then, they objected to one another's statements of fact. Then, they offered clarifications and subtle amendments to one another's facts, followed by "supplemental" facts in response.  They even went so far as to agree with the *substance* of one another's facts but disagree as to whether the *evidence* cited in support of a particular fact was exactly right.  All of this was exceedingly tiresome and of little assistance to the Court.

small religious community, which was composed of several families who shared the same beliefs and met at one another's homes for church services, which they called "gatherings." Once Mr. and Mrs. Duggar told Mr. and Mrs. Holt about Joshua's repeated abuse of his sisters, the relationship between the two families became strained.

For the next several years, it appears very few people outside of the Holt family knew the Duggars' secret. However, in 2003, the Holts' daughter, Kaeleigh, wrote a summary of what she had heard from her parents about the abuse in a letter to her favorite author. Instead of mailing the letter, she placed it in a book, which she left on her bookshelf. There the secret remained until 2006, when Kaeleigh loaned the book to a friend and fellow church member. Kaeleigh's friend found the letter and shared its contents with her parents. From that point on, the Duggars' family secret spread by word of mouth to the other members of their close-knit church community. It is unknown exactly how many church members learned of the abuse, but the news caused factions to form within the church, and certain church members evidently disagreed with how the matter was being handled.

On December 7, 2006, the Arkansas Department of Human Services Hotline received two tips that Joshua had molested his sisters. The first tip came from an anonymous caller to the Hotline. The second tip came from Harpo Studios, the producer of Oprah Winfrey's talk show. It seems the Duggars had caught the attention of the media at around that time because of their unusually large family. They were scheduled to appear on the Oprah Winfrey Show, and they had traveled to Chicago to record an episode. Harpo Studios received an anonymous email warning that the Duggars were "not what they seem[ed] to be" because Joshua had sexually abused his sisters. (Doc.

141-9, p. 20).[3] Harpo Studios faxed this email to the Arkansas Department of Human Services Hotline, and the same day, Sergeant Darrell Hignite of the Springdale Police Department opened a police investigation into the abuse allegations. Joshua was 18 years old at the time, but Plaintiffs were still minors. Jill, the oldest Plaintiff, was 15 years old, and Joy, the youngest, was 9 years old. Sergeant Hignite contacted Detective Garry Conner of the Washington County Sheriff's Department to request that the County assist the City in the investigation.

State Police Investigator Whitney Taylor called the Duggars and asked them to bring their children to the Children's Safety Center in Springdale to be interviewed about the Hotline reports. According to the redacted copies of the Springdale Police Report and the Washington County Incident Report, the Duggar family arrived at the Children's Safety Center on December 12, 2006, and Mr. and Mrs. Duggar, Joshua, and the Plaintiffs were interviewed by Investigator Taylor and Sergeant Hignite. Plaintiffs testified in their depositions that these investigators assured them that the contents of their interviews would remain confidential. The narrative summaries of each interview appear in the Springdale Police Report. *See* Doc. 141-9, pp. 21–37. Only the summary of the interview with Mr. and Mrs. Duggar appears in the Washington County Incident Report (Doc. 152-1). According to the Springdale Police Report, after the Duggar family was interviewed, Sergeant Hignite submitted a Family in Need of Services ("FINS") Affidavit to the Washington County Prosecutor's Office with instructions to open a FINS case. *Id.* at p. 39. On January 10, 2007, the Washington County Prosecutor filed the FINS petition in

---

[3] Kaeleigh testified at her deposition that the individual who called the Hotline and sent the email to Harpo Studios was a former member of the Duggars' and Holts' religious community. (Doc. 139-12, pp. 40 & 58).

4

the Juvenile Court of Washington County under case number J2007-38. Sergeant Hignite's affidavit and the 33-page Springdale Police Report were attached to the petition and became part of the juvenile court record. No criminal charges were ever brought against Joshua, nor were his sisters removed from the family home.

The following year, 2008, the Duggars began starring in a reality television series called "17 Kids and Counting." The name of the show was later changed to "18 Kids and Counting" and then "19 Kids and Counting" as the family grew. Once the show began airing nationwide, Mr. and Mrs. Duggar and all their children became minor celebrities.

On May 15, 2015, the City of Springdale and Washington County each received a Freedom of Information Act ("FOIA") request seeking all files, documents, notes, and recordings mentioning Joshua Duggar, his parents, or any of the addresses where the family had lived over the years. (Docs. 141-10 & 152-15). The requests had been sent by an Arkansas attorney named Abtin Mehdizadegan. He was representing a tabloid magazine called *In Touch Weekly* (though that fact was not revealed in the FOIA request). Neither the City of Springdale nor Washington County responded immediately to Mr. Mehdizadegan's request. In fact, both departments lost track of it and did not address it for several days. Under the Arkansas FOIA, governmental agencies typically have three business days to respond to a request. Ark. Code Ann. § 25-19-105(e).

On May 19, 2015, *In Touch Weekly* posted a "teaser" article on its website entitled, "'19 Kids and Counting' Son Named in Underage Sex Probe." The identities of Joshua's victims were not revealed directly or indirectly in the article. Also on May 19, Chief O'Kelley was first told about Mr. Mehdizadegan's FOIA request. She obtained a copy of the Springdale Police Report on the Duggar family so she could review it. That same

day, Sergeant Hignite of the Springdale Police Department received an email from NBC Universal inquiring about a police report on Joshua Duggar.  Sergeant Hignite forwarded the email to Chief O'Kelley.  She responded by email at 7:54 p.m., stating, "Oh Good Lord . . . we will soon be in the tabloids!"  (Doc. 152-6, p. 2).  Then, at 7:58 p.m., she sent the following email to Springdale Mayor Doug Sprouse:

> HERE IS AN INTERESTING TURN OF EVENTS FOR THE DUGGER [sic] FAMILY—WE ARE PREPAING TO REDACT AND RELEASE THE INVESTIGATION BUT THIS IS A NEW TWIST TO THE ORIGINAL REQUEST—NOW WE ARE HEADING TO THE TABLOID NEWS!

(Doc. 152-7, p. 2).  Chief O'Kelley also forwarded the email from Sergeant Hignite to separate Defendant Ernest Cate, who was—and still is—Springdale's City Attorney.  Chief O'Kelley asked Mr. Cate to be available to have "a conversation about this" the following day because she was "preparing to release the report . . . ."  *Id.*

On the morning of May 20, 2015, Mr. Cate and Chief O'Kelley met to discuss the FOIA request.  Mr. Cate agreed the police report should be released, provided that the names of the juvenile victims were redacted.  He did, however, seem to harbor some doubt about his decision—at least initially—because he "proceeded that afternoon to obtain as much legal advice and opinions as was [sic] possible on the FOIA Request."  (Doc. 141-1, p. 4).[4]  He asked Sarah Sparkman, the Deputy City Attorney, for her opinion, and she advised that it would be appropriate to redact the child victims' names and

---

[4] The summary judgment record is silent as to exactly what Mr. Cate told each of these advisors about the case before asking their opinions.  For example, Mr. Cate does not claim he showed anyone the actual police report, nor does he claim he supplied his advisors with the critical facts they would have needed to arrive at an informed opinion, namely, that the child perpetrator and child victims were from the same family and lived in the same household and that the police report noted the family would be referred to juvenile court on a FINS petition.

release the report.  Mr. Cate also asked Terra Stephenson, the juvenile prosecutor at the time, and based on what he told her about the case, her opinion was that the report should be released.  Mr. Cate then states he "attempted to contact the Arkansas Department of Human Services" to ask for advice, but no one from that agency called him back that day. *Id.*  Finally, he placed a telephone call that afternoon to Mark Hayes, the General Counsel of the Arkansas Municipal League.  According to Mr. Cate's memory of the call, he provided Mr. Hayes with "the relevant facts related to the FOIA Request and the SPD Offense Report," and Mr. Hayes responded that he believed the report would have to be redacted and released—but that he "would look further into the issue." *Id.* at p. 5.

Also on May 20th, Chief O'Kelley directed Captain Ron Hritz to reach out to Mr. and Mrs. Duggar and explain to them what was going on with the FOIA request.  Captain Hritz did this, but Chief O'Kelley had no direct contact with the Duggars.

At another point on May 20th, Chief O'Kelley telephoned Mr. Mehdizadegan and told him "SPD would need more time to comply" with his request because he sought such a wide variety of records. (Doc. 141-2, p. 5).  In response, according to Chief O'Kelley's declaration, "Mr. Mehdizadegan told [her] that he was only interested in the SPD Offense Report and not with any of the other records which would be responsive to this request." *Id.* City Attorney Cate and Chief O'Kelley then reviewed and redacted the report to make sure the names and ages of all the minors and Joshua had been removed.  Mr. Cate states that he and Chief O'Kelley "discuss[ed] that we would prefer to over-redact, rather than to under-redact, the report." *Id.* at p. 6.  The pair then learned that Doug Thompson, a local reporter from the *Arkansas Democrat-Gazette*, had heard about the Duggar police

7

report and was requesting a copy of it under the FOIA.  Chief O'Kelley telephoned Mr. Thompson to let him know she was redacting the report and would contact him later.

Just before 9:00 p.m. that same evening, May 20th, Chief O'Kelley emailed a final version of the redacted Springdale Police Report to both Mr. Mehdizadegan and Mr. Thompson.  She also sent a copy to Mr. Cate.

At 6:19 a.m. the next morning, May 21st, Mr. Hayes of the Arkansas Municipal League—believing the report had not yet been released—emailed his staff attorneys and directed them to review Mr. Mehdizadegan's FOIA request and the redacted police report, which he had attached, and advise whether the report should be disclosed under Arkansas law.  Attorney Amanda LaFever emailed him back on her way to work at 7:45 a.m., stating she was "[a]t a stoplight" but knew there were laws "protecting the identity of victims of sex crimes." (Doc. 152-10, p. 3).  By 9:01 a.m., Ms. LaFever had made it to the office, done some quick research, and composed and sent an email to Mr. Hayes advising him that documents that directly or indirectly identified the victim of a sex crime would not be subject to disclosure under the FOIA.  *Id.*  Ms. LaFever then forwarded her email to Mr. Cate, who forwarded it to Chief O'Kelley. Though Chief O'Kelley quickly reached out to Mr. Mehdizadegan to ask that he not use the redacted offense report she had sent him the night before, it was too late.  He had already forwarded it to his client.  That same morning, at 11:10 a.m., *In Touch Weekly* posted an online article entitled, "Bombshell Duggar Police Report:  Jim Bob Duggar Didn't Report Son Josh's Alleged Sex Offenses for More Than a Year."  The article reproduced the 33-page redacted Springdale Police Report.

Also on May 21st, the Washington County Sheriff's Department first learned of Mr. Mehdizadegan's FOIA request. Kelly Jensen, whose official title is "Enforcement Secretary," presented the request to separate Defendant Major Rick Hoyt, who was in charge of responding to such requests on behalf of the Department. Major Hoyt believed—without consulting the FOIA or any other legal materials—that Washington County's Incident Report on the Duggars should be disclosed. He admitted in his deposition that he reviewed the unredacted Incident Report for about ten minutes and then asked Ms. Jensen if there had been any arrests in the case. She said no. Then Major Hoyt looked at Joshua's current age (18) and decided he "didn't know of anything in the law that would let [him] not release this." (Doc. 152-4, p. 8). Major Hoyt's initial opinion was that the report should be released without any redactions. It appears he thought better of this decision after a while and told Ms. Jensen to "go back and take out the juvenile information," and then the report would be "good to go." *Id.*[5]

Major Hoyt went home that evening without reviewing the final redactions to the report. He had no idea that the same FOIA request had been sent to the Springdale Police Department and that Springdale had already sent a redacted report to Mr. Mehdizadegan. After Major Hoyt arrived home, he turned on the six o'clock news and saw a report about *In Touch Weekly*'s publication of the Springdale Police Report. The local news explained that Washington County Juvenile Judge Stacy Zimmerman entered an order that very day expunging the offense report from the public record to protect the

---

[5] Major Hoyt was asked in his deposition whether he was "aware" at the time he decided to release this report that "there were laws in Arkansas protecting victims who were minors . . . from their identities being disclosed." (Doc. 152-4, p. 19). He replied, "No." *Id.*

identities of the victims. That prompted Major Hoyt to make a series of phone calls to figure out if the Washington County Incident Report he had ordered released had already been mailed. He (or someone else in the Sheriff's Department) contacted the 24-hour dispatch unit and directed one of the officers on call to search the outgoing mail bin for the report. Unfortunately, the mail had already been picked up that day, and the bin was empty.

The following day, May 22nd, Judge Zimmerman called the Sheriff's Department and ordered that the report not be released. But once again, it was too late. Mr. Mehdizadegan received the redacted Washington County Incident Report in the mail on May 27 and forwarded it to his client. On June 3, *In Touch Weekly* published a follow-up article entitled, "Josh Duggar Chilling Molestation Confession in New Police Report," which reproduced the redacted Washington County Incident Report.

In general, the Springdale Police Report was redacted more heavily and more carefully than the Washington County Incident Report. Springdale's Chief O'Kelley and Mr. Cate redacted all the children's names and ages (including Joshua's) from the Springdale Police Report, although they did not redact Mr. and Mrs. Duggar's names and the family's home address. The Washington County Incident Report was shorter than the Springdale Report because it did not contain the interviews of Joshua and the Plaintiffs; however, the Washington County Report contained a summary of the interview of Mr. and Mrs. Duggar—which was not well redacted. One of the victim's ages was left unredacted in the Washington County Report; Joshua's name was disclosed once; and the child victims were variously referred to as Joshua's "sister[s]," Jim Bob's "daughter[s]," and, more generally, as "the girls in the family." (Doc. 152-1, p. 3). The Springdale Police

Report did not include all of these details, but a casual reader of the Springdale Report could, nevertheless, have discerned the following information about the victims: (1) they were sexually abused on multiple different occasions over the course of a year; (2) the abuse took place in the Duggar home; (3) the perpetrator of the abuse was Mr. and Mrs. Duggar's child, who lived in the home; and (4) the victims of the abuse were Mr. and Mrs. Duggar's children, who also lived in the home. (Doc. 141-9, pp. 21–37).

Plaintiffs maintain the publication of these two police reports caused them damage. The original complaint brought a large variety of claims against an array of private and public defendants. In the first round of dispositive motions, the Court winnowed the parties and claims subject to suit. (Doc. 62). On interlocutory appeal, the Eighth Circuit's *en banc* rulings further narrowed the field of claims. (Doc. 89-1).

As we now approach the scheduled trial, Plaintiffs are left with three remaining causes of action: invasion of privacy (intrusion upon seclusion), invasion of privacy (public disclosure of a private fact), and outrage. Defendants now seek summary judgment on all counts. Below, the Court will set forth the legal standard used to evaluate motions for summary judgment. Next, the Court will analyze whether Plaintiffs established genuine, material disputes of fact as to each of the three torts. Finally, the Court will consider whether Defendants are entitled to immunity for their actions under state law.

## II.  LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." On such a motion, the Court reviews the facts in the light most favorable to the opposing party and gives that

party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

If the moving party meets its burden, the non-moving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The non-moving party must instead produce sufficient evidence "such that a reasonable jury could return a verdict" in their favor. *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248).

### III.  DISCUSSION

#### A.  Invasion of Privacy (Intrusion upon Seclusion)

To prove intrusion upon seclusion, a plaintiff must establish:

> (1) that the plaintiff sustained damages; (2) that the defendant intentionally intruded physically or otherwise upon plaintiff's solitude or seclusion and believed or was substantially certain that the defendant lacked the necessary legal authority or personal permission, invitation, or valid consent to commit the intrusive act; (3) that the intrusion was of a kind that would be highly offensive to a reasonable person, as the result of conduct to which a reasonable person would strongly object; (4) that the plaintiff conducted himself or herself in a manner consistent with an actual expectation of privacy; and (5) that the defendant's intrusion was the proximate cause of the plaintiff's damages.

*Duggar v. City of Springdale*, 599 S.W.3d 672, 683 (Ark. Ct. App. 2020).

The record presents questions of fact for the jury as to four of the five elements. However, the Court finds that Plaintiffs have not presented any direct proof or reasonable inference that would place the second element of the tort in dispute, and for this reason, the entire claim must be dismissed. Element Two requires proof that Defendants "believed or w[ere] substantially certain that [they] lacked the necessary legal authority or personal permission, invitation, or valid consent to commit the intrusive act." *Id.* If the question is whether Defendants were ignorant of the law or grossly negligent in its application, the answer is: Absolutely. But that is not the question. The inquiry focuses on whether Defendants engaged in conduct which they knew (believed) to exceed the boundaries of their authority. Here, the proof and all reasonable inferences point to the opposite conclusion.

Although profoundly wrong about the law, Defendants were motivated by a belief that they were legally *obligated* to release these reports, and to do so quickly. By the time Chief O'Kelley from Springdale and Major Hoyt from Washington County discovered the existence of the FOIA requests, the three-day response deadline had already passed. Chief O'Kelley testified she was "embarrassed" that her department had missed the request and deadline, (Doc. 141-2, p. 5), and Major Hoyt testified that his first glimpse at the request revealed "we were over our limit of time." (Doc. 152-4, p. 8). It is undisputed that Defendants' actions were motivated by fear of possible legal consequences for a missed deadline. In other words, they worried exclusively about compliance with one part of the FOIA and failed to investigate the other parts (and other relevant state law). There

is no evidence of an alternate motivation for Defendants' actions that would show some consciousness of wrongdoing.

In their sudden rush to release the reports, Defendants failed to adequately investigate the applicable law. Neither report should have been released, even with redactions. The Arkansas FOIA is not all-inclusive, which is to say, other Arkansas statutes contain provisions that either expressly or effectively allow additional exemptions and exceptions to the FOIA. The individual Defendants were seasoned government officials tasked with the responsibility of deciding which governmental records should be publicly released and which should not. Yet all individual Defendants were seemingly ignorant of the privacy rights Arkansas affords to sexual assault victims and to families that are identified as "in need of services."

> Under Arkansas Code § 16-90-1104(b):
>
> A law enforcement agency shall not disclose to the public information directly *or indirectly* identifying the victim of a sex offense except to the extent that disclosure is:
>
> (1) Of the site of the sex offense;
> (2) Required by law;
> (3) Necessary for law enforcement purposes; or
> (4) Permitted by the court for good cause.

(emphasis added). In the instant case, even though the Springdale Police Report and Washington County Incident Report contained redactions, both reports quite obviously identified the victims of a sex offense. The redacted reports revealed that the victims were the minor children of Jim Bob and Michelle Duggar, that the perpetrator of the sexual

14

abuse was also a child of the same parents, and that the victims lived in the same home with the perpetrator.[6]

Moreover, the disclosure of the reports was not required by law. Because the Duggars were the subject of a FINS case, the police reports affiliated with that FINS case were specifically exempted from disclosure under the FOIA, pursuant to the Arkansas Child Maltreatment Act, which states:

> Any data, records, reports, or documents that are created, collected, or compiled by or on behalf of the Department of Human Services, the Department of Arkansas State Police, or other entity authorized under this chapter to perform investigations or provide services to children, individuals, or families shall not be subject to disclosure under the Freedom of Information Act of 1967, § 25-19-101 et seq.

Ark. Code Ann. § 12-18-104(a).

The Court finds that the two statutes quoted above—§§ 16-90-1104(b) and 12-18-104(a)—are clear and unambiguous. Nevertheless, the prima facie case requires more than mere ignorance of the law. To prove intrusion upon seclusion, Plaintiffs must present *not only* evidence of intentional intrusion *but also* evidence of the tortfeasor's culpable *mens rea*. There must be evidence that one or more Defendants had some awareness— whether a mere belief or a substantial certainty—that they lacked the legal authority to disclose these records. Plaintiffs failed to meet their burden. Because there is no evidence on which a jury could rely to show that Defendants believed that disclosing the reports would be illegal, this claim is **DISMISSED WITH PREJUDICE**.

---

[6] Both reports also listed the address where the abuse took place and the new address where the victims were residing when they were interviewed by the police.

### B. Invasion of Privacy (Public Disclosure of Private Fact)

There are very few cases in Arkansas that discuss this particular tort. Recently, however, the Arkansas Court of Appeals confirmed that Arkansas Model Civil Jury Instruction 422 correctly sets forth the elements. They are:

> (1) that [plaintiff] sustained damages; (2) that [defendant] made a public disclosure of a fact about [plaintiff]; (3) that prior to disclosure the fact was not known to the public; (4) that a reasonable person would find the disclosure highly offensive; (5) that [defendant] knew or should have known that the disclosed fact was private; (6) that the fact was not of legitimate public concern; and (7) that the public disclosure was the proximate cause of the plaintiff's damages.

*Duggar*, 599 S.W.3d at 684.

After reviewing the summary judgment record, the Court finds there are genuine, material disputes of fact as to each element of this tort. As explained above, Defendants did not know the disclosed facts were private—in the sense that Defendants incorrectly believed the FOIA laws required disclosure to the public upon request. However, in contrast to the tort of intrusion upon seclusion, public disclosure of a private fact does not require evidence of a culpable *mens rea*. The tort may alternately be proved by showing Defendants should have known the law and were negligent in releasing private facts about Plaintiffs that were not of legitimate public concern.[7]

Despite the fact that Plaintiffs have met their evidentiary burden to survive summary judgment, this claim is, nonetheless, subject to dismissal due to Defendants' statutory immunity. In *Trammell v. Wright*, the Supreme Court observed—generally—

---

[7] Here, the Court specifically distinguishes facts about *Plaintiffs* from facts about *their brother*. Defendants have repeatedly conflated the two sets of facts in their summary judgment briefing. *See, e.g.,* Doc. 138, p. 21; Doc. 142, p. 19. Plaintiffs, unlike their brother, were juvenile victims of sexual assault, and any facts that indirectly identified them were private under the law.

that Arkansas Code § 21-9-301 provides state actors "with immunity from civil liability for negligent acts, but not for intentional torts." 489 S.W.3d 636, 639 (Ark. 2016) (citing *Deitsch v. Tillery*, 833 S.W.2d 760 (1992)). In the case at bar, there is no evidence from which a trier of fact could conclude any Defendant knew that the law prohibited disclosure of facts contained in the police reports and, despite such knowledge, released the reports anyway with the intent to cause harm. Instead, all facts point to Defendants' negligence— or perhaps recklessness.

According to the Arkansas Supreme Court, an intentional tort "involve[s] consequences which the actor believes are substantially certain to follow his actions." *Miller v. Ensco, Inc.,* 692 S.W.2d 615, 617 (Ark. 1985). In *Williams v. Pate*, the Arkansas Court of Appeals reasoned that even when a wrong is

> categorized as an "intentional" tort, an analysis of the application of qualified immunity does not stop with that determination. Simply because an actor's conduct satisfies the type of intent necessary to establish [a tort], it does not follow that the same conduct is necessarily an intentional act that bars application of the doctrine of qualified immunity.

463 S.W.3d 734, 737 (Ark. Ct. App. 2015). For example, in *Williams*, a school district's employees cut down trees adjacent to the school district's property. It turned out that the trees rightfully belonged to private landowner Dorothy Williams. The case was ultimately dismissed on summary judgment because Ms. Williams could not point to facts to show the school's employees had "any knowledge that they were trespassing on [her] property" or "that she objected to the trespass while it was occurring." *Id.* at 737. Arguably, the school district should have surveyed the land before cutting down trees, and the court found that the district's failure to do so "may be considered evidence of negligence." *Id.* However, since Ms. Williams "offered no proof to support [an] allegation" that the school's

employees "deliberately failed to conduct a survey so that they could claim ignorance later," the district was entitled to immunity on summary judgment because its employees trespassed, at most, negligently—and not intentionally. *Id.* at 737–38.

Trespass, like invasion of privacy, is ordinarily considered an intentional tort; but, as illustrated in the *Williams* case, a tortfeasor's actual conduct may meet the elements of a tort and yet not qualify as "intentional." In the instant case, when Defendants moved to dismiss under a Rule 12(b)(6) standard, the Court found Plaintiffs had plausibly alleged that Defendants disclosed certain facts they knew to be private. *See* Doc. 62, pp. 21–22. Now that discovery has concluded, however, and the Court is presented with proof, rather than mere allegations, it is clear that Plaintiffs have no evidence to demonstrate Defendants' knowledge that the facts at issue were (legally) private. Plaintiffs have not come forward with evidence to satisfy Arkansas's definition of an intentional tort. *Miller*, 692 S.W.2d at 617. Defendants are immune from civil liability for unintentional torts under § 21-9-301, and for that reason, this claim is **DISMISSED WITH PREJUDICE**.

### C.  Outrage

To establish a prima facie case of outrage, Plaintiffs must meet the following four elements:

> (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Rees v. Smith*, 301 S.W.3d 467, 471–72 (Ark. 2009).

18

### *1. Plaintiffs Have Not Created Triable Questions of Fact*

The first element requires evidence that Defendants "intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of [their] conduct." *Id.* As discussed above, there is no evidence that Defendants intended to inflict emotional distress. Rather, the evidence shows that Defendants were attempting to conceal (not reveal) Plaintiffs' identities by redacting their names from the police reports. The Court is skeptical that a state actor could intend to inflict emotional distress and at the same time believe he was complying with the law—regardless of how his resulting professional negligence might affect others.

Plaintiffs have also failed to present proof that Defendants' *conduct* was "extreme and outrageous." The second element here is not focused on whether the salacious nature of Plaintiffs' personally private information in the hands of a tabloid publisher is extreme and outrageous. Instead, the question is whether the Defendants' conduct along the way was extreme and outrageous. The Defendants' mistaken release of exempt information—while attempting to comply with the FOIA laws they were legally tasked to administer—was profoundly negligent, but negligent conduct is not the sort of conduct that Arkansas law views as "beyond all possible bounds of decency, and utterly intolerable in a civilized community." *Id.*; *see also Dowty v. Riggs,* 385 S.W.3d 117, 120 (Ark. 2010) (Arkansas does not recognize a cause of action for mere negligent infliction of emotional distress, even where the perpetrator is incompetent).

Likewise, Plaintiffs failed to satisfy the fourth element of the tort, which requires proof of unendurable emotional distress. To be sure, Plaintiffs' deposition testimony (Docs. 141-3–141-6) confirms they all suffered emotional distress as a result of these

19

events, but not to the severe degree necessary to satisfy the tort. *See Coombs v. J.B. Hunt Transport*, 388 S.W.3d 456, 463 (Ark. Ct. App. 2012) (finding that "discomfort, upset, embarrassment, anxiety, loss of sleep, and depression do not meet the 'mental distress' element of the tort of outrage").

### 2. Statutory Immunity

Second, assuming there is sufficient evidence on the first element to establish that Defendants "should have known" that emotional distress was the likely result of releasing these police reports, and further assuming there are disputed material facts as to the second and fourth elements, the Defendants are nevertheless entitled to summary judgment because they are immune from liability. The Court refers the reader to and incorporates by reference its earlier discussion of statutory immunity. *See supra*, Section III.B. This type of negligent conduct fails to satisfy the definition of an intentional tort under Arkansas law, and Defendants are entitled to statutory immunity for their unintentional conduct.

This claim is therefore **DISMISSED WITH PREJUDICE**.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motions for Summary Judgment (Docs. 137 & 140) are **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE**, and judgment will enter concurrently with this Order.

**IT IS SO ORDERED** on this 9th day of February, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE